UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re NOKIA CORPORATION SECURITIES LITIGATION | : | Civil Action No. 1:19-cv-03509-ALC |
| | : | CLASS ACTION |
| This Document Relates To: | : | |
| ALL ACTIONS. | : | |

**CONSOLIDATED AMENDED COMPLAINT**
**FOR VIOLATIONS FOR THE FEDERAL SECURITIES LAWS**

Lead Plaintiff, Judge Clyde W. Waite (Ret.) ("Lead Plaintiff"), by his undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to himself and upon belief based on the investigation of Lead Plaintiff's attorneys as to all other matters, which included, among other things, a review and analysis of the Defendants' public documents, conferences and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases by Nokia Corporation ("Nokia" or the "Company"), analyst reports, industry reports, and other publicly available information. Lead Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired Nokia's American Depositary Shares ("ADSs")[1] between April 27, 2017 and March 21, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. This action arises from Defendants' materially false and misleading statements and omissions concerning the progress of Nokia's integration of its recently-acquired subsidiary, Alcatel-Lucent S.A. ("Alcatel" or "Alcatel-Lucent"). During the Class Period, Nokia and its Chief

---

[1] An ADS represents ownership in a security issued by a foreign company in foreign markets. *See Edward F. Greene, et al., U.S. Regulation of the International Securities and Derivatives Markets* 2-19 (9th ed. 2009). Generally, a depositary institution, typically a U.S. bank, has custody of the foreign security, and issues the ADS certificate to an investor in the United States. *See id.*

Executive Officer ("CEO"[2]) assured investors that the Company had successfully completed and was moving "***beyond the integration***"[3] of Alcatel. This action likewise arises from Defendants' numerous statements concerning Nokia's and Alcatel's adherence to standards of legal and ethical compliance and reporting, including that "***Nokia managers and leaders are compliance stewards for their organizations: they own the culture of compliance***."

3. On March 21, 2019 – almost ***two years after*** Defendants declared that the Company had moved beyond the Alcatel integration – the Company announced that it had identified "compliance issues" at Alcatel ***during the integration***. The disclosure of these compliance issues stunned the marketplace, which believed and relied on Defendant's mid-2017 announcement that "***the integration of Alcatel-Lucent [is] behind us***." Explained one securities analyst on March 25, 2019: "[I]t is a bit strange to see such compliance issues emerging today, since Nokia completed the acquisition of [Alcatel] more [than] three years ago."

4. The successful integration of Alcatel into Nokia's business was highly material to investors and a critical focus of the Company's operations during the Class Period. The Alcatel acquisition was indispensable to Nokia's ability to compete in fifth generation wireless communications (also called "5G") and a seamless integration of Alcatel was, therefore, a matter of paramount importance to both the Company's leadership and investors. Moreover, because Nokia had experienced significant difficulties integrating previous ventures, the market was uniquely concerned about the Company's ability to carry out the Alcatel integration effectively. Further, the market was particularly wary of any compliance issues at Alcatel because of that company's history

---

[2] In addition to CEO, this complaint uses abbreviations for the titles of other senior corporate officers, including Chief Financial Officer ("CFO"), Chief Legal Officer ("CLO") and Chief Operating Officer ("COO").

[3] Unless otherwise indicated, all emphasis herein has been added.

of serious compliance and criminal law violations – including its involvement in an international bribery scheme leading to one of the largest settlements in history with the U.S. Department of Justice ("DOJ") for violations of the Foreign Corrupt Practices Act ("FCPA"). Indeed, Alcatel's deferred prosecution agreement with the DOJ related to these earlier violations came to an end in February 2015 – just two months before Nokia announced the Alcatel transaction.

5. Given these concerns, defendant Rajeev Suri ("Suri"), Nokia's CEO, provided regular updates on the progress of the integration and ***repeatedly assured investors that he was personally involved in the integration process***. Defendant Suri insisted on an extremely rapid integration process and established an elite dedicated team to carry it out. Defendant Suri was a self-described "permanent attendee" of the team's meetings, which, according to Suri, provided "granular visibility" into the progress of the integration. This elite integration team was led by members of Nokia senior management who reported directly to Suri and whose compensation was tied expressly to the smooth and speedy completion of the Alcatel integration, creating a financial incentive to claim a successful integration and conceal or recklessly disregard any compliance issues identified during the course of the integration.

6. These and other facts detailed herein raise a strong inference that Defendant Suri knew or recklessly disregarded that the Company was not "moving beyond" the Alcatel integration as he claimed and/or that, to the contrary, the Company had identified compliance issues at Alcatel during the integration. The facts alleged herein likewise support a strong inference that the Company – to which the knowledge of its senior executives is attributed, including those responsible for the Alcatel integration – knew or recklessly disregarded that the integration had not been successfully completed and/or that the Company had identified compliance issues at Alcatel during the integration.

7. When the truth was finally revealed, the price of Nokia's ADSs plummeted by nearly 10% in the days following this announcement before closing at $5.69 per ADS on March 28, 2019, down from a Class Period high of $6.65 on May 23, 2017, resulting in a market capitalization loss for investors of over $3 billon. Thus, Lead Plaintiff and other Class members have suffered significant losses and damages resulting from Defendants' false and misleading statements. This action seeks to recover those damages.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

10. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Nokia securities trade on the New York Stock Exchange ("NYSE") located within this District.

11. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

12. As set forth in its previously-filed certification, Lead Plaintiff purchased Nokia ADSs during the Class Period, and has been damaged thereby.

13. Defendant Nokia is a network and technology company that provides hardware, software, and services for telecommunications operators and enterprises and provides fixed networking solutions. Nokia is incorporated under the laws of Finland with its principal executive offices located in Espoo, Finland. Nokia's ADSs or "shares" trade on the NYSE under the symbol "NOK."

14. Defendant Suri has served as Nokia's President and CEO since May 2014.

## IV. FACTUAL ALLEGATIONS: NOKIA ACQUIRES ALCATEL AND CLAIMS TO RAPIDLY MOVE BEYOND THE INTEGRATION

15. On April 15, 2015, Nokia announced plans to purchase Alcatel. The Company made this announcement in a press release entitled "Nokia and Alcatel-Lucent to Combine to Create an Innovation Leader in Next Generation Technology and Services for an IP Connected World." The press release indicated that Nokia and Alcatel-Lucent had entered into a memorandum of understanding under which Nokia would acquire all outstanding Alcatel shares through a public exchange offer. The combined company would continue to be called "Nokia Corporation" and would continue to be headquartered in Nokia's headquarters in Finland. Defendant Suri would continue as the CEO of the newly combined Company, which would have a board of directors with members from both legacy Nokia and Alcatel boards.

16. The Nokia-Alcatel transaction was intended to enable the Company to compete in 5G. 5G is the next generation of wireless cellular network technology, capable of significantly greater data speeds than earlier wireless networks. The 5G rollout is currently underway worldwide.[4] Since

[4] For example, 5G networks first began to become available within parts of this District during 2019, one of the first 5G rollouts in the United States. The first country to adopt 5G on a large scale is South Korea, where 5G networks only became available in April 2019.

early 2015, preparation for the coming transition to 5G has been the focal point of the telecommunications industry.

17. Although Nokia was historically focused on wireless service, 5G requires a combination of wireless capabilities with physical networking capabilities and infrastructure that Nokia did not have. As a result, unlike its major competitors Ericsson and Huawei, Nokia was unable to compete in 5G alone. Alcatel had the networking capabilities and infrastructure necessary to enable Nokia to contend with the approaching 5G transition. Nokia's 2016 acquisition of Alcatel gave the Company the combination of wireless and networking assets and expertise essential to compete in the race to 5G.

18. In light of the impending launch of 5G, Nokia's rapid integration of Alcatel was the single most important operational priority carried out by the Company during (and in the lead-up to) the Class Period.

19. But Nokia's acquisition of Alcatel raised significant concerns regarding the Company's ability to integrate Alcatel into Nokia's operations. These concerns were heightened by both companies' past failures to successfully and timely integrate acquisitions and joint ventures. Nokia had experienced severe difficulties integrating its operations with those of Siemens AG ("Siemens") in connection with the creation of "Nokia Siemens Networks" – a venture that took over six years to integrate and was widely regarded as a business integration failure. Notably, Defendant Suri first became Nokia's CEO because of his efforts to rescue the failing Nokia-Siemens integration, which he did by creating a team dedicated to carrying out the integration process and working personally with that team (an approach he would implement again for the Nokia-Alcatel integration). Alcatel likewise had significant problems integrating its Lucent acquisition, suffering over $10 billion in losses in the process.

20. Defendant Suri was determined to avoid the same problems that had plagued these earlier business integrations. According to *Bloomberg*, Suri "didn't want to repeat the mistakes of past mergers at the two network suppliers that dragged on for years and led to billions in losses." Defendant Suri acknowledged these concerns directly during Nokia's Annual General Meeting on May 5, 2015, just a few weeks after Nokia announced the transaction. At that event, Suri said:

> Those of you who have been following the transaction news have, I am sure, seen people raise concerns about execution risk. Given the issues associated with similar transactions in the past, that is a very fair concern. But, I do believe that this time can be different.

21. That difference would come largely from Defendant Suri's signature management methodology, which he called the "Nokia Business System." Suri first introduced the Nokia Business System ("NBS") in a letter to Nokia employees when he ascended to the position of CEO in 2014. As explained in that letter, one of his priorities as CEO was "to develop and implement a 'Nokia Business System' that can be applied consistently across the company, as well as to any possible future acquisitions." As he explained, that "system will include . . . focused M&A and integration practices[.]"

22. Consistent with NBS, Suri immediately created a discrete committee to plan the Alcatel integration and report directly to him. On April 17, 2015, Nokia issued a press release announcing the creation of an Integration Steering Board that would "provide the structure, processes and working team needed to set up the required plans for the combined company." The announcement indicated that Jorg Erlemeier had been appointed as the Integration Planning Head and "[i]n this role, which will take effect immediately, ***he will report to Nokia President and CEO, Rajeev Suri***." Thus, from the initial planning phases of the integration, Defendant Suri ensured that he would be kept directly informed. Mr. Erlemeier has since been promoted to (and currently serves as) Nokia's COO.

23. At the May 5, 2015 meeting, Suri emphasized the "Nokia Business System, or 'NBS,' which defines the . . . processes that will be used at group level [*i.e.*, at the level of Nokia senior management] to govern our business portfolio and performance." As Suri explained, NBS "covers our . . . end-to-end mergers and acquisition process" – including the Alcatel integration. Suri went on to articulate why the Alcatel integration would be different from past integration failures and could advance rapidly:

> [I]t is an acquisition by Nokia, with clarity in terms of leadership and governance. This will allow us to move fast, to avoid politics, and to show that history does not have to repeat itself. Both companies – Nokia and Alcatel-Lucent – have been through significant recent transformation and restructurings, and both have learned from those experiences. We have already appointed an integration leader, and are moving fast to get detailed planning underway.

24. Those details included the "Integration and Transformation Board" (the "Integration Board") an exclusive team dedicated to the Alcatel integration and led by senior executives reporting directly to Defendant Suri, who would later describe himself as a "***permanent attendee***" of its meetings. The Integration Board was chaired by Marc Rouanne, Nokia's then-Chief Innovation and COO, who reported directly to Defendant Suri. Thus, in a regulatory filing in France, Nokia described this "clear governance structure for the execution of the integration" in which the head of the integration process "***reports directly to Rajeev Suri***, President and Chief Executive Officer of Nokia."

25. Suri then required the Integration Board to carry out the Alcatel integration in an exceptionally rapid time-frame. As *Bloomberg* reported, Defendant Suri demanded an integration "pace [that] was extreme even for the fast-moving world of technology." Further, Suri "sped along the . . . integration by limiting the team of people on the project to fewer than 100, versus the thousands he says were involved at Nokia Siemens."

26. At the same time, the Company established compensation incentives for Suri and other members of Nokia's "Group Leadership Team" to carry out the integration rapidly and to overcome (or overlook) any impediments to a seamless integration. Nokia's Group Leadership Team consists of the Company's senior-most executives. According to the Company, the Group Leadership Team is "responsible for the operative management of Nokia." The Group Leadership Team is chaired by the Company's CEO and President – *i.e.*, by Defendant Suri. At the time Nokia announced the Alcatel transaction, the Group Leadership Team consisted of twelve members, including the Company's CEO, CFO, COO, CLO, and other senior officers. In January 2016, Nokia confirmed the new membership of the Group Leadership Team, which would now include legacy Nokia and Alcatel executives. At all relevant times, Marc Rouanne ("Rouanne") (Nokia's COO) and Maria Varsellona ("Varsellona") (Nokia's CLO) sat on the Group Leadership Team. Along with Defendant Suri, Rouanne and Varsellona were the Nokia executives principally responsible for carrying out the Alcatel integration on Suri's behalf. Both Rouanne and Varsellona have since departed the Company.

27. The members of the Group Leadership Team all received incentive compensation – in the form of restricted stock units – tied specifically to the success of the Alcatel integration. Specifically, Defendant Suri was awarded 208,700 restricted shares, worth €986,942 on the grant date in 2016. The other twelve members of the Group Leadership Team were granted a total of 1,015,100 restricted shares, valued at €4,800,408 on the grant date. All of these grants were set to vest in three equal tranches on October 1st of 2017, 2018, and 2019 and were tied expressly to targets related to the smooth and speedy integration of Alcatel.

28. On January 14, 2016, Nokia announced that Nokia and Alcatel-Lucent had begun operations as a single company. The Company made this announcement in a press release entitled

"Nokia celebrates first day of combined operations with Alcatel-Lucent." According to the release, the announcement "mark[ed] the completion of Nokia's latest transformation and the creation of a global leader in technology and services for an IP connected world." Contemporaneously, the Company installed its own nominees as the new majority of Alcatel's board of directors. These new Alcatel board members included Defendant Suri and CLO Varsellona, as well as two other members of the Group Leadership Team (including Nokia's CFO and the President of its Mobile Networks division) and Risto Siilasmaa, the Chairman of Nokia's board of directors.

29. In addition to installing a new board and new Group Leadership Structure, on January 8, 2016, Nokia and Alcatel adopted a Master Services Agreement and Framework Agreement (together, the "MSA")[5] to facilitate the integration of Nokia and Alcatel. The MSA established Nokia's complete control over Alcatel, its operations, and, most importantly, its compliance processes. It accomplished this by designating Nokia's CLO, Maria Varsellona, as the head of the compliance organization for both companies. All legal and compliance-related issues were channeled directly to Ms. Varsellona, who, in turn, would "advis[e] the President and CEO, Board of Directors and officers of the company in relation so such matters."

30. On November 2, 2016, Nokia announced that it had completed the Alcatel-Lucent transaction. The Company made this announcement in a press release entitled "Nokia finalizes its acquisition of Alcatel-Lucent, ready to seize global connectivity opportunities."

31. Approximately two weeks later, on November 15, 2016, Nokia hosted its Capital Markets Day conference for investors and analysts. During this conference, Defendant Suri

[5] The MSA is available at https://www.sec.gov/Archives/edgar/data/886125/000119312516572951/d130996dex43.htm and https://www.sec.gov/Archives/edgar/data/886125/000119312516572951/d130996dex44.htm. These agreements are incorporated by reference herein.

described the status of the Company's integration process and provided details about his plan to complete it effectively. In so doing, Defendant Suri further described the role that his Nokia Business System played in the integration. According to Defendant Suri, NBS is "core to our culture and to how we operate" and responsible for Nokia's "operational excellence." As he explained:

> Plans are good. But without the ability to execute, they are worth less than the paper on which they are printed. We have seen the perils of poor execution in this industry time and time again, and we are intent on avoiding that bump. As a result, we have created what we call the Nokia Business System, or NBS, to formalize the disciplined way that we run the company. NBS provides a consistent framework for key areas that span across all our business groups, investment optimization, performance management, continuous improvement, and talent management.

32. Defendant Suri provided specific details concerning the Company's use of the Nokia Business System to manage all aspects of the Alcatel-Lucent integration. Suri explained that NBS is a "structured governance process with a high degree of granular visibility into the business" and that it "give[s] us visibility to our progress and confidence that we can achieve our goals." As he explained:

> [C]onsider how we are managing the integration of Alcatel-Lucent, where we have adopted the model used in the earlier transformation of Nokia Siemens networks. Rather than mingling the day-to-day operations of the business with integration activities, we have a separate structure in place that focuses on driving defined programs, guided by the [I]ntegration and [T]ransformation board.
>
> ***I am [a] permanent attendee of these sessions***, which are chaired by Marc Rouanne, our Chief Innovation and Operating Officer.

33. On February 2, 2017, Nokia conducted a conference call with securities analysts in which Defendant Suri provided another update on the progress of the Alcatel integration. According to his statements at this conference call, the integration was nearly complete at that time. As Defendant Suri stated: "[W]e have completed the integration projects related to Alcatel-Lucent with the exception of a small handful of long-tail efforts." Defendant Suri also described his satisfaction with the progress of the integration, the majority of which had already been completed: "I will be the

first to tell you that I'm pleased we have all of the main integration work behind us, because now we can get on with it."

34. On April 27, 2017, Nokia first claimed that it had moved beyond the integration. On that date, Nokia conducted a conference call with securities analysts. During this conference call, Defendant Suri announced for the first time that Nokia had moved beyond the integration of Alcatel. Defendant Suri began his remarks by stating that the Company's "results showed our improving business momentum and that we are ***effectively moving beyond the integration effort*** for 2016 to making 2017 a year of execution and performance." He went on to describe "the power of our end-to-end portfolio" and that he was "pleased, even if not fully satisfied, both with where we landed in Q1 and with our operational momentum as we head into the rest of the year." He concluded his remarks by once again assuring investors that the Alcatel integration had been accomplished and that the Company was moving on to its next operational priorities. Suri further stated:

> [O]f course, we are not complacent. We know we have some challenges in select business groups, and we are very focused on addressing those issues. And with the actions we have underway, I am confident that we can get those businesses back on track. ***With the integration of Alcatel-Lucent behind us, we are committed to building on that platform and to making 2017 a year of execution and performance***.

35. The market welcomed the news that the integration was finally complete. On May 7, 2017, for example, a Canaccord analyst wrote that "[w]ith Nokia's operations now integrated with Alcatel Lucent, a strong balance sheet, and improved cost structure, we believe the company is well positioned for improving industry trends longer term." Likewise, an analyst at Liberium observed in a May 23, 2017 reported that "[t]he issues related to the integration with Alcatel Lucent seem to be largely in the past[.]" And in a June 9, 2017 report, a Barclays analyst expressed his belief that "following the conclusion of the initial [Alcatel-Lucent] integration . . . expectations should now be

clearer." Finally, in a June 14, 2017 report, a Societe Generale analyst lauded Nokia for "a very successful integration of [Alcatel-Lucent]."

36. On October 25, 2018, Nokia's CFO confirmed Defendant Suri's assertion that the Company had completed the Alcatel integration and had progressed to post-integration cost cutting measures. As the CFO stated: "We have now gone through, one could say, one phase of cost optimization ***after the Alcatel-Lucent integration***, ***and we are now moving into the next phase***."

## V. FALSE AND MISLEADING STATEMENTS AND OMISSIONS

37. On April 27, 2017, during a conference call with investors and analysts, Defendant Suri stated that "we are effectively moving beyond the integration" and that "the integration of Alcatel-Lucent [is] ***behind us***," and that the Company was turning its attention away from the integration efforts stating, in pertinent part, as follows:

> Thank you, Matt, and thanks to all of you for joining our Q1 results call. Nokia's first quarter results showed our improving business momentum and that ***we are effectively moving beyond the integration effort*** for 2016 to making 2017 a year of execution and performance.
>
> * * *
>
> Thanks, Matt and Kristian, and thanks again to all of you for joining. I'd like to close with just a few thoughts. We are pleased with the Q1 performance we delivered and with the progress we are making to put our strategy into action. Whether it's deepening and widening our footprint with communication service providers, launching new innovations, adding customers and new vertical markets, enhancing our software offerings, stabilizing our top line or progressing with our cost savings. But of course, we are not complacent. We know we have some challenges in select business groups, and we are very focused on addressing those issues. And with the actions we have underway, I am confident that we can get those businesses back on track. ***With the integration of Alcatel-Lucent behind us, we are committed to building on that platform and to making 2017 a year of execution and performance.***

38. Not only did Nokia announce that it had successfully moved beyond the Alcatel integration, but the Company also told investors that it had already completed the first phase of post-

integration cost-cutting and was "moving into the next phase." During an analyst conference call on October 25, 2018, the Company's CFO stated that: "We have now gone through, one could say, one phase of cost optimization ***after the Alcatel Lucent integration***, ***and we are now moving into the next phase***."

39. The statements referenced above were materially false and misleading when made, and omitted to disclose material information necessary to make those statements not misleading because they falsely conveyed that the risks associated with the Company's integration efforts were behind it. In fact, the Company had learned of material compliance issues at Alcatel that would have to be reported to regulatory authorities and which the Company later admitted "could result in potential criminal or civil penalties . . . which could have a material adverse effect on [Nokia's] business, brand, reputation, or financial position."

40. In announcing that the Company had successfully moved beyond the integration, the Company conveyed to the market that it had brought Alcatel fully into the Company's operations, governance, and internal reporting mechanisms. These included Nokia's Code of Conduct, which, according to Defendant's Suri's introduction, was "a vital part of our work and of everything we do."[6]

41. This Code of Conduct expressly "outlines our commitment to act compliantly and ethically in our business activities." In this regard, the Code of Conduct assured investors that: "We follow the laws of the countries where we do business, and we adhere to Nokia's policies and procedures."

---

[6] At all times during the Class Period, the Code of Conduct was published on the Company's website and disclosed to the investing public. The Code of Conduct was amended during 2018. All language from the Code of Conduct cited herein was disclosed as part of every version of the Code of Conduct that existed throughout the Class Period.

42. The Code of Conduct also set forth specific "policy statements" describing compliance standards concerning numerous areas of ethical and/or legal compliance, including "Improper Payments;" "Conflict of Interest;" "Dealing with Government Officials;" "Working with Suppliers;" "Trade Compliance;" "Insider Trading;" and "Controllership."[7] The Code of Conduct assured investors that any non-compliance with the Code of Conduct was reported promptly: "We hold each other accountable to this Code, and if we become aware of potential violations, we promptly report them."

43. The Code of Conduct also emphasized the direct and critical role that senior management played in ensuring ethical and legal compliance:

> ***Nokia managers and leaders are compliance stewards for their organizations: they own the culture of compliance***. Thus, leaders and managers have additional responsibilities to engage actively with their teams and create an effective culture of compliance in their organizations. This means that managers must:
>
> - Know and anticipate business compliance risk areas that would affect your team operations;
> - Take proactive steps to mitigate risks that may affect team operations and ensure your team is trained to deal with them;
> - Communicate regularly with your team about the importance of compliance;
> - Emphasize the value of reporting potential compliance concerns promptly and foster an environment of open reporting;
> - Ensure that employees feel comfortable raising concerns with no fear of retaliation;
> - Reward and recognize employees who go above and beyond with respect to compliance;

[7] The Code of Conduct describes "Controllership" as "complying with the applicable laws and regulations that govern its financial accounting and reporting to government agencies, investors and the public."

- Allocate appropriate resources to ensure compliance and set goals to track compliance;
- Hire and promote only those people who have high standards of integrity;
- Participate actively and meaningfully in the compliance process and governance for the company;
- Demonstrate visibly – through your own words and actions – your personal commitment to the Nokia Code of Conduct and its policies.

44. To bolster this "compliance stewardship" by Nokia's senior leadership, the Code of Conduct imposed an obligation on all Nokia employees – including the Company's former Alcatel employees – to report any compliance concerns and provided details concerning the Company's well-developed procedures for reporting compliance concerns up the management chain. As stated in the Code of Conduct, all Nokia employees must "[p]romptly raise any and all compliance concerns through one of the channels provided by the business[.]" Further, the Code of Conduct described these thorough reporting procedures:

> Nokia provides multiple ways to raise a concern. You may talk to your line manager, Legal & Compliance, HR or Local Ombuds Leaders. The Ombuds Leaders serve as a neutral and confidential channel for discussing ethics questions and concerns. You may also write to our CEO or our Board. All concerns are handled confidentially.

45. The Code of Conduct also explicitly recognized the importance of compliance to the Company's shareholders: "[O]ur shareholders expect us to do business the right way – by earning, through lawful and ethical competitive advantages, a sound return on their investments." Similarly, the Code of Conduct recognized that: "Violations of our Code of Conduct erodes the trust we have built with our shareholders, customers and other stakeholders."

46. The statements referenced above were materially false and misleading when made, and omitted to disclose material information necessary to make those statements not misleading because they falsely conveyed that Alcatel had been fully integrated into the Company's Code of

Conduct and compliance mechanisms. These statements likewise communicated to the market that Alcatel – despite the risks associated with its history of serious compliance problems – had been brought within and was in compliance with Nokia's Code of Conduct. These statements omitted to disclose that, in fact, the Company had discovered compliance issues during the integration that were only disclosed in March 2019, causing significant damage to Class members.

## VI. THE TRUTH EMERGES: NOKIA SHARES PLUMMET WHEN THE COMPANY ANNOUNCES COMPLIANCE ISSUES DISCOVERED DURING THE ALCATEL INTEGRATION

47. On March 21, 2019, Nokia filed its annual report on Form 20-F for the 2018 fiscal year (the "2018 Annual Report"). Although the Company had repeatedly assured the investing public almost two years earlier that it had successfully moved beyond the Alcatel integration, the Company now suddenly announced that it had discovered compliance problems in the legacy Alcatel business ***during*** the integration. As the 2018 Annual Report stated:

> ***During the course of the ongoing integration process, we have been made aware of certain practices relating to compliance issues at the former Alcatel Lucent business that have raised concerns***. We have initiated an internal investigation and voluntarily reported the matter to the relevant regulatory authorities, with whom we are cooperating with a view to resolving the matter. ***The resolution of this matter could result in potential criminal or civil penalties, including the possibility of monetary fines, which could have a material adverse effect on our business, brand, reputation or financial position***.

48. In light of the Company's assurances that it had already accomplished the Alcatel integration, this disclosure stunned the markets and caused a massive and rapid decline in the price of the Company's ADSs, which fell from a previous close of $6.26 per share to $5.88 per share on March 22, 2019, representing a decline in over 6% in a single day of unusually heavy trading volume.

49. The cause of this price drop was clear. "Nokia shares dive on potential Alcatel-Lucent compliance issues" screamed the title of one *CNBC* article. "Nokia Shares Plunge After

Warning of Possible Compliance Issues" was the title of *The Wall Street Journal*'s article about the losses caused to investors by this announcement.

50. On March 22, 2019, after market hours, Nokia issued a press release responding to what the Company described as "market rumors" about its own disclosure of compliance issues on the previous day. The March 22nd announcement attempted to downplay the compliance issues and assuage investor fears, stating:

> While Nokia does not typically comment on market rumors, given the market reaction and inquiries related to a disclosure in the risk factors section of its annual report on Form 20-F for 2018, the company issues this statement to clarify that the specified investigation is not expected to have a material impact on Nokia. We have seen no evidence that would suggest that criminal penalties would apply in this case, and we believe it is highly likely that any penalties that might apply would be limited and immaterial.
>
> Nokia wishes to clarify that the context of this disclosure is the risk factors section of its annual report on Form 20-F where the company lists various risks which could potentially have a material impact on it. However, the disclosure does not reflect Nokia's assessment of the expected or likely impact of the investigation on Nokia.
>
> As noted in the annual report, to ensure complete compliance we are now scrutinizing certain transactions in the former Alcatel Lucent business. Out of an abundance of caution and in the spirit of transparency, Nokia has contacted the relevant regulatory authority regarding this review. We are proud of our reputation as one of the world's most ethical companies and this level of openness, transparency and cooperation is what you would expect from Nokia.

51. Despite Nokia's attempt to soothe investors by means of its March 22, 2019 Press Release, Nokia securities continued to decline over the next few trading days, falling an additional $0.19 per share from its close price on March 22, 2019, or approximately 3.23%, to close at $5.69 per share on March 28, 2019.

## VII. DEFENDANTS ACTED WITH SCIENTER

52. Defendants either knew or recklessly disregarded the false and misleading nature of the foregoing information they disseminated to the investing public. Among other things,

Defendants knew or recklessly disregarded that the Company had not moved beyond the Alcatel integration, that Alcatel had not been brought within the Company's Code of Conduct and other compliance and reporting mechanisms, and that Alcatel suffered from ongoing compliance issues that remained undisclosed until their existence was announced at the end of the Class Period. Defendants' scienter is demonstrated by several categories of fact alleged herein.

53. *First*, Defendant Suri described and touted his personal involvement in the granular details of the Alcatel integration process. His personal involvement included the creation of a small dedicated integration team reporting directly to Defendant Suri, his personal attendance at all of this team's meetings, the imposition of extreme time deadlines on the team's performance of the integration, and providing regular updates on the status of the integration to investors.

54. *Second*, under Defendant Suri's leadership, Nokia implemented a detailed reporting and personnel infrastructure to monitor Alcatel's operations and ensure reporting to Nokia leadership concerning Alcatel's legacy operations and the status of the integration. This reporting infrastructure was layered over the compliance reporting mechanisms already in place at Alcatel due to its history of compliance violations, and reported to Defendant Suri and other Nokia senior executives in their positions as members of the Alcatel board of directors.

55. *Third*, Defendant Suri had a compensation arrangement that focused specifically on achieving a successful Alcatel integration. Similarly, other senior Nokia executives – including those leading the integration process and reporting to Defendant Suri – had similar compensation arrangements that would only provide remuneration if they met integration targets. These compensation arrangements created a strong incentive for Suri and his direct reports to conceal or recklessly disregard information concerning compliance issues or other problems at Alcatel and to otherwise communicate that the Company had successfully moved beyond the Alcatel integration.

56. *Fourth*, the Alcatel integration was the single most important operational priority for Nokia during (and in the period leading up to) the Class Period. Indeed, it was precisely for this reason that Defendant Suri took on a critical personal role in the integration, repeatedly assured investors about its progress, and staked his reputation on its successful and rapid conclusion. It was also for this reason that Nokia created strong financial incentives for Defendant Suri and other senior officers to claim that the integration had been successful while concealing or ignoring material facts to the contrary. With the coming transition to 5G wireless communications, Nokia's acquisition and integration of Alcatel was fundamental to the Company's financial performance and was, therefore, a core Nokia operation of the precise sort that Defendant Suri would have necessarily had first-hand knowledge.

### A. Defendant Suri's Personal Involvement in the Integration Raises a Strong Inference of Scienter

57. Defendant Suri's repeated statements concerning his personal involvement in and management of the Alcatel integration alone raise a strong inference that he knew or recklessly disregarded that the Company had not moved beyond the Alcatel integration, as he claimed; that Alcatel was not in compliance with Nokia's Code of Conduct and other compliance mechanisms; and that the Company had discovered compliance issues at Alcatel during the integration, which was omitted from the Company's and Defendant Suri's public representations.

58. Defendant Suri boasted of the prominent personal role that he played in the Alcatel integration. In particular, Defendant Suri created the Integration Board dedicated to the Alcatel integration and emphasized that he was a "***permanent attendee***" of its meetings. Not only did Suri attend all of its meetings, but the Integration Board was also a small team of fewer than 100 members led by the Company's COO and other members of senior leadership, all reporting to – and maintaining close contact with – Defendant Suri throughout the process. The Integration Board

exemplified Defendant Suri's signature "Nokia Business System" management philosophy, a formal organized system designed by Suri to provide "***a high degree of granular visibility***" for Suri and other members of Nokia senior leadership.

59. Suri's direct involvement in and granular knowledge of the integration process is also reflected by his position on the Alcatel board of directors, which he joined along with his CFO and CLO by early-2016. Because of Alcatel's previous compliance violations and criminal prosecution, Alcatel had wide-ranging mechanisms in place to allow Alcatel's board of directors to monitor and ensure legal and ethical compliance throughout that company. In effect, Alcatel's compliance processes required a significant flow of compliance-related information directly to its board of directors. Defendant Suri's position on the Alcatel board of directors demonstrates further his direct involvement in the Alcatel integration and his receipt of information concerning the integration process and compliance issues at Alcatel.

60. Suri had, moreover, staked his reputation on the successful and rapid integration of the two companies. Not only was the integration crucial to the Company to prepare for the approaching 5G transition, but the Company's earlier integration failures had heightened the importance of a seamless integration process. Notably, Suri's management methods were widely credited with rescuing Nokia's earlier integration failures, and his continued standing as a skillful M&A manager depended on Nokia's effective integration of Alcatel. In this context, Suri promised that "this time can be different" from earlier integration failures and then undertook to provide frequent personal updates on the status of the integration and his role in it.

61. Suri's reputational incentive to claim a flawless integration was reinforced by his personal financial incentives. Suri had an incentive-based compensation package focused specifically on the rapid and effective Alcatel integration. Had the market learned that Nokia had

not "moved beyond" the integration – or if that integration had been stalled by revelations concerning Alcatel's compliance issues – Suri's reputational and financial interests would have suffered.

62. Suri was also aware that Nokia's senior leadership, including those individuals most responsible for carrying out the integration on his behalf, had similar financial incentives to ensure that the market believed that the Company had moved beyond the integration and to otherwise disregard any potential compliance issues at Alcatel. Suri then imposed "extreme" time pressures on these very same senior managers. Defendant Suri thus knowingly presided over an integration process designed to encourage Nokia's senior leadership to announce a rapid and successful Alcatel integration and to avoid disclosing compliance or other issues encountered in the course of that integration.

63. Moreover, Defendant Suri personally provided numerous updates on the status of the project throughout the integration, reflecting his own belief that he was informed and well-positioned to speak authoritatively on the subject. On February 2, 2017, for example, Defendant Suri stated on a conference call that "we have ***completed the integration projects related to Alcatel-Lucent*** with the exception of a small handful of long-tail efforts. With this progress, we have been able to turn to continuous improvement activities that already delivered clear benefits in 2016 and will continue to do so this year." On the same call, Defendant Suri boasted that "***[w]e successfully integrated Alcatel-Lucent faster than expected***," and stated that he was "pleased we have [completed] all of the main integration work."

### B. Nokia's Robust Reporting and Monitoring Infrastructure Regarding Alcatel and the Integration Supports a Strong Inference of Scienter

64. Throughout the Alcatel integration, Defendant Suri and other members of Nokia senior leadership maintained at least three avenues to receive information concerning the integration

process and/or any compliance or other issues at Alcatel. *First*, Nokia used the Integration Board as an independent unit to monitor the integration. *Second*, Nokia had merged its compliance processes with those of Alcatel by early-2016 and centralized them through Nokia's CLO, Maria Varsellona, who reported directly to Suri, served on the Alcatel board of directors with Suri, and had a personal financial incentive to claim that the Alcatel integration had been successful. Despite her critical role in the integration, Nokia announced Ms. Varsellona's departure from the Company shortly after Alcatel's compliance issues became public at the end of the Class Period. *Third*, the foregoing reporting and compliance mechanisms were in addition to pre-existing compliance systems created at Alcatel as the result of its earlier history of compliance violations. These reporting systems included providing information to Alcatel's board of directors, which included Suri and Varsellona (among others) by early-2016.

65. As explained previously, the Integration Board was a free-standing source of "granular visibility" into the Alcatel integration process. As Suri stated, the Integration Board was "a separate structure in place that focuses on driving defined programs" and prevented "mingling the day-to-day operations of the business with integration activities[.]" As also noted above, Defendant Suri played a critical personal role in the Integration Board, as did many of the Company's other senior-most executives.

66. Nokia had also incorporated Alcatel's compliance structures into Nokia's and centralized them in Nokia's Chief Legal Officer by early-2016. As early as January 8, 2016 – well before the transaction had been completed – Nokia and Alcatel had created the "Legal & Compliance (L&C) Organization" through the MSA, establishing Nokia's control over Alcatel and ensuring that Nokia was in control of Alcatel's compliance systems.

67. Under these agreements, Nokia's Chief Legal Officer, Maria Varsellona, was appointed for the purpose of "overseeing and managing all legal, contracting, corporate governance, ethics and compliance matters across Nokia globally, as well as advising the President and CEO, Board of Directors and officers of the company in relation to such matters." These agreements further established a detailed legal and compliance structure that would "mirror the business organization, with separate legal teams supporting the business groups as [and] legal and compliance specialist groups with global responsibilities for their expertise areas." Thus, Nokia put in place separate legal and compliance teams for each business unit, as well as for particular areas of legal and compliance concern including, *inter alia*, an "Ethics & Compliance unit," a "Regulatory unit," a "Litigation unit," and a "Mergers & Acquisitions unit," as well as an "Operational Excellence unit . . . responsible for excellence, efficiency and standardization for legal processes and operations across Nokia." All of these legal and compliance units reported to the Company's CLO, who sat on Alcatel's board of directors with Defendant Suri, otherwise reported directly to Suri at all relevant times, and had incentive compensation tied to the Alcatel integration.

68. Further, the Integration Board and the Legal & Compliance Organization were layered over Alcatel's preexisting compliance structures, which were created in the aftermath of Alcatel's earlier compliance scandals and were designed to push information to Alcatel's board of directors – on which Suri sat alongside Nokia's CLO and CFO.

69. In December 2010, Alcatel and its subsidiaries entered into a deferred prosecution agreement and agreed to pay a combined $137 million to settle a long-running bribery investigation by the Department of Justice and the Securities and Exchange Commission. This settlement represented the fifth largest FCPA settlement with regulators in history, reflecting the severity of

Alcatel's violations. As part of the settlement, Alcatel engaged a compliance monitor to oversee its efforts to rebuild its internal compliance systems.

70. Accordingly, Alcatel established an elaborate internal compliance organization designed to drive information related to compliance issues to the Alcatel board of directors. Under that regime, a Chief Compliance Officer was charged with coordinating, supervising, and centralizing key compliance, anticorruption, and ethics functions within Alcatel. The Chief Compliance Officer reported directly to the Chief Financial and Legal Office, and met periodically with the CEO and the Audit and Finance Committee to assess the adequacy of the compliance programs, any known potential violations, and the need, if any, for corrective measures. In addition, Alcatel instituted a global compliance risk assessment process to identify compliance issues related to key compliance areas. The program, which was aimed primarily at middle management, mandated annual "deep dive" assessments within each business area focused on identifying potential compliance gaps and risks to preemptively develop and implement risk mitigation measures.

71. On February 9, 2015, after the compliance monitor submitted a final report, the court dismissed the FCPA charges underlying the deferred prosecution agreement. Only two months later, on April 15, 2015, Nokia announced the Alcatel acquisition.

72. Further, the facts alleged herein likewise establish a strong inference of Nokia's corporate scienter. Numerous senior executives whose scienter is imputed to the Company were directly involved in the planning and execution of the Alcatel integration, including, *inter alia*, (i) Defendant Rajeev Suri, CEO and President; (ii) COO Marc Rouanne; (iii) CFO Timo Ihamoutila; and (iv) CLO Maria Varsellona. Given their personal involvement in the integration efforts (and their compensation tied to those efforts), these individuals – and therefore Nokia – knew or recklessly disregarded the falsity of Defendants' Class Period statements.

**C. Nokia Executives Incentive Compensation Tied to the Integration Supports a Strong Inference of Scienter**

73. Defendant Suri received incentive compensation tied specifically to the Alcatel integration. The Company's other senior executives – including all members of Nokia's Group Leadership Team – also received similar incentive compensation packages. Defendant Suri's incentive compensation arrangements created an additional motive for him to claim that the Company had successfully moved "beyond" the Alcatel integration and to disregard or downplay any compliance or other issues identified in the integration process. Further, Defendant Suri knew or recklessly disregarded that the other members of Nokia's Group Leadership Team – including those with specific responsibility for the integration – had similar incentives.

74. Specifically, Defendant Suri was awarded 208,700 restricted shares, worth €986,942 on the grant date in 2016. The other twelve members of the Group Leadership Team were granted a total of 1,015,100 restricted shares, valued at €4,800,408 on the grant date. All of these grants were set to vest in three equal tranches on October 1st of 2017, 2018, and 2019 and were tied expressly to integration targets. Thus, two of the three tranches vested during the Class Period and prior to the Company's announcement of the Alcatel compliance issues on March 21, 2019.

75. Had the market learned earlier that the Company had discovered compliance issues ***during*** the integration, that revelation would have threatened or prevented the vesting of these restricted shares. Accordingly, these restricted shares created an incentive for Defendant Suri to claim that the Company was successfully "beyond" the Alcatel integration and that the integration was now "behind" the Company. These restricted shares likewise created an incentive for Suri to disregard or downplay any compliance or other problems or issues at Alcatel.

76. Along similar lines, these restricted shares created the same incentives for the members of the Group Leadership Team – including for those senior Nokia executives directly

involved in the integration and reporting to Suri on its progress. Suri was aware of or recklessly disregarded these incentives.

### D. Nokia's Alcatel Integration Was the Company's Foremost Core Operation Further Supporting a Strong Inference of Scienter

77. The Alcatel integration was the single most important Nokia operation during any relevant time. From the moment Nokia announced its intention to acquire Alcatel in April 2016, through the end of the Class period, the Alcatel integration was the foremost operational objective for Suri, the Company, and its senior managers. The centrality of the Alcatel integration within the Company's operations further supports and strengthens the inference of scienter.

78. The Alcatel acquisition was essential to the Company's ability to succeed in 5G because, without Alcatel, Nokia lacked the assets and technology necessary to provide 5G services. Before the Alcatel transaction, the Company was among the world's leading mobile providers. Despite this strength in wireless, Nokia's business would be severely disadvantaged by the shift to 5G, a more versatile form of networking requiring a significantly greater degree of physical networking capacity. The Company itself noted in the 2014 annual report that its operations could be severely jeopardized by this "convergence of information technology and telecommunications." Thus, the Alcatel acquisition and integration were necessary to fill this extraordinary gap in Nokia's portfolio – the most important task facing the Company.

79. Further, with the shift to 5G fast-approaching, the speed and success of the Alcatel integration required even greater focus from Suri and other Company managers. Simply, had Nokia failed to carry out the Alcatel integration prior to the 5G launch – which is presently underway worldwide – Nokia would have been unable to credibly offer 5G services to the marketplace. As a result, the Alcatel integration demanded a unique and consistent level of attention from the highest

levels of Company management. The Alcatel integration was thus the Company's predominant core operation at all times relevant to this case.

80. Other evidence alleged herein supports the conclusion that the Alcatel integration was the Company's most core operation. For example, the fact that the Company gave Defendant Suri and the other members of the Group Leadership Team compensation tied specifically to integration targets reflects the importance of the Alcatel integration and its need for involvement by senior executives. Similarly, the creation of the Integration Board and Defendant Suri's personal involvement in its meetings shows that the Alcatel integration was fundamental to the Company. Moreover, the Company's repeated and consistent public statements about the status and progress of the integration likewise show the integration's significance to the Company. Indeed, Defendant Suri commented on the status of the integration at virtually every public appearance on behalf of the Company from the time the acquisition was announced through the end of the Class Period – a clear demonstration that the Alcatel integration was a core Company operation deserving the CEO's full attention.

## VIII. LOSS CAUSATION

81. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Nokia ADSs and operated as a fraud or deceit on Class Period purchasers of Nokia ADSs. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Nokia ADSs fell precipitously as the artificial inflation was removed.

82. As a result of their purchases of Nokia ADSs during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

Defendants' false and misleading statements throughout the Class Period had the intended effect and caused Nokia ADSs to trade at artificially inflated levels throughout the Class Period

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

83. Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

84. With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(i) the omissions and misrepresentations were material;

(ii) the ADSs traded in an efficient market;

(iii) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the ADSs; and

(iv) Lead Plaintiff and other members of the Class purchased the ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

85. At all relevant times, the market for the ADSs was efficient for the following reasons, among others:

(a) the ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Nokia filed periodic public reports with the SEC and the NYSE;

(c) Nokia regularly communicated with public investors *via* established market communications mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Nokia was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

86. As a result of the foregoing, the market for Nokia ADSs promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Nokia ADSs. Under these circumstances, all purchasers of Nokia ADSs during the Class Period suffered similar injury through their purchase of such ADSs at artificially inflated prices, and a presumption of reliance applies.

87. In addition to the *Basic* presumption, a class-wide presumption of reliance is also applicable in this action under the Supreme Court's holding in *Affiliated Ute*, because the claims alleged are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Nokia's business operations and financial prospects and performance – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

88. Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in a sense that a reasonable investor might have considered

them important in making investment decisions. Given the importance of the Class Period, material misstatements and omissions set forth above, that requirement is satisfied here.

## X. CLASS ACTION ALLEGATIONS

89. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Nokia ADSs during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, as well as the officers and directors of the Company and the members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

90. The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Nokia ADSs were actively traded on the NYSE. While the exact number of class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, Lead Plaintiff believes there are hundreds, if not thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nokia or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

91. Lead Plaintiff's claims are typical of the claims of members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

92. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

93. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and practices of Nokia;

(c) whether the trading price of Nokia ADSs was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

94. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. NO SAFE HARBOR

95. The statutory safe harbor provided for certain forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many of the statements herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause any actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

**COUNT I**

**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

96. Lead Plaintiff repeats and realleges the allegations set forth above as if set forth in full herein.

97. During the Class Period, Defendants knowingly or recklessly made, participated in the preparation of and/or caused to be disseminated, false and misleading statements of material fact, and omitted material facts necessary to make the statements about Nokia's financial results, operations, and legal compliance, in light of the circumstances in which they were made, not misleading.

98. In addition to the duties of full disclosure imposed on the Company as a result of its affirmative statements and reports, Defendants had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete, and accurate information with respect to the Company's operations and financial results.

99. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available, or made those misrepresentations and omissions of material fact without a reasonable belief in their accuracy. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Nokia's operating condition and financial status from the investing public, and supporting the artificially inflated price of its ADSs.

100. As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Nokia ADSs was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's ADSs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in Nokia's public statements during the Class Period, Lead Plaintiff and other Class members purchased Nokia ADSs during the Class Period at artificially high prices and were ultimately damaged thereby.

101. At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff or other Class members and the marketplace known the truth regarding Nokia, which Defendants did not disclose, Lead Plaintiff and other Class members would not have purchased Nokia ADSs, or, if they had purchased Nokia ADSs during the Class Period, would not have done so at the artificially inflated prices which they paid.

102. As a direct and proximate result of Defendants' false and misleading statements, Lead Plaintiff and the other Class members suffered losses and damages in connection with their Class Period purchases of Nokia ADSs.

103. By reason of the foregoing, Nokia has violated §10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### Violation of §20(a) of the Exchange Act Against Defendant Suri

104. Lead Plaintiff repeats and realleges the allegations set forth above as if set forth in full herein.

105. During the Class Period, Defendant Suri participated in the operation and management of Nokia, and conducted and participated, directly and indirectly, in the conduct of Nokia's business affairs. Because of his senior position, he knew the adverse non-public information about Nokia's false statements and omissions.

106. As an officer and/or director of a publicly owned company, Defendant Suri had a duty to disseminate accurate and truthful information with respect to Nokia's financial condition and results of operations, and to correct promptly any public statements issued by Nokia that had become materially false or misleading.

107. Because of his position of control and authority as a senior officer, Defendant Suri was able to, and did, control the contents of the various reports, press releases and public filings that Nokia disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendant Suri exercised his power and authority to cause Nokia to engage in the wrongful acts complained of herein. Defendant Suri, therefore, was a "controlling person" of Nokia within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Nokia ADSs.

108. Defendant Suri, therefore, acted as a controlling person of Nokia. By reason of his senior management position, Defendant Suri had the power to direct the actions of, and exercised the same to cause, Nokia to engage in the unlawful acts and conduct complained of herein. Defendant Suri exercised control over the general operations of Nokia and possessed the power to control the

specific activities that comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

109. By reason of the above conduct, Defendant Suri is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nokia.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Determining that this action is a proper class action, and certifying Lead Plaintiff as the Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other relief as the Court deems just and proper.

## XIII. JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 30, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
CHAD JOHNSON
NOAM MANDEL

*/s/ Chad Johnson*
CHAD JOHNSON

125 Park Ave, 25th Floor
New York, NY 10017
Telephone: 212/791-0567
631/367-1173 (fax)
chadj@rgrdlaw.com
noam@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MOSHE O. BOROOSAN
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mboroosan@rgrdlaw.com

*Attorneys for Lead Plaintiff*

SCHALL LAW FIRM
BRIAN J. SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
310/388-0192 (fax)

*Additional Counsel*

CERTIFICATE OF SERVICE

I, Chad Johnson, hereby certify that on October 30, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Chad Johnson*
CHAD JOHNSON