UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x
In re NOKIA CORPORATION SECURITIES    :    Civil Action No. 1:19-cv-03509-ALC-SLC
LITIGATION                            :
——————————————————————— :    CLASS ACTION
                                      :
This Document Relates To:             :
                                      :
      ALL ACTIONS.                    :
——————————————————————— x

## SECOND CONSOLIDATED AMENDED COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff, Judge Clyde W. Waite (Ret.) ("Lead Plaintiff"), by his undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to himself and upon belief based on the investigation of Lead Plaintiff's attorneys as to all other matters, which included, among other things, a review and analysis of the Defendants' public documents, conferences and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases by Nokia Corporation ("Nokia" or the "Company"), analyst reports, industry reports, and other publicly available information.  Lead Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired Nokia's American Depositary Shares ("ADSs")[1] between April 27, 2017 and October 23, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.       This action arises from Defendants' materially false and misleading statements and omissions concerning Nokia's readiness for the transition to fifth generation – or "5G" – wireless technology and the progress of Nokia's integration with Alcatel-Lucent S.A. ("Alcatel" or "Alcatel-Lucent"), which was essential to the 5G transition.  During the Class Period, Nokia and

---

[1]     An ADS represents ownership in a security issued by a foreign company in foreign markets. *See Edward F. Greene, et al., U.S. Regulation of the International Securities and Derivatives Markets* 2-19 (9th ed. 2009).  Generally, a depositary institution, typically a U.S. bank, has custody of the foreign security, and issues the ADS certificate to an investor in the United States.  *See id.*

its Chief Executive Officer ("CEO"[2]) repeatedly assured investors that the Company was "**5G ready**" and had successfully completed and moved "**beyond the integration**" of Alcatel necessary for 5G.[3] These assurances were false. In truth, the Alcatel integration was hampered by significant undisclosed problems and the Company was far from "5G ready" as a result. This action also arises from Defendants' numerous statements concerning Nokia's and Alcatel's adherence to standards of legal and ethical compliance and reporting, including that "**Nokia managers and leaders are compliance stewards for their organizations: they own the culture of compliance**."

3.    On March 21, 2019 – almost **two years after** Defendants declared that the Company had moved beyond the Alcatel integration – the market began to learn the truth concerning the problems facing the Alcatel integration. On that date, the Company announced that it had identified "compliance issues" at Alcatel **during the integration**. The disclosure of these compliance issues stunned the marketplace, which believed and relied on Defendant's mid-2017 announcement that "**the integration of Alcatel-Lucent [is] behind us**," as well as on Defendants' numerous other statements about the alleged success of the integration since that time. As one securities analyst explained on March 25, 2019: "[I]t is a bit strange to see such compliance issues emerging today, since Nokia completed the acquisition of [Alcatel] more [than] three years ago." This news caused a massive decline of the Company's share price, resulting in a market capitalization loss for investors of over $3 billon. Despite this revelation, however, Defendants downplayed the problem and continued to assure the market that the Company had managed the Alcatel integration effectively and was on track for a successful rollout of 5G.

---

[2]    In addition to CEO, this complaint uses abbreviations for the titles of other senior corporate officers, including Chief Financial Officer ("CFO"), Chief Legal Officer ("CLO") and Chief Operating Officer ("COO").

[3]    Unless otherwise indicated, all emphasis herein has been added.

4.     Then, on October 23, 2019, Nokia further shocked investors by announcing – contrary to its repeated earlier assertions that it was "5G ready" – that the Company was still at least **two years away** from marketing devices fully compatible with 5G.  At the same time, the Company announced that it was suspending its dividend to conserve cash to address this problem, had revised its financial guidance downward significantly, and that it did not expect to become profitable for at least another two years.  Investors thus learned **that Nokia was anything but 5G ready**.  These disclosures revealed the true extent of the Company's failure to successfully carry out the Alcatel integration essential for the 5G transition.  As one securities analyst described the new information, the Company's inability to compete in 5G was "[d]ue to the **extended and troubled Alcatel-Lucent integration**" and that "**[d]ue to the Alcatel integration** and the acceleration of 5G standards setting over the past few years, Nokia has been **behind in 5G development**."  This news caused substantial harm to investors.  As *Bloomberg* explained: "The stock fell as much as 25%[.] That's the steepest decline since at least 1991, when *Bloomberg* started collecting data."

5.     The successful integration of Alcatel into Nokia's business was highly material to investors and a critical focus of the Company's operations during the Class Period.  The sole purpose of Nokia's acquisition of Alcatel was to enable the Company to compete in 5G; without Alcatel and its technology, Nokia simply could not provide effective 5G services to its customers.  The market thus understood that Alcatel was indispensable to Nokia's ability to deliver in 5G services and that a seamless integration of Alcatel was a matter of paramount importance to both the Company's leadership and its investors.  Further, because Nokia had experienced significant difficulties integrating previous ventures, the market was especially concerned about the Company's ability to carry out the Alcatel integration effectively.

6.      The market was also particularly wary of any compliance issues at Alcatel because of that company's history of serious compliance and criminal law violations – including its involvement in an international bribery scheme leading to one of the largest criminal settlements in history with the U.S. Department of Justice ("DOJ") for violations of the Foreign Corrupt Practices Act ("FCPA").  Indeed, Alcatel's deferred prosecution agreement with the DOJ came to an end in February 2015 – just two months before Nokia announced the Alcatel transaction.

7.      Given these concerns, defendant Rajeev Suri ("Suri"), Nokia's CEO, provided regular updates on the progress of the integration and ***repeatedly assured investors that he was <u>personally</u> involved in the integration process***.  Defendant Suri insisted on an extremely rapid integration process and established an elite dedicated team to carry it out.  Defendant Suri was a self-described "permanent attendee" at the team's meetings, which, according to Suri, provided "granular visibility" into the progress of the integration.  This elite integration team was led by members of Nokia senior management who reported directly to Suri and whose compensation was expressly tied to the smooth and speedy completion of the Alcatel integration, creating a financial incentive to claim a successful integration and conceal or recklessly disregard problems with the integration and the associated transition to 5G.

8.      These and other facts detailed herein raise a strong inference that Defendant Suri knew or recklessly disregarded that the Company was not 5G ready, as he claimed, and that it had not carried out a successful integration with Alcatel.  The facts alleged herein likewise support a strong inference that the Company – to which is attributed the knowledge of its senior executives, including those responsible for the Alcatel integration – knew or recklessly disregarded the same facts concerning the Company's lack of 5G readiness and the failure of the Alcatel integration.

9.      As a result of the foregoing, Lead Plaintiff and other Class members have suffered significant losses and damages resulting from Defendants' false and misleading statements.  This action seeks to recover those damages.

## II.    JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Nokia securities trade on the New York Stock Exchange ("NYSE") located within this District.

13.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

14.     As set forth in the accompanying certification, Lead Plaintiff purchased Nokia ADSs during the Class Period, and has been damaged thereby.

15.     Defendant Nokia is a network and technology company that provides hardware, software, and services for telecommunications operators and enterprises and provides fixed networking solutions.  Nokia is incorporated under the laws of Finland with its principal executive offices located in Espoo, Finland.  Nokia's ADSs or "shares" trade on the NYSE under the symbol "NOK."

16.     Defendant Suri has served as Nokia's President and CEO since May 2014.

**IV.    FACTUAL ALLEGATIONS: NOKIA ACQUIRES ALCATEL AND
CLAIMS TO RAPIDLY MOVE BEYOND THE INTEGRATION**

17.     On April 15, 2015, Nokia announced plans to purchase Alcatel.  The Company
made this announcement in a press release entitled "Nokia and Alcatel-Lucent to Combine to
Create an Innovation Leader in Next Generation Technology and Services for an IP Connected
World."   The press release indicated that Nokia and Alcatel-Lucent had entered into a
memorandum of understanding under which Nokia would acquire all outstanding Alcatel shares
through a public exchange offer.  The combined company would continue to be called "Nokia
Corporation" and would continue to be headquartered in Nokia's headquarters in Finland.
Defendant Suri would continue as the CEO of the newly combined Company, which would have
a board of directors with members from both legacy Nokia and Alcatel boards.

18.     The Nokia-Alcatel transaction was intended to enable the Company to compete in
5G.  5G is the next generation of wireless cellular network technology, capable of significantly
greater data speeds than earlier wireless networks.   The 5G rollout is currently underway
worldwide.[4]  Since early 2015, preparation for the coming transition to 5G has been the focal point
of the telecommunications industry.

19.     Although Nokia was historically focused on wireless service, 5G requires a
combination of wireless capabilities with physical networking capabilities and infrastructure that
Nokia did not have.  As a result, unlike its major competitors Ericsson and Huawei, Nokia was
unable to compete in 5G on its own.  Alcatel had the networking capabilities and infrastructure
necessary to enable Nokia to contend with the approaching 5G transition.   Nokia's 2016

---

[4]    For example, 5G networks first began to become available within parts of this District during
2019, one of the first 5G rollouts in the United States.

acquisition of Alcatel gave the Company the combination of wireless and networking assets and expertise essential to compete in the race to 5G.

20.    In light of the impending launch of 5G, Nokia's rapid integration of Alcatel was the single most important operational priority carried out by the Company during (and in the lead-up to) the Class Period.

21.    Nokia's acquisition of Alcatel raised significant concerns regarding the Company's ability to integrate Alcatel into Nokia's operations.  These concerns were heightened by both companies' past failures to successfully and timely integrate acquisitions and joint ventures.  Nokia had experienced severe difficulties integrating its operations with those of Siemens AG ("Siemens") in connection with the creation of "Nokia Siemens Networks" – a venture that took over six years to integrate and was widely regarded as a business integration failure.  Notably, Defendant Suri first became Nokia's CEO because of his efforts to rescue the failing Nokia-Siemens integration, which he did by creating a team dedicated to carrying out the integration process and working personally with that team (an approach he would implement again for the Nokia-Alcatel integration).  Alcatel likewise had significant problems integrating its Lucent acquisition, suffering over $10 billion in losses in the process.

22.    Defendant Suri was determined to avoid the same problems that had plagued these earlier business integrations.  According to *Bloomberg*, Suri "didn't want to repeat the mistakes of past mergers at the two network suppliers that dragged on for years and led to billions in losses."  Defendant Suri acknowledged these concerns directly during Nokia's Annual General Meeting on May 5, 2015, just a few weeks after Nokia announced the transaction.  At that event, Suri said:

> Those of you who have been following the transaction news have, I am sure, seen people raise concerns about execution risk.  Given the issues associated with similar transactions in the past, that is a very fair concern.  But, I do believe that this time can be different.

23.     That difference would come largely from Defendant Suri's signature management methodology, which he called the "Nokia Business System."   Suri first introduced the Nokia Business System ("NBS") in a letter to Nokia employees when he ascended to the position of CEO in 2014.   As explained in that letter, one of his priorities as CEO was "to develop and implement a 'Nokia Business System' that can be applied consistently across the company, as well as to any possible future acquisitions."   As he explained, that "system will include . . . focused M&A and integration practices[.]"

24.     Consistent with NBS, Suri promptly created a discrete committee to plan the Alcatel integration and report directly to him.   On April 17, 2015, Nokia issued a press release announcing the creation of an Integration Steering Board that would "provide the structure, processes and working team needed to set up the required plans for the combined company."   The announcement indicated that Joerg Erlemeier had been appointed as the Integration Planning Head and "[i]n this role, which will take effect immediately, *he will report to Nokia President and CEO, Rajeev Suri*."   Thus, from the initial planning phases of the integration, Defendant Suri ensured that he would be kept directly informed.   Mr. Erlemeier has since been promoted to (and currently serves as) Nokia's COO.[5]

25.     At the May 5, 2015 meeting, Suri emphasized the "Nokia Business System, or 'NBS,' which defines the . . . processes that will be used at group level [*i.e.*, at the level of Nokia senior management] to govern our business portfolio and performance."   As Suri explained, NBS "covers our . . . end-to-end mergers and acquisition process" – including the Alcatel integration.

---

[5]     On November 25, 2019, Nokia announced that Mr. Erlemeier would step down from this position effective January 1, 2020.

Suri went on to articulate why the Alcatel integration would be different from past integration failures and could advance rapidly:

> [I]t is an acquisition by Nokia, with clarity in terms of leadership and governance. This will allow us to move fast, to avoid politics, and to show that history does not have to repeat itself.  Both companies – Nokia and Alcatel-Lucent – have been through significant recent transformation and restructurings, and both have learned from those experiences.  We have already appointed an integration leader, and are moving fast to get detailed planning underway.

26.     Those details included the "Integration and Transformation Board" (the "Integration Board") an exclusive team dedicated to the Alcatel integration and led by senior executives reporting directly to Defendant Suri, who would later describe himself as a "***permanent attendee***" of its meetings.  The Integration Board was chaired by Marc Rouanne, Nokia's then-Chief Innovation and COO, who reported directly to Defendant Suri.  Thus, in a regulatory filing in France, Nokia described this "clear governance structure for the execution of the integration" in which the head of the integration process "***reports directly to Rajeev Suri***, President and Chief Executive Officer of Nokia."

27.     Suri then required the Integration Board to carry out the Alcatel integration in an exceptionally rapid time-frame.  As *Bloomberg* reported, Defendant Suri demanded an integration "pace [that] was extreme even for the fast-moving world of technology."  Further, Suri "sped along the . . . integration by limiting the team of people on the project to fewer than 100, versus the thousands he says were involved at Nokia Siemens."

28.     At the same time, the Company established compensation incentives for Suri and other members of Nokia's "Group Leadership Team" to carry out the integration rapidly and to overcome (or overlook) any impediments to a seamless integration.  Nokia's Group Leadership Team consists of the Company's senior-most executives.  According to the Company, the Group Leadership Team is "responsible for the operative management of Nokia."  The Group Leadership

Team is chaired by the Company's CEO and President – *i.e.*, by Defendant Suri. At the time Nokia announced the Alcatel transaction, the Group Leadership Team consisted of twelve members, including the Company's CEO, CFO, COO, CLO, and other senior officers. In January 2016, Nokia confirmed the new membership of the Group Leadership Team, which would now include legacy Nokia and Alcatel executives. At all relevant times, Marc Rouanne ("Rouanne") (Nokia's COO) and Maria Varsellona ("Varsellona") (Nokia's CLO) sat on the Group Leadership Team. Along with Defendant Suri, Rouanne and Varsellona were the Nokia executives principally responsible for carrying out the Alcatel integration on Suri's behalf. Both Rouanne and Varsellona have since departed the Company.

29.     The members of the Group Leadership Team all received incentive compensation – in the form of restricted stock units – tied specifically to the success of the Alcatel integration. Specifically, Defendant Suri was awarded 208,700 restricted shares, worth €986,942 on the grant date in 2016. The other twelve members of the Group Leadership Team were granted a total of 1,015,100 restricted shares, valued at €4,800,408 on the grant date. All of these grants were set to vest in three equal tranches on October 1st of 2017, 2018, and 2019 and were tied expressly to targets related to the smooth and speedy integration of Alcatel.

30.     On January 14, 2016, Nokia announced that Nokia and Alcatel-Lucent had begun operations as a single company. The Company made this announcement in a press release entitled "Nokia celebrates first day of combined operations with Alcatel-Lucent." According to the release, the announcement "mark[ed] the completion of Nokia's latest transformation and the creation of a global leader in technology and services for an IP connected world." Contemporaneously, the Company installed its own nominees as the new majority of Alcatel's board of directors. These new Alcatel board members included Defendant Suri and CLO

Varsellona, as well as two other members of the Group Leadership Team (including Nokia's CFO and the President of its Mobile Networks division) and Risto Siilasmaa, the Chairman of Nokia's board of directors.

31.     In addition to installing a new board and new Group Leadership Structure, on January 8, 2016, Nokia and Alcatel adopted a Master Services Agreement and Framework Agreement (together, the "MSA")[6] to facilitate the integration of Nokia and Alcatel.  The MSA established Nokia's complete control over Alcatel, its operations, and, most importantly, its compliance processes.  It accomplished this by designating Nokia's CLO, Maria Varsellona, as the head of the compliance organization for both companies.  All legal and compliance-related issues were channeled directly to Ms. Varsellona, who, in turn, would "advis[e] the President and CEO, Board of Directors and officers of the company in relation so such matters."

32.     On November 2, 2016, Nokia announced that it had completed the Alcatel-Lucent transaction.  The Company made this announcement in a press release entitled "Nokia finalizes its acquisition of Alcatel-Lucent, ready to seize global connectivity opportunities."

33.     Approximately two weeks later, on November 15, 2016, Nokia hosted its Capital Markets Day conference for investors and analysts.[7]  During this conference, Defendant Suri described the status of the Company's integration process and provided details about his plan to complete it effectively.  In so doing, Defendant Suri further described the role that his Nokia

---

[6]   The MSA is available at https://www.sec.gov/Archives/edgar/data/886125/000119312516572951/d130996dex43.htm and https://www.sec.gov/Archives/edgar/data/886125/000119312516572951/d130996dex44.htm.  These agreements are incorporated by reference herein.

[7]   Nokia's Capital Markets Day is a one-day event for investors.  It provides a full review of the company's strategy, operations, and financial targets.  Investors have the opportunity to connect with Nokia leadership and join interactive breakout sessions and Q&A discussion with senior Nokia executives.

Business System played in the integration. According to Defendant Suri, NBS is "core to our culture and to how we operate" and responsible for Nokia's "operational excellence." As he explained:

> Plans are good. But without the ability to execute, they are worth less than the paper on which they are printed. We have seen the perils of poor execution in this industry time and time again, and we are intent on avoiding that bump. As a result, we have created what we call the Nokia Business System, or NBS, to formalize the disciplined way that we run the company. NBS provides a consistent framework for key areas that span across all our business groups, investment optimization, performance management, continuous improvement, and talent management.

34. Defendant Suri provided specific details concerning the Company's use of the Nokia Business System to manage all aspects of the Alcatel-Lucent integration. Suri explained that NBS is a "structured governance process with a high degree of granular visibility into the business" and that it "give[s] us visibility to our progress and confidence that we can achieve our goals." As he explained:

> [C]onsider how we are managing the integration of Alcatel-Lucent, where we have adopted the model used in the earlier transformation of Nokia Siemens networks. Rather than mingling the day-to-day operations of the business with integration activities, we have a separate structure in place that focuses on driving defined programs, guided by the [I]ntegration and [T]ransformation board.
>
> *I am [a] permanent attendee of these sessions*, which are chaired by Marc Rouanne, our Chief Innovation and Operating Officer.

35. On February 2, 2017, Nokia conducted a conference call with securities analysts in which Defendant Suri provided another update on the progress of the Alcatel integration. According to his statements at this conference call, the integration was nearly complete at that time. As Defendant Suri stated: "[W]e have completed the integration projects related to Alcatel-Lucent with the exception of a small handful of long-tail efforts." Defendant Suri also described his satisfaction with the progress of the integration, the majority of which had already been

completed: "I will be the first to tell you that I'm pleased we have all of the main integration work behind us, because now we can get on with it."

36.    On April 27, 2017, Nokia first claimed that it had moved beyond the integration. On that date, Nokia conducted a conference call with securities analysts.  During this conference call, Defendant Suri announced for the first time that Nokia had moved beyond the integration of Alcatel.  Defendant Suri began his remarks by stating that the Company's "results showed our improving business momentum and that we are **effectively moving beyond the integration effort** for 2016 to making 2017 a year of execution and performance."  He went on to describe "the power of our end-to-end portfolio" and that he was "pleased, even if not fully satisfied, both with where we landed in Q1 and with our operational momentum as we head into the rest of the year."  He concluded his remarks by once again assuring investors that the Alcatel integration had been accomplished and that the Company was moving on to its next operational priorities.  Suri further stated:

> [O]f course, we are not complacent. We know we have some challenges in select business groups, and we are very focused on addressing those issues. And with the actions we have underway, I am confident that we can get those businesses back on track. **With the integration of Alcatel-Lucent behind us, we are committed to building on that platform and to making 2017 a year of execution and performance**.

37.    The market welcomed the news that the integration was finally complete.  On May 7, 2017, for example, a Canaccord analyst wrote that "[w]ith Nokia's operations now integrated with Alcatel Lucent, a strong balance sheet, and improved cost structure, we believe the company is well positioned for improving industry trends longer term."  Likewise, an analyst at Liberium observed in a May 23, 2017 reported that "[t]he issues related to the integration with Alcatel Lucent seem to be largely in the past[.]"  And in a June 9, 2017 report, a Barclays analyst expressed his belief that "following the conclusion of the initial [Alcatel-Lucent] integration . . . expectations

should now be clearer."  Finally, in a June 14, 2017 report, a Societe Generale analyst lauded Nokia for "a very successful integration of [Alcatel-Lucent]."

## V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS

38.      Throughout the Class Period, Defendants made numerous materially misleading statements, falsely touting the success of the Alcatel integration and misrepresenting the Company's readiness for 5G.  Defendants stressed that Nokia was "*5G ready*" and that its 5G products were "*ready for full deployment*;" that it had successfully completed and even progressed "*beyond the integration*;" that the "financial synergies and cultural integration . . . *were achieved in full*" and that the "cultural integration . . . *went beautifully*;" that the "*heavy lifting [wa]s over*" with respect to technological, cultural, and organizational aspects of the acquisition; and that Nokia was otherwise in a "*solid position in the early stages of 5G*[.]"  Defendants likewise boasted about the "*speed at which [Nokia] addressed* the portfolio challenges" inherent in the Alcatel integration and declared that there was "*absolutely no doubt that a fast and meaningful shift to 5G is underway*."  Further, Defendants misrepresented their "*commitment to act compliantly* and ethically in our business activities" and their "*culture of compliance*."

39.      These and other Class Period statements – taken individually and collectively – were false and misleading, and created (and were intended to create) the false and misleading impression that Nokia's integration with Alcatel was complete and successful, and that the Company was fully prepared for the 5G transition.  Defendants' Class Period statements likewise omitted to disclose material information concerning significant problems – including technological, organizational, compliance, and cultural problems – that were necessary to make Defendants' statements concerning Nokia's 5G readiness and the progress of the integration not materially false and misleading.  Defendants' materially false and misleading Class Period statements are set forth with particularity below.

A.      2017

1.      Q1 2017 Earnings Call (April 27, 2017)

40.      On April 27, 2017, during a conference call with investors and analysts, Defendant

Suri stated that "we are effectively moving beyond the integration" and that "the integration of

Alcatel-Lucent [is] *behind us*," and that the Company was turning its attention away from the

integration efforts stating, in pertinent part, as follows:

> Thank you, Matt, and thanks to all of you for joining our Q1 results call. Nokia's
> first quarter results showed our improving business momentum and that *we are
> effectively moving beyond the integration effort* for 2016 to making 2017 a year
> of execution and performance.
>
> *            *            *
>
> Thanks, Matt and Kristian, and thanks again to all of you for joining.  I'd like to
> close with just a few thoughts.  We are pleased with the Q1 performance we
> delivered and with the progress we are making to put our strategy into action.
> Whether it's deepening and widening our footprint with communication service
> providers, launching new innovations, adding customers and new vertical markets,
> enhancing our software offerings, stabilizing our top line or progressing with our
> cost savings.  But of course, we are not complacent.  We know we have some
> challenges in select business groups, and we are very focused on addressing those
> issues.  And with the actions we have underway, I am confident that we can get
> those businesses back on track.  *With the integration of Alcatel-Lucent behind us,
> we are committed to building on that platform and to making 2017 a year of
> execution and performance*.

41.      Not only did Nokia announce that it had successfully moved beyond the Alcatel

integration, but the Company also told investors that it had already completed the first phase of

post-integration cost-cutting and was "moving into the next phase."  During an analyst conference

call on October 25, 2018, the Company's CFO stated that: "We have now gone through, one could

say, one phase of cost optimization *after the Alcatel Lucent integration*, *and we are now moving

into the next phase*."

42.      The statements referenced above were materially false and misleading when made,

and omitted to disclose material information necessary to make those statements not misleading

because they falsely conveyed that the risks associated with the Company's integration efforts were behind it. In fact, the Company had learned of material compliance issues at Alcatel that would have to be reported to regulatory authorities and which the Company later admitted "could result in potential criminal or civil penalties . . . which could have a material adverse effect on [Nokia's] business, brand, reputation, or financial position."

### 2. Q2 2017 Earnings Call (July 27, 2017)

43. On July 27, 2017, Nokia hosted its Q2 2017 earnings conference call. During the call, Nokia again attributed its positive financial results to "our disciplined operating model," stating, as follows:

> In general however, ***I believe our second quarter results continue to show the underlying strength of Nokia and of our disciplined operating model in end-to-end portfolio in particular***. Reflecting that, I remain confident we will meet the full year 2017 guidance that we have given for our networks business operating margin and that we also remain on track to reach our goal of EUR 1.2 billion in total cost savings in full year 2018.

44. Suri also announced that the roadmap for the 5G rollout had been moved up to meet market demands. While noting that "this situation does create some near term risk" with respect to the 5G rollout, Suri assured investors that Nokia's "strong customer relationship, deep R&D capacity, and . . . ability to invest as needed" were adequate to offset that risk, as follows:

> I want to be transparent that ***this situation does create some near term risk***, as it makes the timing of certain project completions and acceptance is more uncertain than is typical for us. ***But we have successfully worked through such issues before and I'm confident that we will do so again. We have strong customer relationships, deep R&D capacity and thanks to our robust balance sheet, the ability to further invest as needed***. While we are still evaluating the full impact of these developments, I want to be clear this is not a time to back off from product leadership. We believe we are gaining share from a competitor that is struggling and we are focused on working hard and fast to meet the needs of our customers.

45.     Kristian Pullola echoed this sentiment in his prepared remarks, stating that "[w]e believe that we can manage through these headwinds and risks in 2017 with a relatively small impact on our targets for the full year," as follows:

> In addition, as Rajeev discussed in his remarks, we have today provided some new commentary on the drivers for our full year outlook for our networks business. These include uncertainties related to the timing of completions and acceptances of certain projects, particularly in the second half, 2017 as well as the level of R&D investment needed to maintain product competitiveness and accelerate 5G. We believe that we can manage through these headwinds and risks in 2017 with a relatively small impact on our targets for the full year.

46.     When asked by a securities analyst for additional details about these amorphous risks, Suri again downplayed the extent of the risk, and emphasized that "this is not broad based and we are talking just about certain projects and we expect to be confident to manage through this," as follows:

> **Andrew Gardiner**
>
> I just have one regarding some of the different outlook within the Networks division. *You've mentioned somewhere in your prepared comments, but just in particular the uncertainty related to the timing of completions and acceptances of certain projects I was just wondering if you can provide little more detail in terms of what you mean there? What type of project might be causing some problems in relation to some of the technology spending that you've also discussed? So a bit more detail would be helpful*? Thanks very much.
>
> **Rajeev Suri** - *Nokia Corporation - President & CEO*
>
> Thanks, Andrew. So we -- I talked about this in previous calls that we are seeing a bigger than expected workload on the radio mobile networks division, one due to platform migration this is what I've talked about before, but we're also seeing advancement of some features by customers and now we are seeing acceleration of 5G. So when you put these three things together, there is even more pressure on workload and product road maps, particularly in the Radio team. *So this leads to a slight elevation of risk that in certain projects -- and I want to say that the operative word is really certain that there could be some timing impact on acceptances and this could affect our revenues. Now I wanted to clear, this is not broad based and we are talking just about certain projects and we expect to be confident to manage through this as Kristian said.*

- 17 -

### 3.     Q3 2017 Earnings Call (October 26, 2017)

47.     On October 26, 2017, Nokia hosted a conference call with announce its Q3 2017 earnings.  During the call, Suri stated that 5G was "com[ing] faster than originally expected" but that "Nokia is well positioned . . . [a]nd Nokia is one of the very few companies that is able to meet all those needs," stating, in pertinent part, as follows:

> As I said last quarter however, we believe that ***5G will come faster than originally expected***, starting in 2019.  As that happens, ***Nokia is well positioned***.  It is important to remember that unlike earlier technologies, 5G solutions require much more than radio.  Cloud core, IP routing, transport of many kinds, fixed wireless access, software-defined networking, software orchestration and more, are all essential.  ***And Nokia is one of the very few companies that is able to meet all those needs***.

48.     Kristian Pullola also announced that the Company had overcome the execution challenges related to the early rollout of 5G and was "now fully in the deployment phase" of the project.

49.     As Rajeev Suri explained, those execution challenges related to the planning and development of the technology needed for the early 5G rollout, all of which were resolved and immaterial now that Nokia's products were "5G ready" and "ready for full deployment."

50.     In response to an analyst question about the scope of these execution challenges, Suri emphasized that the uncertainties related to the early 5G rollout were "contained to less than a handful of customers," as follows:

> **Aleksander Peterc** - *Societe Generale Cross Asset Research - Equity Analyst*
>
> I just wanted to dwell a little bit on one of your uncertainty element that you flagged, that is the timing of completions and acceptances of certain projects that extend into the first half 2018. So I'm just wondering is any of that come through already and could be observed in your revenue and margins? Or is it more of a risk going to Q4? And why you're extending that into 2018?
>
> **Rajeev Suri -** *Nokia Corporation - President & CEO*

Thanks, Alex.  That is to do with -- the extensive R&D workload [with] relate to migration, those 4 points I talked about.  And so that has a risk with those customers, where there is the element of network equipment swaps related to the portfolio migration.  And so it's contained to less than a handful of customers, but we see a risk that it could last until first half of 2018, simply because this is a multi-quarter activity.  ***And the good part is that we are now in full deployment mode, and that of course, is helpful***. And of course, some of that is -- already hit us in Q3.

51.     And in response to another analyst question for more clarity on the details of the uncertainties created by the early 5G rollout, Suri responded that the uncertainties were not related to "a particular hardware issue or software per se."  Suri then downplayed the uncertainties, stating that the "the heavy lifting is over" and the remedial work was "down to a few projects, less than a handful," as follows:

**Francois Auguste Roger Meunier** - *Morgan Stanley, Research Division - MD*

***I understand, Rajeev, you're very confident that you can solve, like the engineering issues associated with transferring those Alcatel and maybe Lucent platform to Nokia***.  But I don't know if Marc Rouanne is on the call, but that would be great if someone could explain what are those engineering issues.  Because if we roll back to the announcement of the merger or the acquisition of Alcatel, the plan was not to do any swap-outs.

So what has changed in the past 3 months, okay?  Because 3 months ago, we didn't know.  ***And what has changed in the past 15 months?  And if you could be really specific on the engineering issues, if it's a hardware issue, if it's a software issue. If it's a software issue, what it is, and what are the ex-Alcatel guys doing to make the transition easier***?

**Rajeev Suri** - *Nokia Corporation - President & CEO*

Thanks, Francois. No, Marc's not on the call.  But it still is -- number one, we did say there will be network equipment swaps.  We said we will mitigate to the extent possible by using open CPRI, which is this open interface between the radio unit and the baseband unit.  And that way, we would avoid swapping out a lot of radio units, but you'll still have to swap out the baseband -- you still have to do some swaps.  So we said there will be swaps, but they will be mitigated by the use of technology, which we have done.  But the thing that what we are -- what we have in our Mobile Network portfolio, ***I think it isn't about a particular hardware issue or software per se.  It is just the feature requirements in particular customers with former Alcatel-Lucent footprint, have been greater than we've originally expected***.  So the feature requirements that we have to provide parity to in the new

- 19 -

AirScale product has just been greater.  So it's really a crunching of those features and getting that in the new products, which takes extra time and effort.  And then the second thing is at the same time that, that has happened, there have been feature creep in the market due to competitive pressure.  So other markets have required new features and just normal world market product.  And then as things would happen sometimes, that 5G also got accelerated in 2020 and 2019.  So it's really about getting the quality right when you ship the software.  I think the good news is that the software is now shipped, i.e. the software release is now available. The AirScale hardware is now available, and it is now moving into this full deployment phase, which is all about site work and getting the Global Services team to focus on implementation.  *So the heavy lifting is over. It's down to a few projects, less than a handful. And we're in bulk deployment phase*.

52.     The statements from 2017 identified above were materially false and misleading, and created (and were intended to create) the false and misleading impression that Nokia's integration with Alcatel was complete and successful and that the Company was fully prepared for the 5G transition.  These statements likewise omitted to disclose material information concerning significant problems – including technological, organizational, compliance, and cultural problems – that were necessary to make Nokia's statements concerning 5G readiness and the progress of the integration not materially false and misleading.

**B.     2018**

**1.     Q4 2017 Earnings Call (February 1, 2018)**

53.     On February 1, 2018, Nokia hosted its Q4 2017 conference call for investors and analysts.  In his opening remarks, Defendant Suri announced that the Company was "coming back very fast" from the execution challenges related to the integration.  With respect to 5G development, Suri claimed that "software releases have been at our highest quality levels ever" and that the performance of key 5G infrastructure hardware was "very good."  Suri stated:

As you know, *I flagged some issues related to product integration challenges in Mobile Networks in previous calls.  Looking at the situation today, I think it is safe to say that we are coming back very fast.  Recent software releases have been at our highest quality levels ever.  The performance of our AirScale product is extremely good*.

54.     Suri then introduced its new ReefShark chipset, a critical piece of hardware within the Company's 5G infrastructure, claiming that "we are confident that we have [gotten it right]." The ReefShark chipset purportedly gave Nokia a huge competitive advantage over its competitors, especially insofar as the chip was 5G ready and could be updated remotely through software upgrades.   As Suri explained on the call:   "ReefShark . . . is something that will be hard for competitors to match . . . it is easy to deploy . . . just plug it into our commercially available AirScale unit, and off you go, fast and effective capacity when you need it truly powerful."   Suri stated:

> ***Then ReefShark, which is something that will be hard for competitors to match. It is the mobile network equivalent of our leading FP4 routing chip and has variants for both radio and baseband.  While others can design their own silicon, it takes time and expertise, so if you get it right, and we are confident that we have, you can deliver superior-performing products that have a sustainable advantage for some time***.  Why do you think we have it right with ReefShark?  Well, we think because of several things.  First, it is extraordinarily powerful, capable of meeting the densification needs of operators in the world's largest cities, increasing sell-side throughput by a factor of 3.  Or when chained together, ReefShark can provide base stations up to a massive 6 terabits per second of throughput.  Second, it is extraordinarily smart, leveraging Nokia Bell Labs' artificial intelligence innovations to optimize radio resources and support network slicing.  This will be critical to manage the thousands and even millions of end-to-end network slices that will come with 5G.  Third, it is extraordinarily efficient, able to slash massive MIMO antenna size and power consumption in half and cut baseband power consumption by more than 60%.  Fourth, it is open with common interfaces and toolkits, allowing customers the opportunity to access its AI capability, implement machine learning and deploy their own algorithms in their networks.  Finally, ***it is easy to deploy.  To upgrade your baseband, just plug it into our commercially available AirScale unit, and off you go, fast and effective capacity when you need it truly powerful.***

55.     In addition, Suri stated that "[w]e are moving fast and successfully to put the portfolio integration challenges in Mobile Networks behind us," as follows:

> I know that's a lot to absorb, so just a quick recap: Nokia delivered well in the fourth quarter and ended the full year with improved group-level performance compared to the previous year.  ***We are moving fast and successfully to put the portfolio integration challenges in Mobile Networks behind us***.  We have a highly competitive set of products and services ideally suited to the world of 5G. We

expect 2018 to be challenging from a market perspective and due to the acceleration of near-term 5G investments.  We expect those investments to pay off.  And in 2020, we believe we will be positioned to deliver strong financial performance, including significant EPS growth.

56.     And in his closing remarks, Suri stated that "I'm pleased with where Nokia landed in Q4 and closed the year," highlighting "the speed at which we have addressed the portfolio integration challenges" as evidence of "the execution power of Nokia," as follows:

> To briefly summarize.  ***I'm pleased with where Nokia landed in Q4 and closed the year.  The fact that we were able to turn-around the net working capital issues that we experienced in the third quarter demonstrates the execution power of Nokia, as does the speed at which we have addressed the portfolio integration challenges in Mobile Networks***.  2018 will be another challenging year, and tapping the opportunity of 5G requires additional near-term investment.  I am confident, however, that our investment will deliver the right future results.  We are not interested in investments without returns, nor in gaining share without profits.  That approach is embedded in our DNA, so while we will compete aggressively and expect to continue to win more than our fair share of deals, we will always stay focused on creating real value for our shareholders.  And we believe the value is there to be created and have a high degree of confidence that the guidance we gave for 2020 is achievable. Now we will go and get it done.

### 2.     2017 Form 20-F (March 22, 2018)

57.     On March 22, 2018, Nokia filed its annual report for fiscal year ending December 31, 2017 on Form 20-F with the SEC ("2017 20-F").  In the 2017 20-F, Nokia stated that it completed "***the last major organizational step in [the] Nokia and Alcatel integration***" on July 3, 2017, when it commenced operations of the Nokia Shanghai Bell joint venture to service its Chinese operations, stating, as follows:

> In **Greater China**, we are the leading player among companies headquartered outside China, and work with all the major operators.  We have also extended our market presence to the public and enterprise sectors, including energy, railways and public security.  In 2017, we worked with numerous China-based webscale companies, and all the major operators in Taiwan.  In China, we have six Technology Centers, one regional Service Delivery Hub and more than 80 offices spread over megacities and provinces.  ***A major achievement in 2017 was the closing of our agreement with our Chinese partner, which resulted in the formation of the joint venture – Nokia Shanghai Bell.  This was the last major***

*organizational step in Nokia and Alcatel Lucent integration, bringing together approximately 8 000 colleagues from both companies into a single organization*.

\*      \*      \*

As part of the acquisition of Alcatel Lucent in 2016, Nokia acquired a partly owned consolidated subsidiary, Alcatel-Lucent Shanghai Bell Co., Ltd.  On May 18, 2017 Nokia announced the signing of definitive agreements with the China Huaxin Post & Telecommunication Economy Development Center ("China Huaxin"). related to the integration of Alcatel-Lucent Shanghai Bell Co., Ltd. and Nokia's China business into a new joint venture branded as Nokia Shanghai Bell.  On July 3, 2017, Nokia and China Huaxin commenced operations of the new joint venture.  Nokia holds an ownership interest of 50% plus one share in the parent company, Nokia Shanghai Bell Co., Ltd., with China Huaxin holding the remaining ownership interests.

58.     The 2017 20-F disclosed that the incentive compensation awards related to the Alcatel acquisition were paid to the Company's CEO and President because targets related to "financial synergies and cultural integration . . . were achieved in full," stating, as follows:

Long-term incentive payments received in the year reflect the performance share award granted in 2014.  Based on strong performance in 2014 and 2015 the payout under that plan was 125.72% of target.  The President and CEO also received the payment under the first tranche of a special award granted in 2016 to incentivize the delivery of synergies from the Alcatel Lucent acquisition.  *That award was based on financial synergies and cultural integration and the targets were achieved in full*.  The three-tranche vesting of the award ensures continued interest in delivering sustainable integration.

### 3.     Q1 2018 Earnings Call (April 26, 2018)

59.     On April 26, 2018, during Nokia's Q1 2018 earnings call, Suri used his prepared remarks to assure investors that "we are in a very strong position for 5G" and that "the roadmap issues we saw last year are largely behind us," as follows:

On the individual product side, our innovation engine is delivering well.  Among other things in the quarter, we announced 2 new chipsets: ReefShark for Mobile Networks; and our Photonic Service Engine 3 or PSE-3 for Optical Networks. Both are leaps ahead of the competition and both will give us differentiation for some time to come, as creating your own silicon takes time, effort and above all, expertise.  In addition, and as I said earlier, *we are in a very strong position for 5G.* Our AirScale platform is performing very well in the field. Recent software releases are at the highest quality levels ever and *the roadmap issues which we saw last*

*year are largely behind us*, even if there is plenty of heavy R&D lifting still to come in the sprint to 5G.

60.    In response to an analyst question about the expected financial impact of the ReefShark chipset, Suri claimed that the ReefShark chipset was a "competitive, cost-based product" that would "improve the cost structure over the long term," as follows:

**Thomas Michael Walkley** - *Canaccord Genuity Limited, Research Division - MD & Senior Equity Analyst*

*Just a question about internally developed silicon, such as ReefShark.* Can you share with us kind of customer feedback? *How margins might be impacted when the new product ship*? Is ReefShark still in track for the second half of the year and is somewhat – could it be possible some customers waiting for the new architecture creating a much stronger second half versus first half of the year?

**Rajeev Suri -** *Nokia Corporation - President & CEO*

Thanks, Mike. Customer feedback is fantastic, both on this as well as the new chipset in optical, PSE-3, because this makes massive [Multiple Input Multiple Output] more relevant because massive MIMO then can be rolled out in the scale sort of way because it reduces the power consumption quite meaningfully by almost half, but also the size of the massive MIMO antenna is such that you can actually carry it on the top of the tower as opposed to using cranes and so on. So of course, everything changes with that sort of massive MIMO antenna because then you can really scale it. So great feedback. *It will improve the cost structure over the long term. That's the point of having a competitive cost-based product*. It will not stop AirScale deployments because AirScale deployments are continuing to grow. And when this comes, which it will still be on track for the second half, so this will only help scale it even further with massive MIMO in 4G as well as 5G.

###    4.    Q2 2018 Earnings Call (July 26, 2018)

61.    On July 26, 2018, Nokia hosted its Q2 2018 earnings call for investors and analysts. During the call, Suri announced that "the Mobile Networks team is making solid progress on its [5G] roadmaps," as follows:

With those comments, let me turn to the progress we are making in the execution of our strategy. Starting with our first pillar, leading in high-performance end-to-end networks with communications service providers. The good news here is that we see no change to the overall dynamics driving the acceleration of 5G. Nokia and its competitors are all hard at work, as there's been a radical shift in the time from the release of standards to the expectation of trial systems from around 12

- 24 -

months for 3G and 4G to just a few months for 5G. With that intensity, if any company tells you they have everything done and dusted for 5G, well, I would approach that claim with more than a little skepticism. We all face some risks as we push to get 5G products to market. Time is tight and development teams are stretched. But despite the high pressure, ***the Mobile Networks team is making solid progress on its roadmaps***. You can see this in the deals that we have won and announced, and we have others in the pipeline that are still to come.

62.     Suri dismissed media reports that "Nokia is losing share as a result of some fundamental issue of product competitiveness" as "competitor-fueled speculation." Suri assured investors that "I see no reason for concern about our market share position beyond normal execution challenges," as follows:

Second, ***we are not losing any footprint in North America***. I know it has been reported that Nokia lost a small number of markets in Verizon to a competitor; that is true, and it is unfortunate. Verizon is a longstanding customer and we deeply value our relationship with them, but we still have a very strong position with Verizon and are working closely with them on 5G.

In 2 other large North American operators, we are gaining meaningful share in Mobile Radio. In a fourth, we are holding steady. In the coming few days, you should expect to hear more, as we have a large signed deal with one of the large North American customers that we are preparing to announce. I'm also sure that you've seen a number of press releases from us since the start of the year about our very close work with T-Mobile and Sprint.

So in short, I see no overall footprint loss in North America, ***and any suggestion that Nokia is losing share as a result of some fundamental issue of product competitiveness is simply incorrect***. It might make for interesting competitor-fueled speculation, but it does not reflect reality. When I look at our performance in the first half of the year and our backlog in the second half, ***I see no reason for concern about our market share position beyond normal execution challenges***.

63.     Furthermore, during an exchange with a securities analyst, Suri explained that the costs of 5G were ***decreasing*** through cost erosion as the Company increased the scale of its product development, as follows:

**Sandeep Sudhir Deshpande** - *JP Morgan Chase & Co, Research Division - Research Analyst*

You talked about the scale helping in terms of the margins in the second half. Can you comment on the mix? Because you've got -- you've announced over the past

- 25 -

1.5 years a couple of major new products associated with -- I mean, the ReefShark-based base stations, as well as the FP4-based IP routers.  I mean, can you talk about the mix of those new products in terms of your revenue and whether that will help improve the gross margin, not only in the second half but into 2019?

**Rajeev Suri** - *Nokia Corporation - President & CEO*

Yes, I'm glad you asked the question.  So yes, we do expect, with AirScale ramping up in our Mobile portfolio, including with ReefShark and the timing of chips coming with ReefShark, FB4 in IP Routing, PSE-3 in Optical; these are all enhancements to product cost.  **And so we see product cost erosion, and therefore we will see also a benefit from that**. . . .

### 5.    Q3 2018 Earnings Call and Press Release (October 25, 2018)

64.    On October 25, 2018, issued a press release on a Form 6-K announcing its "plans to accelerate strategy execution, sharpen customer focus, and maintain long-term cost leadership." The press release issued a quote from Rajeev Suri touting "the successful Alcatel-Lucent integration" and Nokia's "considerable progress in executing its strategy."  Suri also stated in the press release that "[o]ur early progress in 5G is extremely strong," and, citing the Company's win rate for new deal, that "we are in a very good competitive position," as follows:

"***Nokia has made considerable progress in executing on its strategy***, with excellent momentum in providing high-performance end-to-end networks, targeting new enterprise segments and creating a standalone software business," said Rajeev Suri, President and CEO.  "***Our early progress in 5G is extremely strong***, we continue to increase our investment in this critical technology, and our win rate for new deals suggests that ***we are in a very good competitive position***."

"***With the successful Alcatel-Lucent integration and cost-saving program soon to be behind us, we are taking steps to accelerate the execution of our strategy and sharpen our customer focus***.  We will also redouble our efforts to ensure that Nokia's disciplined operating model remains a source of competitive advantage for us, and that we maintain our position as the industry leader in cost management, productivity and efficiency.  We noted earlier this year that we would need to take further cost actions in order to deliver on our 2020 guidance.  Today, we are quantifying those actions and raising the certainty that we can meet those commitments," Suri said.

65.     In the press release, Suri also highlighted the measures the Company was taking to optimize the combined Company, thereby conveying to the market that the integration itself was already complete, as follows:

> "Our industry is one where a constant focus on costs is essential," said Suri.  "The plan we are announcing today is the logical step to take as the completion of our Alcatel-Lucent-related cost saving program draws near.  *Since the acquisition closed, we have been integrating and capturing synergies and now it is time to focus on optimizing and ensuring that we are lean in every part of our business*.

66.     That same day, Nokia hosted its Q3 2018 quarterly earnings call with investors and analysts.  During the call, and in response to a question from a J.P. Morgan analyst, Nokia's CFO Kristian Pullola stated that the lingering execution challenges relating to the Alcatel integration and 5G rollout were mostly complete, and had no impact on the Company's revenue, as follows:

> **Sandeep Sudhir Deshpande** - *JP Morgan Chase & Co, Research Division - Research Analyst*
>
> One question again on the fourth quarter and the margin progression in the fourth quarter.  I mean, *in the third quarter, were your swaps that you were doing in the first half of the year completely over*?
>
> And then secondly, with regard to the 5G orders that you have that are going to ramp up into revenue into the fourth quarter, do you have anything to do with the acceptance on those orders?  And is there any risk on the acceptance?  Or [have] you already begun to ship those 5G orders and have already seen some acceptances?
>
> **Kristian Pullola** - *Nokia Corporation - CFO*
>
> I think maybe I can take the swap question.  *So I think we still have some swaps to do*.  As I said in my prepared remarks, *we now expect that the cost of executing those swaps will be somewhat lower than what we originally anticipated.  But there's really no kind of correlation between that and revenues*.
>
> Of course, getting out of the swap phase will enable us to fully focus our delivery capacity on the 5G project in North America, and that will help.  *But I think one should not kind of see that as being a source of revenue upside going forward*.

67. In response to a question about cost-cutting related to the Alcatel integration, Kristian Pullola stated that "[w]e have now gone through . . . one phase of cost optimization after the Alcatel Lucent integration," as follows:

**Aleksander Peterc** - *Societe Generale Cross Asset Research - Equity Analyst*

I'd just like to understand very briefly regarding your new structuring plan. What part of it is pertaining to remodeling your business structure? And what part of it is pure cost cuts? And are you exiting any business areas? ***Are you still eliminating any of the excess and duplicate cost base due to the ALU takeover? I'd just like to understand that***.

\*       \*       \*

**Kristian Pullola -** *Nokia Corporation - CFO*

Maybe I'll start on the cost restructuring, because I think it's very important to understand that in the additional announcement we make today, we talk about two different things, like Rajeev said in his prepared remarks. We are making structural changes that will enable us to execute quicker on our strategy and to enhance our customer focus.

And those relate to the creation of the Enterprise business groups, making Mobile Networks more focused on mobile radio and moving core into Nokia Software as core more and more is really about software. So those are enablers to run a better business going forward.

Then, on the other hand, we are also taking cost actions. The cost actions are in areas where we want to make sure that we have support function costs that are world-class. ***We have now gone through, one could say, one phase of cost optimization after the Alcatel Lucent integration, and we are now moving into the next phase***. We can, through leverage and digitalization and improved processes take out more cost from our support functions.

### 6. Global Technology Conference (November 12, 2018)

68. On November 12, 2018, during UBS Global Technology Conference in San Francisco, Rajeev Suri delivered a presentation on "Creating Value in the 5G Era," followed by a questions and answer session with a director of UBS Investment Bank's research division. The first question related to the execution challenges related to the Alcatel deal, and asked whether

Nokia was "past the worst."  Suri responded positively, stating that "things are starting to improve

in our move to 2020 . . . and much of that is from 5G acceleration," as follows:

> **David Terence Mulholland** - *UBS Investment Bank, Research Division - Director and Equity Research Analyst - Technology Hardware*
>
> So before we jump into the future and 5G, I just wanted to quickly cover some of the challenges that Nokia has faced over the last 12 months.  I think from my perspective, how we've initially seen a very strong financial performance post the Alcatel Lucent deal.  The last 12 months have seen some more challenges to the business, particularly from a gross margin perspective, even if the top line's got a bit better.  So *I wondered if you could just run through some of those issues and comment on whether you think you're kind of the -- seems to me, at least for Q3, your past the worst, but I'd love to get your perspective on that*.
>
> **Rajeev Suri** – *Nokia Corporation – President & CEO*
>
> Thanks, David.  *So first, in Q3 last year, we had some issues regarding our swaps when we brought the road map together between the former Alcatel Lucent and Nokia on the wireless side.  We had some delays on the swaps notably in the -- with a few customers, especially here in North America.  That hurt us to some extent*.  And then the first half of this year, with Q4 last year was actually pretty decent.  And then first half of this year, we saw some regional mix issues and product mix issues as well.  So more lower-margin portfolio being sold relative to high-margin portfolio.  In Q3, we saw some of that reverse, as we said it will happen, second half will be stronger.  We also saw that the order backlog was 30% up since the start of the year.  That's a good sign. And much of that is from 5G acceleration, Nokia's software business, et cetera.  So I do believe from here on, things are starting to improve in our move to 2020.  And of course, a EUR 700 million cost reduction that we have provides us more certainty towards that 2020 guidance goal.

69.     In response to a question about competition in the telecommunications industry,

Suri stated that "competitive intensity [is] unchanged" and that Nokia was in a "good position to

be in right at the beginning of the outset of 5G," as follows:

> **David Terence Mulholland** - *UBS Investment Bank, Research Division - Director and Equity Research Analyst - Technology Hardware*
>
> And then changing to talk a little bit, because one of the discussions I have with investors a lot is around the competitive intensity and kind of competition within the industry.  And I guess, over the last couple of years we've heard Ericsson talking a lot more robustly on trying to regain share.  We've seen some of your competitors facing security concerns and Samsung has kind of always been on the door.  My

personal view is that I don't see things changing that much, but I'd love to get your impression on how you see the competitive intensity and the competitive strategy differences between you and some of your competitors over the next year or 2.

**Rajeev Suri** - *Nokia Corporation - President & CEO*

Yes, the competitive intensity in terms of price, and so on is neutral in the last couple of years.  I've not seen it get better or worse. So that's neutral.

*     *     *

But in terms of competitive intensity, I think there are 2 end-to-end players, just 2 out of the 5 that compete here in this carrier-focused industry.  We are probably best served in moving to the enterprise because we have again this end-to-end portfolio.  Again, we're not going to buy the ocean in the enterprise business. So our – we only want to focus on the top 4,000 companies and not like building a deep enterprise channel because we're not interested in hospitality and hotels and educational institutions and selling WiFi and small cells to all kinds of people with massive reseller channel.  That's not our interest.  We're a large networks company.  We want to keep focus on large networks whoever needs it, whether it' a Webscale or a carrier or an enterprise. ***So competitive intensity unchanged***.  We are the only ones that -- you talk about 5G, there are 14 operators in the lead countries, the 4 lead countries I talk about.  We're the only ones that work with all 4 countries, all 14 operators. ***So it's a good position to be in right at the beginning of the outset of 5G***, which we didn't have at Nokia in the past because we didn't have such a great presence in the U.S. or that expanded presence in China that we got up with the Alcatel Lucent acquisition.  So I think we operate at scale in all the markets of that need end-to-end. And there are only 2 end-to-end players.  And over time this will be a very significant differentiator as we move into 5G.

70.     When asked about the nature of the challenges related to the Alcatel integration,

Suri stated that there were "hiccups" but that everything else was positive.  Suri also stated that

"[t]he cultural integration worked very well . . . that can go really badly, but [it] actually went

beautifully," as follows:

**David Terence Mulholland** - *UBS Investment Bank, Research Division - Director and Equity Research Analyst - Technology Hardware*

That's great and I have a few more questions.  Once that, if anyone has any questions they want to put to Rajeev, feel free to send them in the conference app.  ***So if we take a think back I think nearly 3 years post the closing of the Nokia Alcatel deal.  I think compared to our expectations were at the time the margins and things have played out a little bit more challenging than expected.  But I wondered if you could talk about what you think has gone well about the deal***

- 30 -

*and the transaction and where you think some of the challenges have been over the last 3 years*.

**Rajeev Suri** - *Nokia Corporation - President & CEO*

What's gone well is that we've been able to bring the roadmaps of the 2 products, i.e., product rationalized the wireless products fairly quickly.  It can take years, but we've been able to do it in about a year.  And then we were able to use the next 1.5 years to swap all that former Alcatel Lucent portfolio fairly well.  Even though we had a hiccup in Q3 last year, we recovered very nicely from that.  It's almost done, so it's 95% of it is done and the rest will be done by the end of this year, which is quite remarkable that you can swap all that portfolio, now have cleaned the new AirScale Nokia base stations to move into the world of 5G.  So that rationalization has been positive.  Inevitably, *there are hiccups, but it's been positive*.  The enterprise business has worked well for us. Nokia's software, building the stand-alone software business at scale, I mean, that's starting to now reap its rewards because we've been growing in that business about 3% last year and about 4% last quarter so it's starting to move into growth.  The order backlog there is very strong.  *The cultural integration worked very well because that can go really badly, but that actually went beautifully*.

So in 3 years, we have -- our employees are highly engaged even if we have been restructuring and having layoffs in that last 3-year period.  What didn't go well is at the beginning in Alcatel Lucent in 2015, there were some significant pull-forwards that company had done of revenue that hurt us when we started in 2016.  In a public company acquisition, you can't manage that, but that's something that one has to learn from.

71.     In a follow-up exchange regarding the cultural integration, Suri stated that

"[c]ultural integration is 80% over," and that "most of the heavy lifting is over," as follows:

> **David Terence Mulholland -** *UBS Investment Bank, Research Division - Director and Equity Research Analyst - Technology Hardware*
>
> *And coming back to your point on the cultural integration and the 2 businesses, do you think you're pretty much through that now*?  And when do you start seeing the benefits of that in the actual operational performance of the business?
>
> **Rajeev Suri** - *Nokia Corporation - President & CEO*
>
> *Yes, we're through most of that*.  It is a -- usually it's a 3- to 5-year period you bring the cultures together, right?  Because it's just 50,000 people from each company coming together with different cultures, different backgrounds . You've got to put the effort, and it just doesn't happen, right?  You've got to all the way from Monday, and then putting -- harmonizing the incentives around the world, harmonizing the base systems around the world to deeper cultural attributes and

what are your values, what are your culture, what do you stand for, how do you reinvent yourself. And so we have this culture focused around their care and just a strong execution drive their end care for principles on that. I work the price for principles myself.

I'm a deep advocate of culture. I work pretty hands-on in the culture, spend a lot of time with people and employees. And we're now going to need customers who have lots of employee town halls to ensure that, that culture is -- you don't want a loose umbrella culture and just many subcultures, which can happen in M&A. ***So I think we're in a good place now. I'd say that integration is over at the end of this year. Cultural integration is 80% over***. Employee engagement is super high, 85%, that level. Which is extremely high for 3 years into a merger like this. It's a journey, so it's never over. You have to keep working on a high-performance, high-integrity culture. But ***I think most of the heavy lifting is over***, and now it's about optimizing and. . . .

72.    The statements from 2018 identified above were materially false and misleading, and created (and were intended to create) the false and misleading impression that Nokia's integration with Alcatel was complete and successful and that the Company was fully prepared for the 5G transition. These statements likewise omitted to disclose material information concerning significant problems – including technological, organizational, compliance, and cultural problems – that were necessary to make Nokia's statements concerning 5G readiness and the progress of the integration not materially false and misleading.

**C.    2019**

**1.    Q4 2018 Earnings Call (January 31, 2019)**

73.    On January 31, 2019, Nokia hosted it Q4 2018 earnings call. During the call, Defendant Suri announced that certain risks "related to project timings and product deliveries" materialized, but assured investors that "I have absolutely no doubt that a fast and meaningful shift to 5G is underway," stating, as follows:

Also, ***as you will remember, I said in our last call that we saw risks as we headed to the end of the year, largely related to project timings and product deliveries***. Some of those risks did in fact materialize in the fourth quarter, although we were able to offset them by capturing upsides in other areas, particularly in North America.

- 32 -

Looking ahead, I expect those risks to carry over into at least the first half of 2019. To be clear, ***I have absolutely no doubt that a fast and meaningful shift to 5G is underway***.  But there are several factors that point to 2019 being very second half loaded similar to what we saw in 2018.

74.     Suri further stated that the Nokia had "a massive amount of 5G-ready hardware already deployed," some of which was "waiting for the availability and acceptances of key 5G software releases," as follows:

> . . . there are several factors that point to 2019 being very second half loaded similar to what we saw in 2018.

> The first is the staggered nature of 5G rollouts.  A small number of lead countries will start rollouts that accelerate over the course of this year.  As is typical in large technology transitions, however, more general adoption will go at a slightly slower pace with a broader ramp-up starting at the tail end of 2019 and in 2020.  The second reason for a back half-loaded year is that the 5G ecosystem: standards, chipsets and devices, is still in its early days.  We expect this to stabilize in the coming months, but it means that development and testing are operating under considerable time pressure.

> The final reason is that ***while Nokia has a massive amount of 5G-ready hardware already deployed*** and we ended 2018 with a backlog considerably larger than the previous year, conversion of orders and backlog to sales could be somewhat slower than normal.  ***Some of the hardware that has been deployed is waiting for the availability and acceptances of key 5G software releases***.  Those releases will come available as the year progresses.  When you put this all together, I think it is safe to say that 2019 will be one focused on full year results, not those of individual quarters.

### 2.     2018 Form 20-F (March 21, 2019)

75.     On March 21, 2019, Nokia filed its annual report for fiscal year ended December 31, 2018 on Form 20-F with the SEC (the "2018 20-F").  The 2018 20-F again highlighted "the successful Alcatel Lucent integration," as follows:

> Given the considerable momentum of our strategy, and with ***the successful Alcatel Lucent integration*** and associated cost-saving program completed, we took steps during 2018 to accelerate the execution of our strategy and position our business for 5G leadership.  Alongside a new program targeting EUR 700m in annual cost savings by the end of 2020, these steps have led to a number of organizational changes that further strengthen our ability to deliver on our 2019 and 2020 guidance.

76.     Nokia also touted its R&D capabilities, without disclosing that problems with the

Alcatel integration were impeding its ability to develop the technology that it needed to compete.

To the contrary, Nokia claimed that "[w]e are one of the industry's largest R&D investors in

information communication technology and we drive innovation across telecommunications and

vertical industries," that "[p]roduct development is continually underway," and that "our R&D

network is an important competitive advantage for us," as follows:

> We are one of the industry's largest R&D investors in information communication
> technology and we drive innovation across telecommunications and vertical
> industries to meet the needs of a digitally connected world.  Product development
> is continually underway to meet the high programmability, agility and efficiency
> requirements of the next-generation software-defined networks that will
> accommodate mobile and fixed broadband, IoT, intelligent analytics and
> automation, which are used to forge new human possibilities.

> We have a global network of R&D centers, each with individual technology and
> competence specialties.  The main R&D centers are located in Belgium, Canada,
> China, Finland, France, Germany, Greece, Hungary, India, Italy, Japan, Poland, the
> Philippines, Portugal, Romania, the United Kingdom and the United States.  We
> believe that the geographical diversity of our R&D network is an important
> competitive advantage for us.  In addition, the ecosystem around each R&D center
> helps us to connect with experts on a global scale, and our R&D network is further
> complemented by cooperation with universities and other research facilities.

77.     In the 2018 20-F, the Company also touted its progress in 5G technology, and

specifically invoked its investments in the ReefShark processor, yet failed to disclose that Nokia

was lagging behind its competitors in 5G development, as follows:

> In Mobile Networks our goal is to be the leader in 5G and provide the best value to
> our customers as they evolve their networks.  In December 2017 the first 3GPP
> specifications were confirmed – including 5G New Radio (NR) – and since then,
> the technology and the market have moved fast.  ***We continue to develop our 5G
> portfolio according to the latest 3GPP specifications and are proud of the number
> of industry firsts that we have completed on the path to 5G commercialization.
> Furthermore, we continue to invest significantly in our ReefShark processor
> family for baseband and RF***.  Our customers are moving fast as well: our first
> commercial 5G radio contract was signed in January 2018 with NTT DoCoMo in
> Japan based on 5G New Radio.  As an industry, we have moved quickly from
> specifications to development, testing, and implementation in real networks. To this
> end, roughly half of our R&D personnel are fully focused on 5G and this is expected

to increase as we continue to move personnel on a periodic and strategic basis.  As we move from 4G to 5G, we aim to become a champion of continuous integration, continuous delivery and DevOps.

We have a global installed base that is expected to provide us with the platform for success in 5G.  ***We have more than 400 customers in 4G/LTE and a robust AirScale platform, which can be upgraded from 4G to 5G***.  We built our AirScale portfolio and small cells, software and mobile transport solutions to work across all generations of technology and all relevant spectrum bands for efficient, simplified and optimized sites for our customers.  In radio we build our access portfolio based on one architecture: Future X is the foundation of our reference architecture for all deployment models.  The Nokia 5G Future X end-to-end product and services portfolio combines high-capacity 5G New Radio, core, SDN-controlled "Anyhaul" transport, edge clouds, and software orchestration to provide a complete set of network capabilities for commercial 5G[.]

78.    With respect to the Alcatel integration, the 2018 20-F again referenced the "completion of the Alcatel Lucent integration" and stated that the company was "now moving to the next phase of restructuring, where we will focus on optimization and ensuring that we are lean in every part of our business," as follows:

In 2018, our Networks business continued to focus on operational improvements across its business groups, in an effort to complete the cost savings program put in place following the acquisition of Alcatel Lucent.  ***Upon completion of the Alcatel Lucent integration as of the end of 2018, we are now moving to the next phase of restructuring, where we will focus on optimization and ensuring that we are lean in every part of our business***.  In order to continue to make our Networks business more efficient, higher-performing and positioned for long-term success, we aim to further strengthen our productivity, efficiency and competitive cost structure through strong operational discipline.

Thus, despite claiming that the integration was totally complete, Nokia did not disclose that problems with the integration had severely interfered with the Company's efforts to develop its 5G infrastructure.

### 3.    Q1 2019 Earnings Call (April 25, 2019)

79.    On April 25, 2019, Nokia released its earnings for the first quart of 2019. That same day, Nokia hosted a conference call with investors and analysts to discuss that earnings report. During the conference call, Suri addressed and rejected market rumors that Nokia was lagging

- 35 -

behind its competitors in 5G development.  Suri acknowledged that "[w]e do have some short term

issues," but claimed that these issues only delayed the anticipated 5G rollout by "weeks and, at

most, a few months in some select cases," and stated that "I do not find these [defects and stability

issues] particularly surprising," stating, in pertinent part, as follows:

> I would also like to openly address the question of Nokia mobile radio road maps as there is some noise about where we stand today.  ***We do have some short-term issues, weeks and, at most, a few months in some select cases***.  But these need to be understood in the context of a technology cycle that will last well over the next decade and that is still in the process of maturing. In Q1, higher radio product costs also had an impact on gross margin, and that is not unusual early in a new generation of technology.  We are very focused on this issue and have a clear plan for improvement.
>
> As a proof point that the ecosystem is still maturing, we have found software defects and instability in the consumer device chipsets in the process of testing our 5G base station software.  It seems reasonable to believe that if we were significantly behind our competition as some have suggested, such defects and stability issues would have already been found and then fixed by the chipset makers.  ***I do not find these gaps particularly surprising***, given the speed at which things have been and are continuing to move, but it also suggests that full ecosystem stability and predictability are yet to come.

### 4.    Cowen's Technology, Media and Telecommunications Conference (May 30, 2019)

80.    On May 30, 2019, Nokia participated in Cowen's 47th Annual Technology, Media

and Telecommunications conference in New York City, which included a Fireside Chat with

Marcus Weldon, CTO and President of Nokia's Bell Labs to discuss the future of 5G.  During the

discussion, an analyst asked Weldon to candidly explain the Company's 5G development was

progressing.  In response, Weldon acknowledged that certain forward-looking statements were

"hype," but that the "reality" was that  about "500,000 of SKL platform base stations have been

deployed that are 5G-ready and 3.8 million 5G-ready radios" were already deployed, as follows:

> ***To your point about hype***, absolutely, I think we're a market that loves to overhang. I mean we've actually started talking about 6G and we've just started 5G.  *I think we either love technology slightly too much or we're just motivated to talk about something new but whatever it is -- **there is reality.  There are tens of thousands***

*of base stations. I'd like to say that we have 500,000 of SKL platform base stations have been deployed that are 5G-ready and 3.8 million 5G-ready radios. So we're sort of put the foundation in*, but then the releases have to go in those, the actual features have to be built on those sort of 5G, and that's going to be years. It starts this year, it gets more next year and you hear from AT&T and Verizon, they have a couple of handsets this year, more next year. I think I've heard numbers like 60% to 70% of their handsets will be 5G-ready by the end of next year. We all know Apple is end of next year for that sort of timeframe for 5G device, I think that's what they've said.

### 5. Q2 2019 Earnings Call (July 25, 2019)

81.    On July 25, 2019, Nokia hosted a conference call for investors and analysts to discuss the Q2 2019 earnings. Suri's prepared remarks covered 4 topics: (i) 5G, both from a Nokia and a market perspective; (ii) how the virtuous circle of investment is benefiting Nokia; (iii) progress in the execution of our strategy; and (iv) an update on Nokia's 2019 expectations.

82.    Starting with 5G, Suri stated that "we continue to win new deals and improve our product competitiveness," and assured the market that the Company was in a "solid position in the early stages of 5G," as follows:

> . . . So to recap here, Nokia has a solid position in the early stages of 5G with our win rate and deployments, our 4G performance and deep customer base give us confidence about the opportunities to come and given the expected timing of large scale deployments as 5G moves beyond the lead countries, Nokia will be ready to support our customers at scale.

83.    During the question and answer question, an analyst asked whether the Company was on track in developing the key hardware needed for 5G. In response, Suri stated that the hardware development was "a few weeks delayed" in the previous quarter, but that "the chipset development on 5G, again . . . [is] on track for both radio and broadband." He further stated that the product "will also give us product cost advantages," as follows:

84.    Suri commented on the software issues from the previous quarter and on the status of the ReefShark products, as follows:

**Alexander Duval** - *Goldman Sachs Group Inc., Research Division - Equity Analyst*

Yes.  Alex Duval, Goldman Sachs.  Wondered if you could talk a bit about your latest thoughts on the strength of your product offering in wireless relative to your peers.  First of all, it looks like you've now navigated the software issues that needed to be resolved.  Wondered if you could just clarify on that?  And secondly, in parallel, how confident are you on chipset development being on track from a roadmap perspective for 5G?

**Rajeev Suri** - *Nokia Corporation - President & CEO*

Thanks, Alex.  **So we were a few weeks delayed**, and that's why we couldn't get that revenue recognition in Q1.  Now we've got general availability.  We're getting customer acceptances.  An important indicator is we have 9 live commercial networks.  Our conversion rate is fantastic, 4G to 5G, with the 45 deals we have.

And then because these networks are non-standalone architecture, it really does matter how good your 4G layer is.  That gives us the ability to use that installed base to sort of convert all the customers to 5G.  And so this RootMetrics example I gave in my prepared remarks, it's really important.  It's the second time we won the best network performance across all of these 125 markets.

And so there is still some work to do, but it's not in the area of stability of the network or network performance generally, perhaps in some features which have to come later in the year.  But we will be there for the most important features that the customers need, such as dynamic spectrum sharing, et cetera.  That'll be on time.  We already have it in parts of the network. Between 4G and 5G, that'll be on time when the customers need it.

***On the chipset development on 5G, again, it's on track for both radio and baseband***.  You remember that ReefShark is there, family of products, and they're starting to come out during '19 and '20.  And they will also give us product cost advantages when they scale and get rolled up.

85.     The statements from 2019 identified above were materially false and misleading, and created (and were intended to create) the false and misleading impression that Nokia's integration with Alcatel was complete and successful and that the Company was fully prepared for the 5G transition.  These statements likewise omitted to disclose material information concerning significant problems – including technological, organizational, compliance, and cultural problems – that were necessary to make Nokia's statements concerning 5G readiness and the progress of the integration not materially false and misleading.

### D.     False and Misleading Statements and Omissions Regarding Nokia's Code of Conduct

86.     In announcing that the Company had successfully moved beyond the integration, the Company conveyed to the market that it had brought Alcatel fully into the Company's operations, governance, and internal reporting mechanisms.   These included Nokia's Code of Conduct, which, according to Defendant's Suri's introduction, was "a vital part of our work and of everything we do."[8]

87.     This Code of Conduct expressly "outlines our commitment to act compliantly and ethically in our business activities."   In this regard, the Code of Conduct assured investors that: "We follow the laws of the countries where we do business, and we adhere to Nokia's policies and procedures."

88.     The Code of Conduct also set forth specific "policy statements" describing compliance standards concerning numerous areas of ethical and/or legal compliance, including "Improper Payments;" "Conflict of Interest;" "Dealing with Government Officials;" "Working with Suppliers;" "Trade Compliance;" "Insider Trading;" and "Controllership."[9]   The Code of Conduct assured investors that any non-compliance with the Code of Conduct was reported promptly:   "We hold each other accountable to this Code, and if we become aware of potential violations, we promptly report them."

---

[8]     At all times during the Class Period, the Code of Conduct was published on the Company's website and disclosed to the investing public.  The Code of Conduct was amended during 2018. All language from the Code of Conduct cited herein was disclosed as part of every version of the Code of Conduct that existed throughout the Class Period.

[9]     The Code of Conduct describes "Controllership" as "complying with the applicable laws and regulations that govern its financial accounting and reporting to government agencies, investors and the public."

89.     The Code of Conduct also emphasized the direct and critical role that senior management played in ensuring ethical and legal compliance:

> *Nokia managers and leaders are compliance stewards for their organizations: they own the culture of compliance.*  Thus, leaders and managers have additional responsibilities to engage actively with their teams and create an effective culture of compliance in their organizations.  This means that managers must:

- Know and anticipate business compliance risk areas that would affect your team operations;

- Take proactive steps to mitigate risks that may affect team operations and ensure your team is trained to deal with them;

- Communicate regularly with your team about the importance of compliance;

- Emphasize the value of reporting potential compliance concerns promptly and foster an environment of open reporting;

- Ensure that employees feel comfortable raising concerns without fear of retaliation;

- Reward and recognize employees who go above and beyond with respect to compliance;

- Allocate appropriate resources to ensure compliance and set goals to track compliance;

- Hire and promote only those people who have high standards of integrity;

- Participate actively and meaningfully in the compliance process and governance for the company;

- Demonstrate visibly – through your own words and actions – your personal commitment to the Nokia Code of Conduct and its policies.

90.     To bolster this "compliance stewardship" by Nokia's senior leadership, the Code of Conduct imposed an obligation on all Nokia employees – including the Company's former Alcatel employees – to report any compliance concerns and provided details concerning the Company's well-developed procedures for reporting compliance concerns up the management chain.  As stated in the Code of Conduct, all Nokia employees must "[p]romptly raise any and all

compliance concerns through one of the channels provided by the business[.]"  Further, the Code of Conduct described these thorough reporting procedures:

> Nokia provides multiple ways to raise a concern. You may talk to your line manager, Legal & Compliance, HR or Local Ombuds Leaders.  The Ombuds Leaders serve as a neutral and confidential channel for discussing ethics questions and concerns.  You may also write to our CEO or our Board. All concerns are handled confidentially.

91.     The Code of Conduct also explicitly recognized the importance of compliance to the Company's shareholders: "[O]ur shareholders expect us to do business the right way – by earning, through lawful and ethical competitive advantages, a sound return on their investments." Similarly, the Code of Conduct recognized that: "Violations of our Code of Conduct erode the trust we have built with our shareholders, customers and other stakeholders."

92.     The statements referenced above regarding Nokia's Code of Conduct were materially false and misleading when made, and omitted to disclose material information necessary to make those statements not misleading because they falsely conveyed that Alcatel had been fully integrated into the Company's Code of Conduct and compliance mechanisms.  These statements likewise communicated to the market that Alcatel – despite the risks associated with its history of serious compliance problems – had been brought within and was in compliance with Nokia's Code of Conduct.  These statements omitted to disclose that, in fact, the Company had discovered compliance issues during the integration that were only disclosed in March 2019, causing significant damage to Class members.

## VI.     THE TRUTH EMERGES

### A.     The Company Announces Compliance Issues Discovered During the Alcatel Integration, Causing Nokia's Shares to Plummet

93.     On March 21, 2019, Nokia filed its annual report on Form 20-F for the 2018 fiscal year (the "2018 Annual Report").  Although the Company had repeatedly assured the investing

public almost two years earlier that it had successfully moved beyond the Alcatel integration, the Company now suddenly announced that it had discovered compliance problems in the legacy Alcatel business *during* the integration.  As the 2018 Annual Report stated:

> *During the course of the ongoing integration process, we have been made aware of certain practices relating to compliance issues at the former Alcatel Lucent business that have raised concerns*.  We have initiated an internal investigation and voluntarily reported the matter to the relevant regulatory authorities, with whom we are cooperating with a view to resolving the matter.  *The resolution of this matter could result in potential criminal or civil penalties, including the possibility of monetary fines, which could have a material adverse effect on our business, brand, reputation or financial position*.

94.     In light of the Company's assurances that it had already accomplished the Alcatel integration, this disclosure stunned the markets and caused a massive and rapid decline in the price of the Company's ADSs, which fell from a previous close of $6.26 per share to $5.88 per share on March 22, 2019, representing a decline in over 6% in a single day of unusually heavy trading volume.

95.     The cause of this price drop was clear.  "Nokia shares dive on potential Alcatel-Lucent compliance issues" screamed the title of one *CNBC* article.  "Nokia Shares Plunge After Warning of Possible Compliance Issues" was the title of *The Wall Street Journal*'s article about the losses caused to investors by this announcement.

96.     Then, in an after-hours press release issued on March 22, 2019, Nokia sought to downplay the compliance issues as "market rumors," and to assuage investor fears that there were additional undisclosed issued related to the Alcatel integration, stating:

> While Nokia does not typically comment on market rumors, given the market reaction and inquiries related to a disclosure in the risk factors section of its annual report on Form 20-F for 2018, the company issues this statement to clarify that the specified investigation is not expected to have a material impact on Nokia.  We have seen no evidence that would suggest that criminal penalties would apply in this case, and we believe it is highly likely that any penalties that might apply would be limited and immaterial.

Nokia wishes to clarify that the context of this disclosure is the risk factors section of its annual report on Form 20-F where the company lists various risks which could potentially have a material impact on it.  However, the disclosure does not reflect Nokia's assessment of the expected or likely impact of the investigation on Nokia.

As noted in the annual report, to ensure complete compliance we are now scrutinizing certain transactions in the former Alcatel Lucent business.  Out of an abundance of caution and in the spirit of transparency, Nokia has contacted the relevant regulatory authority regarding this review.  We are proud of our reputation as one of the world's most ethical companies and this level of openness, transparency and cooperation is what you would expect from Nokia.

97.     Despite Nokia's attempt to soothe investors by means of its March 22, 2019 press release, Nokia securities continued to decline over the next few trading days, falling an additional $0.19 per share from its close price on March 22, 2019, or approximately 3.23%, to close at $5.69 per share on March 28, 2019.

## B. The Company Reveals that It Is Far Behind in the Race to 5G, Causing Nokia's Shares to Plummet

98.     Over the next few months, Nokia continued to downplay the severity of integration challenges the Company faced, while simultaneously representing that the 5G development efforts were on track.  For example, during the Q1 2019 earnings call, Rajeev Suri told investors and analysts that any interruptions to Nokia's 5G roadmap were nothing but "short-term issues" that would only last "weeks and, at most a few months in some select cases."  ¶79.  During his presentation at the Cowen's Technology, Media and Telecommunications Conference on May 30, 2019, CTO Marcus Weldon emphasized the "reality" that "500,000 . . . platform base stations have been deployed that are 5G-ready and 3.8 million 5G-ready radios."  ¶80.  And, during the Q2 2019 earnings call on July 25, 2019, Suri again claimed that the Company was in a "solid position in the early stages of 5G," and that the hardware development for other key 5G infrastructure components was progressing smoothly.  ¶82.  Through these and other false and misleading statements alleged *supra*, Defendants continued to maintain Nokia's share price at artificially inflated levels.

- 43 -

99.     Then, on October 24, 2019, Nokia filed its quarterly report for the third quarter of 2019 on Form 6-K (the "3Q19 Report").  Nokia announced for the first time that it had experienced severe difficulties with the initial phase of its 5G rollout, and was dramatically behind its competition in the race to 5G.  The Company further disclosed that it would have to spend an additional $200 million in R&D and hire a team of 350 specialists to develop the necessary 5G technology, a project estimated to take up to two years.  Finally, the Company announced a significant downward revision of its financial guidance for 2019 and 2020, and eliminated its dividend.

100.    The market was stunned to learn that Defendants' consistent and positive representations about the Alcatel integration and the Company's purportedly impressive 5G capabilities were false.

101.    Market observers and analysts recognized immediately that Nokia's inability to deliver on 5G stemmed from its failed integration.  As explained in an October 24, 2019 Barclay's analyst report: "Due to the Alcatel integration and an acceleration of 5G standards setting over the past few years, Nokia has been behind in 5G development."  The report elaborated:

> Due to the extended and troubled Alcatel-Lucent integration and an acceleration of 5G standard setting over 2017-18, Nokia has been consistently behind in 5G development versus Ericsson and Huawei.  They have been trying to catch up, and given the aforementioned contract wins have convinced customers they are, but problems have compounded in recent quarters to the point where 2019-21 profitability is going to be much lower than expected.

102.    Similarly, a report by the DNB Markets Equity Research team tied the Company's 5G failures directly to the "*post-Alcatel indigestion issues*," and explained:

> Nokia's post-Alcatel indigestion issues had more severe knock-on effects on product competitiveness than management had realized . . .

*        *        *

- 44 -

. . . In our view, Nokia was not able to get its ASIC semiconducters, notably, the ReefShark family of custom silicon and external SoCs, ready in time for the 5G cycle take-off, ***as it was bogged down in an all-consuming post-merger integration process with Alcatel-Lucent***.

103.     And an October 28, 2019 report from Liberium asserted that "the biggest reason for Nokia's problems over the past two years is that it fell behind Ericsson and Huawei in technology," and that:

> ***A confluence of factors seemed to have caused this issue for Nokia.  The key factor was no doubt the company's merger with Alcatel-Lucent and the complexity of aligning both companies 4G and 5G roadmaps***, at a time when Nokia was also under pressure to reduce costs and improve margins.

104.     On this news, the price of Nokia ADRs fell 23.7% on the NYSE, closing at $3.90 per ADR on October 24, 2019, down from a price of $5.11 per ADR the day before, on unusually high trading volume of more than 250 million shares traded.

105.     Just days later, a *Bloomberg* expose provided further evidence of the integration failures causing the Company's 5G shortfall.  The article – entitled "Nokia Staff Say Internal Politics Distracting Managers from 5G" – reported that the "Alcatel-Lucent purchase has led to disagreements" within Nokia:  "[A]dd internal politics to the list" of  factors "wiping out a quarter of its market value[.]"  The article quoted a workers' representative from Nokia's headquarters describing the Company's significant integration problems.  As the article explained:

> Employees in Finland are frustrated because they believe that management at the telecom equipment maker has been distracted by disagreements over priorities and staffing since Nokia's $18 billion takeover of Franco-American rival Alcatel-Lucent in 2016, according to . . . a worker representative for senior salaried staff at the company's Espoo headquarters.

The representative continued:  "It's pure politics.  And some are favoring their nationals and rejecting common ways of working."  These revelations stand in stark contrast to Defendant Suri's false representations that the Company's "cultural integration . . . ***went beautifully***[.]"

## VII.    DEFENDANTS ACTED WITH SCIENTER

106.    Defendants either knew or recklessly disregarded the false and misleading nature of the foregoing information they disseminated to the investing public.  Among other things, Defendants knew or recklessly disregarded that the Company was not ready for the 5G transition and was, in fact, years behind schedule; that the Company had not successfully completed or moved beyond the Alcatel integration and that, in fact, the integration was beset by numerous material problems; and that Alcatel continued to suffer from ongoing compliance issues and was operating against the Company's Code of Conduct.  Defendants' scienter is demonstrated by several categories of fact alleged herein.

107.    *First*, Defendant Suri described and touted his personal involvement in the granular details of the Alcatel integration process.  His personal involvement included the creation of a small dedicated integration team reporting directly to Defendant Suri, his personal attendance at all of this team's meetings, the imposition of extreme time deadlines on the team's performance of the integration, and providing regular updates to investors on the status of the integration and the Company's associated 5G readiness.

108.    *Second*, under Defendant Suri's leadership, Nokia implemented a detailed reporting and personnel infrastructure to monitor Alcatel's operations and ensure reporting to Nokia leadership concerning Alcatel's legacy operations and the status of the integration.  This reporting infrastructure was layered over the compliance reporting mechanisms already in place at Alcatel due to its history of compliance violations, and reported to Defendant Suri and other Nokia senior executives in their positions as members of the Alcatel board of directors.

109.    *Third*, Defendant Suri had a compensation arrangement that focused specifically on achieving a successful Alcatel integration.  Similarly, other senior Nokia executives – including those leading the integration process and reporting to Defendant Suri – had similar compensation

arrangements that would only provide remuneration if they met integration targets. These compensation arrangements created a strong incentive for Suri and his direct reports to misrepresent the status and progress of the integration and to conceal or disregard negative information concerning the Alcatel integration or the related transition to 5G.

110.    *Fourth*, the Alcatel integration was the single most important operational priority for Nokia during (and in the period leading up to) the Class Period. Indeed, it was precisely for this reason that Defendant Suri took on a critical personal role in the integration, repeatedly assured investors about its progress, and staked his reputation on its successful and rapid conclusion. It was also for this reason that Nokia created strong financial incentives for Defendant Suri and other senior officers to claim that the integration had been successful while concealing or ignoring material facts to the contrary. With the coming transition to 5G wireless communications, Nokia's acquisition and integration of Alcatel was fundamental to the Company's financial performance and was, therefore, a core Nokia operation of the precise sort that Defendant Suri would have necessarily had first-hand knowledge.

### A.    Defendant Suri's Personal Involvement in the Integration Raises a Strong Inference of Scienter

111.    Defendant Suri's repeated statements concerning his personal involvement in and management of the Alcatel integration alone raise a strong inference that he knew or recklessly disregarded that the Alcatel integration suffered from multiple problems, that the Company had not moved beyond the Alcatel integration as he claimed, and that, as a result, the Company was not 5G ready. Suri's representations concerning his personal involvement in the integration likewise raise a strong inference that he knew or recklessly disregarded that Alcatel was not in compliance with Nokia's Code of Conduct and other compliance mechanisms and that the

Company had discovered compliance issues at Alcatel during the integration, which was omitted from the Company's and Defendant Suri's public representations.

112.    Defendant Suri boasted of the prominent personal role that he played in the Alcatel integration.  In particular, Defendant Suri created the Integration Board dedicated to the Alcatel integration and emphasized that he was a "***permanent attendee***" of its meetings.  Not only did Suri attend all of its meetings, but the Integration Board was also a small team of fewer than 100 members led by the Company's COO and other members of senior leadership, all reporting to – and maintaining close contact with – Defendant Suri throughout the process.  The Integration Board exemplified Defendant Suri's signature "Nokia Business System" management philosophy, a formal organized system designed by Suri to provide "***a high degree of granular visibility***" for Suri and other members of Nokia senior leadership.

113.    Suri's direct involvement in and granular knowledge of the integration process is also reflected by his position on the Alcatel board of directors, which he joined along with his CFO and CLO by early-2016.  Because of Alcatel's previous compliance violations and criminal prosecution, Alcatel had wide-ranging mechanisms in place to allow Alcatel's board of directors to monitor and ensure legal and ethical compliance throughout that company.  In effect, Alcatel's compliance processes required a significant flow of compliance-related information directly to its board of directors.  Defendant Suri's position on the Alcatel board of directors demonstrates further his direct involvement in the Alcatel integration and his receipt of information concerning the integration process and compliance issues at Alcatel.

114.    Suri had, moreover, staked his reputation on the successful and rapid integration of the two companies.  Not only was the integration crucial to the Company to prepare for the approaching 5G transition, but the Company's earlier integration failures had heightened the

importance of a seamless integration process.  Notably, Suri's management methods were widely credited with rescuing Nokia's earlier integration failures, and his continued standing as a skillful M&A manager depended on Nokia's effective integration of Alcatel.  In this context, Suri promised that "this time can be different" from earlier integration failures and then undertook to provide frequent personal updates on the status of the integration and his role in it.

115.     Suri's reputational incentive to claim a flawless integration was reinforced by his personal financial incentives.  Suri had an incentive-based compensation package focused specifically on the rapid and effective Alcatel integration.  Had the market learned that Nokia was not "5G ready" and had not "moved beyond" the integration – or if that integration had been stalled by revelations concerning Alcatel's compliance or other issues – Suri's reputational and financial interests would have suffered.

116.     Suri was also aware that Nokia's senior leadership, including those individuals most responsible for carrying out the integration on his behalf, had similar financial incentives to ensure that the market believed that the Company was ready for 5G and had moved beyond the integration, and to otherwise disregard any potential compliance issues at Alcatel.  Suri then imposed "extreme" time pressures on these very same senior managers.  Defendant Suri thus knowingly presided over an integration process designed to encourage Nokia's senior leadership to announce a rapid and successful Alcatel integration and to avoid disclosing any difficulties encountered in the course of that integration.

117.     Moreover, Defendant Suri personally provided numerous updates on the status of the project throughout the integration, reflecting his own belief that he was informed and well-positioned to speak authoritatively on the subject.  On February 2, 2017, for example, Defendant Suri stated on a conference call that "we have *completed the integration projects*

*related to Alcatel-Lucent* with the exception of a small handful of long-tail efforts.  With this progress, we have been able to turn to continuous improvement activities that already delivered clear benefits in 2016 and will continue to do so this year."  On the same call, Defendant Suri boasted that "*[w]e successfully integrated Alcatel-Lucent faster than expected*," and stated that he was "pleased we have [completed] all of the main integration work."  Defendants Suri likewise frequently commented specifically on the Company's 5G readiness, reflecting his own belief in his knowledge concerning these matters.

### B.     Nokia's Robust Reporting and Monitoring Infrastructure Regarding Alcatel and the Integration Supports a Strong Inference of Scienter

118.    Throughout the Alcatel integration, Defendant Suri and other members of Nokia senior leadership maintained at least three avenues to receive information concerning the status of the integration process (including any compliance or other issues at Alcatel).  These sources of information contribute and support a strong inference that Suri knew or recklessly disregarded that the Company was behind in its preparation for 5G and that the integration suffered from numerous problems.

119.    *First*, Nokia used the Integration Board as an independent unit to monitor the integration.  *Second*, Nokia had merged its compliance processes with those of Alcatel by early-2016 and centralized them through Nokia's CLO, Maria Varsellona, who reported directly to Suri, served on the Alcatel board of directors with Suri, and had a personal financial incentive to claim that the Alcatel integration had been successful.  Despite her critical role in the integration, Nokia announced Ms. Varsellona's departure from the Company shortly after Alcatel's compliance issues became public at the end of the Class Period.  *Third*, the foregoing reporting and compliance mechanisms were in addition to pre-existing compliance systems created at Alcatel as the result of its earlier history of compliance violations.  These reporting systems included providing

information to Alcatel's board of directors, which included Suri and Varsellona (among others) by early-2016.

120.    As explained previously, the Integration Board was a free-standing source of "granular visibility" into the Alcatel integration process.  As Suri stated, the Integration Board was "a separate structure in place that focuses on driving defined programs" and prevented "mingling the day-to-day operations of the business with integration activities[.]"  As also noted above, Defendant Suri played a critical personal role in the Integration Board, as did many of the Company's other senior-most executives.

121.    Nokia had also incorporated Alcatel's compliance structures into Nokia's and centralized them in Nokia's Chief Legal Officer by early-2016.  As early as January 8, 2016 – well before the transaction had been completed – Nokia and Alcatel had created the "Legal & Compliance (L&C) Organization" through the MSA, establishing Nokia's control over Alcatel and ensuring that Nokia was in control of Alcatel's compliance systems.

122.    Under these agreements, Nokia's Chief Legal Officer, Maria Varsellona, was appointed for the purpose of "overseeing and managing all legal, contracting, corporate governance, ethics and compliance matters across Nokia globally, as well as advising the President and CEO, Board of Directors and officers of the company in relation to such matters."  These agreements further established a detailed legal and compliance structure that would "mirror the business organization, with separate legal teams supporting the business groups as [and] legal and compliance specialist groups with global responsibilities for their expertise areas."  Thus, Nokia put in place separate legal and compliance teams for each business unit, as well as for particular areas of legal and compliance concern including, *inter alia*, an "Ethics & Compliance unit," a "Regulatory unit," a "Litigation unit," and a "Mergers & Acquisitions unit," as well as an

"Operational Excellence unit . . . responsible for excellence, efficiency and standardization for legal processes and operations across Nokia."  All of these legal and compliance units reported to the Company's CLO, who sat on Alcatel's board of directors with Defendant Suri, otherwise reported directly to Suri at all relevant times, and had incentive compensation tied to the Alcatel integration.

123.    Further, the Integration Board and the Legal & Compliance Organization were layered over Alcatel's preexisting compliance structures, which were created in the aftermath of Alcatel's earlier compliance scandals and were designed to push information to Alcatel's board of directors – on which Suri sat alongside Nokia's CLO and CFO.

124.    In December 2010, Alcatel and its subsidiaries entered into a deferred prosecution agreement and agreed to pay a combined $137 million to settle a long-running bribery investigation by the Department of Justice and the Securities and Exchange Commission.  This settlement represented the fifth largest FCPA settlement with regulators in history, reflecting the severity of Alcatel's violations.  As part of the settlement, Alcatel engaged a compliance monitor to oversee its efforts to rebuild its internal compliance systems.

125.    Accordingly, Alcatel established an elaborate internal compliance organization designed to drive information related to compliance issues to the Alcatel board of directors.  Under that regime, a Chief Compliance Officer was charged with coordinating, supervising, and centralizing key compliance, anticorruption, and ethics functions within Alcatel.  The Chief Compliance Officer reported directly to the Chief Financial and Legal Office, and met periodically with the CEO and the Audit and Finance Committee to assess the adequacy of the compliance programs, any known potential violations, and the need, if any, for corrective measures.  In addition, Alcatel instituted a global compliance risk assessment process to identify compliance

issues related to key compliance areas.  The program, which was aimed primarily at middle management, mandated annual "deep dive" assessments within each business area focused on identifying potential compliance gaps and risks to preemptively develop and implement risk mitigation measures.

126.    On February 9, 2015, after the compliance monitor submitted a final report, the court dismissed the FCPA charges underlying the deferred prosecution agreement.  Only two months later, on April 15, 2015, Nokia announced the Alcatel acquisition.

127.    Further, the facts alleged herein likewise establish a strong inference of Nokia's corporate scienter.  Numerous senior executives whose scienter is imputed to the Company were directly involved in the planning and execution of the Alcatel integration, including, *inter alia*, (i) Defendant Rajeev Suri, CEO and President; (ii) COO Marc Rouanne; (iii) CFO Timo Ihamoutila; and (iv) CLO Maria Varsellona.  Given their personal involvement in the integration efforts (and their compensation tied to those efforts), these individuals – and therefore Nokia – knew or recklessly disregarded the falsity of Defendants' Class Period statements.

### C.    Nokia Executives' Incentive Compensation Tied to the Integration Supports a Strong Inference of Scienter

128.    Defendant Suri received incentive compensation tied specifically to the Alcatel integration.  The Company's other senior executives – including all members of Nokia's Group Leadership Team – also received similar incentive compensation packages.  Defendant Suri's incentive compensation arrangements created an additional motive for him to tout falsely the Company's supposedly successful Alcatel integration and to disregard or downplay any problems in the integration process.  Further, Defendant Suri knew or recklessly disregarded that the other members of Nokia's Group Leadership Team – including those with specific responsibility for the integration – had similar incentives.

129.    Specifically, Defendant Suri was awarded 208,700 restricted shares, worth €986,942 on the grant date in 2016.  The other twelve members of the Group Leadership Team were granted a total of 1,015,100 restricted shares, valued at €4,800,408 on the grant date.  All of these grants were set to vest in three equal tranches on October 1st of 2017, 2018, and 2019 and were tied expressly to integration targets.  Thus, two of the three tranches vested during the Class Period and prior to the Company's announcement of the Alcatel compliance issues on March 21, 2019.  The third tranche was scheduled to vest prior to the Company's disclosures at the end of the Class Period.

130.    Had the market learned that the integration was suffering from numerous undisclosed problems – and the Company's 5G readiness was well behind as a result – that revelation would have threatened or prevented the vesting of these restricted shares.  Along similar lines, had the market learned earlier that the Company had discovered compliance issues *during* the integration, that revelation would have likewise threatened or prevented the vesting of these restricted shares.  Accordingly, these restricted shares created an incentive for Defendant Suri to claim that the Company was successfully "beyond" the Alcatel integration and that the integration was now "behind" the Company.  These restricted shares likewise created an incentive for Suri to disregard or downplay any compliance or other problems or issues at Alcatel.

131.    Along similar lines, these restricted shares created the same incentives for the members of the Group Leadership Team – including for those senior Nokia executives directly involved in the integration and reporting to Suri on its progress.  Suri was aware of or recklessly disregarded these incentives.

**D.      Nokia's Alcatel Integration Was the Company's Foremost Core Operation Further Supporting a Strong Inference of Scienter**

132.    The Alcatel integration was the single most important Nokia operation during any relevant time.  From the moment Nokia announced its intention to acquire Alcatel in April 2016, through the end of the Class Period, the Alcatel integration was the foremost operational objective for Suri, the Company, and its senior managers.  The centrality of the Alcatel integration within the Company's operations further supports and strengthens the inference of scienter.

133.    The Alcatel acquisition was essential to the Company's ability to succeed in 5G because, without Alcatel, Nokia lacked the assets and technology necessary to provide 5G services.  Before the Alcatel transaction, the Company was among the world's leading mobile providers.  Despite this strength in wireless, Nokia's business would be severely disadvantaged by the shift to 5G, a more versatile form of networking requiring a significantly greater degree of physical networking capacity.  The Company itself noted in the 2014 annual report that its operations could be severely jeopardized by this "convergence of information technology and telecommunications."  Thus, the Alcatel acquisition and integration were necessary to fill this extraordinary gap in Nokia's portfolio – the most important task facing the Company.

134.    Further, with the shift to 5G fast-approaching, the speed and success of the Alcatel integration required even greater focus from Suri and other Company managers.  Simply, had Nokia failed to carry out the Alcatel integration prior to the 5G launch – which is presently underway worldwide – Nokia would have been unable to credibly offer 5G services to the marketplace.  As a result, the Alcatel integration demanded a unique and consistent level of attention from the highest levels of Company management.  The Alcatel integration was thus the Company's predominant core operation at all times relevant to this case.

135.   Other evidence alleged herein supports the conclusion that the Alcatel integration was the Company's most core operation.  For example, the fact that the Company gave Defendant Suri and the other members of the Group Leadership Team compensation tied specifically to integration targets reflects the importance of the Alcatel integration and its need for involvement by senior executives.  Similarly, the creation of the Integration Board and Defendant Suri's personal involvement in its meetings shows that the Alcatel integration was fundamental to the Company.  Moreover, the Company's repeated and consistent public statements about the status and progress of the integration likewise show the integration's significance to the Company.  Indeed, Defendant Suri commented on the status of the integration at virtually every public appearance on behalf of the Company from the time the acquisition was announced through the end of the Class Period – a clear demonstration that the Alcatel integration was a core Company operation deserving the CEO's full attention.

## VIII.   LOSS CAUSATION

136.   As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Nokia ADSs and operated as a fraud or deceit on Class Period purchasers of Nokia ADSs.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Nokia ADSs fell precipitously as the artificial inflation was removed.

137.   As a result of their purchases of Nokia ADSs during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements throughout the Class Period had the intended effect and caused Nokia ADSs to trade at artificially inflated levels throughout the Class Period

## IX.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE

138.  Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

139.  With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(i)  the omissions and misrepresentations were material;

(ii)  the ADSs traded in an efficient market;

(iii)  the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the ADSs; and

(iv)  Lead Plaintiff and other members of the Class purchased the ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

140.  At all relevant times, the market for the ADSs was efficient for the following reasons, among others:

(a)  the ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)  as a regulated issuer, Nokia filed periodic public reports with the SEC and the NYSE;

(c)  Nokia regularly communicated with public investors *via* established market communications mechanisms, including regular disseminations of press releases on the national

- 57 -

circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> (d)     Nokia was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

141.    As a result of the foregoing, the market for Nokia ADSs promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Nokia ADSs.  Under these circumstances, all purchasers of Nokia ADSs during the Class Period suffered similar injury through their purchase of such ADSs at artificially inflated prices, and a presumption of reliance applies.

142.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also applicable in this action under the Supreme Court's holding in *Affiliated Ute*, because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Nokia's business operations and financial prospects and performance – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

143.    Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in a sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     CLASS ACTION ALLEGATIONS

144.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Nokia ADSs during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are

Defendants and their families, as well as the officers and directors of the Company and the members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

145.    The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Nokia ADSs were actively traded on the NYSE.  While the exact number of class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, Lead Plaintiff believes there are hundreds, if not thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nokia or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146.    Lead Plaintiff's claims are typical of the claims of members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

147.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

148.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and practices of Nokia;

(c)    whether the trading price of Nokia ADSs was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

149.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.      NO SAFE HARBOR

150.     The statutory safe harbor provided for certain forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause any actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

### COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

151.     Lead Plaintiff repeats and realleges the allegations set forth above as if set forth in full herein.

- 60 -

152.    During the Class Period, Defendants knowingly or recklessly made, participated in the preparation of and/or caused to be disseminated, false and misleading statements of material fact, and omitted material facts necessary to make the statements about Nokia's financial results, operations, and legal compliance, in light of the circumstances in which they were made, not misleading.

153.    In addition to the duties of full disclosure imposed on the Company as a result of its affirmative statements and reports, Defendants had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete, and accurate information with respect to the Company's operations and financial results.

154.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available, or made those misrepresentations and omissions of material fact without a reasonable belief in their accuracy.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Nokia's operating condition and financial status from the investing public, and supporting the artificially inflated price of its ADSs.

155.    As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Nokia ADSs was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's ADSs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in Nokia's public statements during the Class Period, Lead

Plaintiff and other Class members purchased Nokia ADSs during the Class Period at artificially high prices and were ultimately damaged thereby.

156.    At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff or other Class members and the marketplace known the truth regarding Nokia, which Defendants did not disclose, Lead Plaintiff and other Class members would not have purchased Nokia ADSs, or, if they had purchased Nokia ADSs during the Class Period, would not have done so at the artificially inflated prices which they paid.

157.    As a direct and proximate result of Defendants' false and misleading statements, Lead Plaintiff and the other Class members suffered losses and damages in connection with their Class Period purchases of Nokia ADSs.

158.    By reason of the foregoing, Nokia has violated §10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against Defendant Suri

159.    Lead Plaintiff repeats and realleges the allegations set forth above as if set forth in full herein.

160.    During the Class Period, Defendant Suri participated in the operation and management of Nokia, and conducted and participated, directly and indirectly, in the conduct of Nokia's business affairs.  Because of his senior position, he knew the adverse non-public information about Nokia's false statements and omissions.

161.    As an officer and/or director of a publicly owned company, Defendant Suri had a duty to disseminate accurate and truthful information with respect to Nokia's financial condition

and results of operations, and to correct promptly any public statements issued by Nokia that had become materially false or misleading.

162.     Because of his position of control and authority as a senior officer, Defendant Suri was able to, and did, control the contents of the various reports, press releases and public filings that Nokia disseminated in the marketplace during the Class Period.  Throughout the Class Period, Defendant Suri exercised his power and authority to cause Nokia to engage in the wrongful acts complained of herein.  Defendant Suri, therefore, was a "controlling person" of Nokia within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Nokia ADSs.

163.     Defendant Suri, therefore, acted as a controlling person of Nokia.  By reason of his senior management position, Defendant Suri had the power to direct the actions of, and exercised the same to cause, Nokia to engage in the unlawful acts and conduct complained of herein.  Defendant Suri exercised control over the general operations of Nokia and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

164.     By reason of the above conduct, Defendant Suri is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nokia.

## XII.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiff as the Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as the Court deems just and proper.

## XIII.  JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 8, 2020                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           CHAD JOHNSON
                                           NOAM MANDEL


                                                    */s/ Chad Johnson*
                                           CHAD JOHNSON

                                           125 Park Ave, 25th Floor
                                           New York, NY  10017
                                           Telephone: 212/791-0567
                                           631/367-1173 (fax)
                                           chadj@rgrdlaw.com
                                           noam@rgrdlaw.com

                                           ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           MOSHE O. BOROOSAN
                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com
                                           drosenfeld@rgrdlaw.com
                                           mboroosan@rgrdlaw.com

                                           *Attorneys for Lead Plaintiff*

SCHALL LAW FIRM
BRIAN J. SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  310/301-3335
310/388-0192 (fax)

*Additional Counsel*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Clyde W. Waite, Individually and as Trustee FBO Estate of Lillian Dunn U/A 03/01/2015 ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>1/7/2020</u> day of January, 2020.

DocuSigned by:

*Clyde Waite*

0629C6968E0924CC...

Clyde W. Waite, Individually and as Trustee FBO Estate of Lillian Dunn U/A 03/01/2015

NOKIA

# SCHEDULE A

## SECURITIES TRANSACTIONS

### ADR

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/05/2017 | 40,000 | $6.07 |
| 05/08/2017 | 25,000 | $6.07 |
| 05/09/2017 | 25,000 | $6.15 |
| 05/10/2017 | 50,000 | $6.11 |
| 05/10/2017 | 50,000 | $6.11 |
| 05/11/2017 | 50 | $6.11 |
| 05/11/2017 | 10,000 | $6.11 |
| 05/17/2017 | 10,000 | $6.20 |
| 05/17/2017 | 25,000 | $6.13 |
| 05/17/2017 | 100,000 | $6.20 |
| 05/18/2017 | 50,000 | $6.06 |
| 05/23/2017 | 10,000 | $6.56 |
| 05/24/2017 | 10,000 | $6.43 |
| 05/24/2017 | 20,000 | $6.46 |
| 05/24/2017 | 25,000 | $6.45 |
| 06/05/2017 | 101,500 | $6.47 |
| 06/05/2017 | 148,500 | $6.46 |
| 06/06/2017 | 250,000 | $6.44 |
| 06/09/2017 | 150,000 | $6.48 |
| 06/09/2017 | 400,000 | $6.48 |
| 06/19/2017 | 55,641 | $6.42 |
| 06/20/2017 | 15,000 | $6.39 |
| 06/20/2017 | 25,000 | $6.39 |
| 06/20/2017 | 25,000 | $6.39 |
| 08/04/2017 | 24,642 | $6.52 |
| 08/04/2017 | 25,000 | $6.52 |
| 08/04/2017 | 50,000 | $6.54 |
| 08/11/2017 | 20,000 | $6.25 |
| 08/21/2017 | 2,700 | $6.14 |
| 08/21/2017 | 50,000 | $6.15 |
| 08/21/2017 | 100,000 | $6.15 |
| 08/24/2017 | 25,000 | $6.20 |
| 08/24/2017 | 50,000 | $6.17 |
| 08/24/2017 | 75,000 | $6.17 |
| 08/30/2017 | 20,000 | $6.18 |
| 08/30/2017 | 20,000 | $6.18 |
| 08/31/2017 | 25,000 | $6.17 |
| 08/31/2017 | 25,000 | $6.17 |
| 08/31/2017 | 25,000 | $6.17 |
| 09/11/2017 | 880 | $6.07 |
| 09/11/2017 | 30,000 | $6.07 |
| 09/11/2017 | 74,120 | $6.08 |
| 09/12/2017 | 20,400 | $6.07 |
| 09/13/2017 | 10,000 | $6.02 |
| 09/13/2017 | 25,000 | $6.06 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 09/18/2017 | 150,000 | $6.20 |
| 09/18/2017 | 150,000 | $6.19 |
| 10/10/2017 | 10,000 | $5.89 |
| 10/10/2017 | 10,000 | $5.89 |
| 10/16/2017 | 10,000 | $5.89 |
| 10/16/2017 | 10,000 | $5.89 |
| 10/16/2017 | 50,000 | $5.91 |
| 10/16/2017 | 50,000 | $5.91 |
| 10/23/2017 | 885 | $6.01 |
| 10/24/2017 | 1,330 | $5.98 |
| 10/24/2017 | 98,670 | $5.99 |
| 11/03/2017 | 50,000 | $4.97 |
| 11/03/2017 | 50,000 | $4.97 |
| 11/07/2017 | 50,000 | $4.98 |
| 11/07/2017 | 50,000 | $4.98 |
| 11/07/2017 | 100,000 | $4.95 |
| 11/07/2017 | 150,000 | $4.96 |
| 11/09/2017 | 150,000 | $4.95 |
| 11/09/2017 | 250,000 | $4.95 |
| 11/10/2017 | 50,000 | $4.89 |
| 11/27/2017 | 50,000 | $5.03 |
| 11/27/2017 | 50,000 | $5.02 |
| 11/27/2017 | 50,000 | $5.02 |
| 11/27/2017 | 100,000 | $5.02 |
| 11/28/2017 | 45,000 | $5.01 |
| 11/28/2017 | 45,000 | $5.01 |
| 11/29/2017 | 100,000 | $5.03 |
| 11/29/2017 | 100,000 | $5.03 |
| 11/30/2017 | 55,000 | $4.99 |
| 12/01/2017 | 25,000 | $4.94 |
| 12/01/2017 | 25,000 | $4.95 |
| 12/01/2017 | 25,000 | $4.94 |
| 12/11/2017 | 75,000 | $4.58 |
| 12/11/2017 | 75,000 | $4.58 |
| 12/14/2017 | 30,000 | $4.63 |
| 12/14/2017 | 30,000 | $4.63 |
| 12/14/2017 | 50,000 | $4.63 |
| 12/14/2017 | 50,000 | $4.62 |
| 12/14/2017 | 50,000 | $4.63 |
| 12/14/2017 | 50,000 | $4.61 |
| 12/19/2017 | 150,000 | $4.67 |
| 12/19/2017 | 200,000 | $4.67 |
| 12/20/2017 | 15,000 | $4.62 |
| 12/27/2017 | 50,000 | $4.73 |
| 12/27/2017 | 100,000 | $4.72 |
| 12/27/2017 | 200,000 | $4.72 |
| 12/28/2017 | 15,000 | $4.71 |
| 12/28/2017 | 15,000 | $4.71 |
| 12/28/2017 | 50,000 | $4.70 |
| 12/28/2017 | 50,000 | $4.70 |
| 12/29/2017 | 3,917 | $4.66 |
| 12/29/2017 | 20,000 | $4.69 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/29/2017 | 25,000 | $4.66 |
| 01/05/2018 | 75,000 | $4.85 |
| 01/05/2018 | 100,000 | $4.85 |
| 01/05/2018 | 150,000 | $4.84 |
| 01/05/2018 | 150,000 | $4.85 |
| 01/08/2018 | 4,050 | $4.85 |
| 01/08/2018 | 50,000 | $4.85 |
| 01/08/2018 | 75,000 | $4.88 |
| 01/08/2018 | 200,000 | $4.89 |
| 01/10/2018 | 20,000 | $4.80 |
| 01/10/2018 | 20,000 | $4.80 |
| 01/18/2018 | 40,000 | $4.85 |
| 01/18/2018 | 85,000 | $4.86 |
| 01/18/2018 | 125,000 | $4.84 |
| 01/18/2018 | 125,000 | $4.84 |
| 01/18/2018 | 200,000 | $4.85 |
| 01/25/2018 | 35,000 | $4.82 |
| 01/25/2018 | 50,000 | $4.82 |
| 01/25/2018 | 125,000 | $4.88 |
| 01/25/2018 | 150,000 | $4.88 |
| 01/30/2018 | 50,000 | $4.94 |
| 01/30/2018 | 75,000 | $4.94 |
| 02/02/2018 | 3,456 | $5.43 |
| 02/02/2018 | 75,000 | $5.44 |
| 02/02/2018 | 96,544 | $5.44 |
| 02/05/2018 | 40 | $5.32 |
| 02/05/2018 | 64,960 | $5.33 |
| 02/05/2018 | 200,000 | $5.45 |
| 02/05/2018 | 200,000 | $5.45 |
| 02/07/2018 | 5,310 | $5.52 |
| 02/07/2018 | 44,497 | $5.51 |
| 02/07/2018 | 50,000 | $5.52 |
| 02/07/2018 | 75,000 | $5.54 |
| 02/07/2018 | 100,000 | $5.54 |
| 02/08/2018 | 25,000 | $5.38 |
| 02/08/2018 | 25,000 | $5.42 |
| 02/08/2018 | 25,000 | $5.38 |
| 02/08/2018 | 50,000 | $5.42 |
| 02/08/2018 | 50,000 | $5.47 |
| 02/08/2018 | 51,000 | $5.47 |
| 02/08/2018 | 75,000 | $5.47 |
| 02/08/2018 | 100,000 | $5.47 |
| 02/13/2018 | 4,001 | $5.48 |
| 02/13/2018 | 200,000 | $5.48 |
| 02/14/2018 | 200,000 | $5.45 |
| 02/16/2018 | 58,361 | $5.74 |
| 02/16/2018 | 70,073 | $5.74 |
| 02/16/2018 | 100,000 | $5.74 |
| 02/16/2018 | 100,000 | $5.74 |
| 02/22/2018 | 43,290 | $5.70 |
| 02/22/2018 | 175,000 | $5.71 |
| 02/22/2018 | 175,000 | $5.71 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/23/2018 | 50,000 | $5.71 |
| 02/23/2018 | 75,000 | $5.71 |
| 02/27/2018 | 75,000 | $5.91 |
| 02/27/2018 | 100,000 | $5.87 |
| 02/27/2018 | 164,286 | $5.87 |
| 03/08/2018 | 175,000 | $5.91 |
| 03/08/2018 | 200,000 | $5.91 |
| 03/13/2018 | 13,676 | $5.86 |
| 03/13/2018 | 21,324 | $5.86 |
| 03/13/2018 | 100,000 | $5.89 |
| 03/13/2018 | 150,000 | $5.89 |
| 03/15/2018 | 40,000 | $5.80 |
| 03/19/2018 | 50,000 | $5.73 |
| 03/21/2018 | 300 | $5.69 |
| 03/21/2018 | 74,700 | $5.70 |
| 04/19/2018 | 500 | $5.82 |
| 04/19/2018 | 50,000 | $5.84 |
| 04/19/2018 | 50,000 | $5.84 |
| 04/20/2018 | 75,000 | $6.05 |
| 04/20/2018 | 75,000 | $5.94 |
| 04/20/2018 | 75,000 | $5.94 |
| 05/01/2018 | 125,000 | $5.91 |
| 05/01/2018 | 125,000 | $5.91 |
| 05/02/2018 | 25,000 | $5.89 |
| 5/4/2018[A] | 50,000 | $4.00 |
| 5/4/2018[A] | 50,000 | $4.00 |
| 05/08/2018 | 50,000 | $6.16 |
| 05/08/2018 | 150,000 | $6.16 |
| 05/14/2018 | 100 | $6.26 |
| 05/14/2018 | 25,000 | $6.24 |
| 05/14/2018 | 25,000 | $6.24 |
| 05/14/2018 | 125,000 | $6.30 |
| 05/15/2018 | 26,000 | $6.26 |
| 05/15/2018 | 75,000 | $6.26 |
| 05/17/2018 | 15,000 | $6.19 |
| 05/17/2018 | 25,000 | $6.19 |
| 05/18/2018 | 15,000 | $6.19 |
| 05/18/2018 | 34,500 | $6.19 |
| 05/22/2018 | 15,000 | $6.20 |
| 05/22/2018 | 25,000 | $6.20 |
| 05/29/2018 | 10,000 | $5.96 |
| 05/29/2018 | 15,000 | $5.96 |
| 06/05/2018 | 15,000 | $5.89 |
| 06/15/2018 | 115,000 | $6.08 |
| 06/19/2018 | 15,000 | $5.93 |
| 07/12/2018 | 150,000 | $5.82 |
| 07/13/2018 | 150,000 | $5.84 |
| 07/17/2018 | 25,000 | $5.79 |
| 07/19/2018 | 50,000 | $5.99 |
| 07/19/2018 | 50,000 | $5.95 |
| 08/20/2018 | 803 | $5.23 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/28/2018 | 30,000 | $5.72 |
| 08/28/2018 | 40,000 | $5.73 |
| 08/29/2018 | 300 | $5.66 |
| 08/29/2018 | 24,700 | $5.69 |
| 08/29/2018 | 150,000 | $5.67 |
| 09/13/2018 | 1,000 | $5.47 |
| 09/13/2018 | 78,100 | $5.47 |
| 09/13/2018 | 95,900 | $5.47 |
| 09/14/2018 | 75,000 | $5.47 |
| 09/19/2018 | 50,000 | $5.40 |
| 09/19/2018 | 100,000 | $5.40 |
| 09/19/2018 | 160,000 | $5.44 |
| 09/21/2018 | 45,000 | $5.54 |
| 09/21/2018 | 200,000 | $5.55 |
| 09/25/2018 | 25,000 | $5.53 |
| 09/26/2018 | 100,000 | $5.54 |
| 09/26/2018 | 100,000 | $5.54 |
| 09/28/2018 | 5,000 | $5.56 |
| 09/28/2018 | 95,000 | $5.57 |
| 09/28/2018 | 100,000 | $5.57 |
| 10/02/2018 | 10,000 | $5.51 |
| 10/02/2018 | 50,000 | $5.52 |
| 10/03/2018 | 5,000 | $5.46 |
| 10/03/2018 | 10,000 | $5.46 |
| 10/03/2018 | 50,000 | $5.49 |
| 10/12/2018 | 40,000 | $5.26 |
| 10/18/2018 | 103 | $5.53 |
| 10/22/2018 | 50,000 | $5.62 |
| 10/22/2018 | 50,000 | $5.59 |
| 10/22/2018 | 50,000 | $5.62 |
| 10/22/2018 | 50,000 | $5.61 |
| 10/29/2018 | 50,000 | $5.59 |
| 10/31/2018 | 5,000 | $5.61 |
| 10/31/2018 | 10,000 | $5.63 |
| 10/31/2018 | 72,000 | $5.63 |
| 10/31/2018 | 75,000 | $5.61 |
| 11/02/2018 | 150,000 | $5.80 |
| 11/05/2018 | 25,000 | $5.82 |
| 11/05/2018 | 30,000 | $5.82 |
| 11/06/2018 | 7,500 | $5.83 |
| 11/06/2018 | 15,000 | $5.83 |
| 11/08/2018 | 25,000 | $5.93 |
| 11/09/2018 | 50,000 | $5.89 |
| 12/04/2018 | 90,000 | $5.50 |
| 12/07/2018 | 50,000 | $5.57 |
| 12/17/2018 | 50,000 | $5.92 |
| 12/31/2018 | 25,000 | $5.79 |
| 01/02/2019 | 50,000 | $5.73 |
| 01/02/2019 | 50,000 | $5.69 |
| 01/03/2019 | 25,000 | $5.59 |
| 01/08/2019 | 45,000 | $6.12 |
| 01/09/2019 | 20,000 | $6.16 |

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 01/09/2019 | 40,000 | $6.16 |
| 01/10/2019 | 28,000 | $6.13 |
| 01/10/2019 | 30,000 | $6.14 |
| 01/10/2019 | 50,000 | $6.13 |
| 01/10/2019 | 50,000 | $6.13 |
| 01/11/2019 | 13,500 | $6.07 |
| 01/11/2019 | 86,500 | $6.07 |
| 01/18/2019 | 263 | $6.05 |
| 01/23/2019 | 7,500 | $6.05 |
| 01/24/2019 | 40,000 | $6.13 |
| 01/25/2019 | 52,600 | $6.61 |
| 01/28/2019 | 18,500 | $6.46 |
| 01/28/2019 | 51,500 | $6.47 |
| 01/29/2019 | 10,000 | $6.55 |
| 01/29/2019 | 30,000 | $6.57 |
| 02/11/2019 | 10,000 | $6.14 |
| 02/11/2019 | 35,000 | $6.14 |
| 02/12/2019 | 98,179 | $6.20 |
| 02/14/2019 | 10,000 | $6.30 |
| 02/14/2019 | 40,000 | $6.29 |
| 02/15/2019 | 10,000 | $6.26 |
| 02/27/2019 | 100 | $6.12 |
| 02/27/2019 | 16,000 | $6.12 |
| 02/27/2019 | 33,900 | $6.12 |
| 03/18/2019 | 20,000 | $6.33 |
| 03/18/2019 | 25,000 | $6.34 |
| 05/07/2019 | 25,000 | $5.11 |
| 05/07/2019 | 50,000 | $5.11 |
| 05/17/2019 | 25,000 | $4.92 |
| 05/17/2019 | 50,000 | $4.92 |
| 05/23/2019 | 15,000 | $5.00 |
| 05/23/2019 | 25,000 | $5.00 |
| 05/28/2019 | 40,000 | $5.05 |
| 05/28/2019 | 100,000 | $5.05 |
| 05/29/2019 | 25,000 | $4.96 |
| 05/29/2019 | 75,000 | $4.96 |
| 06/03/2019 | 100,000 | $4.96 |
| 06/04/2019 | 16,738 | $5.03 |
| 06/06/2019 | 15,400 | $5.01 |
| 06/06/2019 | 284,600 | $5.01 |
| 06/07/2019 | 100,000 | $5.01 |
| 06/10/2019 | 1,020 | $5.02 |
| 06/10/2019 | 25,000 | $5.00 |
| 06/10/2019 | 50,000 | $5.03 |
| 06/10/2019 | 98,980 | $5.03 |
| 06/10/2019 | 100,000 | $4.99 |
| 06/11/2019 | 87,900 | $5.17 |
| 06/12/2019 | 300,000 | $5.12 |
| 06/24/2019 | 2,500 | $5.10 |
| 06/24/2019 | 10,000 | $5.09 |
| 06/24/2019 | 37,500 | $5.10 |
| 06/24/2019 | 50,000 | $5.10 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/24/2019 | 100,000 | $5.10 |
| 06/24/2019 | 300,000 | $5.09 |
| 06/26/2019 | 11,600 | $5.03 |
| 06/26/2019 | 88,400 | $5.04 |
| 07/05/2019 | 20,000 | $5.10 |
| 07/05/2019 | 80,000 | $5.10 |
| 07/05/2019 | 150,000 | $5.07 |
| 07/26/2019 | 100,000 | $5.70 |
| 07/26/2019 | 275,000 | $5.71 |
| 07/29/2019 | 891 | $5.63 |
| 07/29/2019 | 7,800 | $5.64 |
| 07/29/2019 | 50,000 | $5.65 |
| 07/29/2019 | 50,000 | $5.65 |
| 07/29/2019 | 167,200 | $5.64 |
| 08/19/2019 | 11,500 | $5.24 |
| 08/19/2019 | 12,700 | $5.24 |
| 08/19/2019 | 175,800 | $5.24 |
| 08/23/2019 | 100,000 | $5.05 |
| 09/09/2019 | 150,000 | $5.00 |
| 09/13/2019 | 34,000 | $5.18 |
| 09/13/2019 | 166,000 | $5.18 |
| 09/13/2019 | 200,000 | $5.18 |
| 09/23/2019 | 50,000 | $5.16 |
| 09/23/2019 | 75,000 | $5.17 |
| 09/23/2019 | 100,000 | $5.17 |
| 10/18/2019 | 10,000 | $5.21 |
| 10/21/2019 | 50,000 | $5.19 |
| 10/22/2019 | 25,000 | $5.19 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 05/09/2017 | 3,500 | $6.19 |
| 05/09/2017 | 5,649 | $6.19 |
| 05/09/2017 | 25,000 | $6.18 |
| 05/15/2017 | 25,000 | $6.25 |
| 05/15/2017 | 100,000 | $6.25 |
| 05/16/2017 | 10,000 | $6.30 |
| 05/16/2017 | 15,000 | $6.30 |
| 06/01/2017 | 870 | $6.52 |
| 06/01/2017 | 46,981 | $6.52 |
| 06/01/2017 | 50,000 | $6.49 |
| 06/01/2017 | 75,000 | $6.46 |
| 06/01/2017 | 125,000 | $6.49 |
| 06/05/2017 | 82,602 | $6.54 |
| 06/05/2017 | 167,398 | $6.53 |
| 06/07/2017 | 150,000 | $6.58 |
| 06/07/2017 | 400,000 | $6.58 |
| 08/01/2017 | 24,300 | $6.52 |
| 08/01/2017 | 29,774 | $6.54 |
| 08/01/2017 | 50,000 | $6.52 |
| 08/02/2017 | 25,000 | $6.58 |

| | | |
|---|---|---|
| 08/02/2017 | 50,000 | $6.58 |
| 08/09/2017 | 20,000 | $6.34 |
| 08/16/2017 | 31 | $6.36 |
| 08/18/2017 | 100,000 | $6.15 |
| 08/18/2017 | 100,000 | $6.16 |
| 08/22/2017 | 50,000 | $6.23 |
| 08/22/2017 | 50,000 | $6.23 |
| 08/22/2017 | 100,000 | $6.23 |
| 08/22/2017 | 100,000 | $6.23 |
| 08/29/2017 | 20,000 | $6.19 |
| 09/11/2017 | 15,000 | $6.10 |
| 09/11/2017 | 50,000 | $6.10 |
| 09/12/2017 | 75,000 | $6.13 |
| 09/15/2017 | 50,000 | $6.20 |
| 09/15/2017 | 50,000 | $6.21 |
| 09/15/2017 | 100,000 | $6.21 |
| 09/15/2017 | 100,000 | $6.21 |
| 10/13/2017 | 50,000 | $5.93 |
| 10/13/2017 | 50,000 | $5.93 |
| 10/20/2017 | 5,000 | $5.98 |
| 10/20/2017 | 5,000 | $5.98 |
| 10/20/2017 | 100,000 | $6.05 |
| 10/20/2017 | 100,000 | $6.05 |
| 10/20/2017 | 100,000 | $6.05 |
| 10/20/2017 | 100,000 | $6.05 |
| 10/30/2017 | 66 | $4.82 |
| 10/30/2017 | 3,372 | $4.82 |
| 10/30/2017 | 20,000 | $4.84 |
| 10/30/2017 | 50,000 | $4.83 |
| 10/30/2017 | 50,100 | $4.84 |
| 10/30/2017 | 100,000 | $4.83 |
| 10/30/2017 | 100,000 | $4.82 |
| 10/30/2017 | 149,900 | $4.83 |
| 10/30/2017 | 181,367 | $4.82 |
| 11/01/2017 | 20,000 | $4.93 |
| 11/01/2017 | 50,000 | $4.93 |
| 11/02/2017 | 300,000 | $5.02 |
| 11/02/2017 | 300,000 | $5.02 |
| 11/06/2017 | 50,000 | $5.05 |
| 11/06/2017 | 50,000 | $5.05 |
| 11/06/2017 | 100,000 | $5.12 |
| 11/06/2017 | 100,000 | $5.12 |
| 11/07/2017 | 165,000 | $5.03 |
| 11/07/2017 | 302,000 | $5.03 |
| 11/20/2017 | 200,000 | $5.00 |
| 11/20/2017 | 250,000 | $5.00 |
| 12/11/2017 | 25,000 | $4.62 |
| 12/11/2017 | 25,000 | $4.62 |
| 12/11/2017 | 100,000 | $4.62 |
| 12/11/2017 | 100,000 | $4.62 |
| 12/13/2017 | 50,000 | $4.64 |
| 12/13/2017 | 75,000 | $4.62 |
| 12/13/2017 | 75,000 | $4.71 |
| 12/13/2017 | 75,000 | $4.68 |
| 12/13/2017 | 75,000 | $4.71 |

| 12/15/2017 | 25,000 | $4.63 |
| 12/15/2017 | 30,000 | $4.63 |
| 12/18/2017 | 230 | $4.71 |
| 12/18/2017 | 175,000 | $4.70 |
| 12/18/2017 | 249,770 | $4.70 |
| 12/21/2017 | 65,000 | $4.73 |
| 12/21/2017 | 100,000 | $4.73 |
| 12/21/2017 | 100,000 | $4.73 |
| 12/21/2017 | 100,000 | $4.73 |
| 01/02/2018 | 981 | $4.79 |
| 01/02/2018 | 33,494 | $4.77 |
| 01/02/2018 | 100,000 | $4.74 |
| 01/02/2018 | 100,000 | $4.74 |
| 01/03/2018 | 107,410 | $4.79 |
| 01/03/2018 | 188,608 | $4.79 |
| 01/05/2018 | 100 | $4.92 |
| 01/05/2018 | 500 | $4.92 |
| 01/05/2018 | 174,900 | $4.91 |
| 01/05/2018 | 299,500 | $4.91 |
| 01/09/2018 | 100 | $4.91 |
| 01/16/2018 | 1,312 | $4.97 |
| 01/16/2018 | 25,000 | $5.01 |
| 01/16/2018 | 100,000 | $5.01 |
| 01/17/2018 | 120,000 | $4.97 |
| 01/17/2018 | 122,638 | $4.97 |
| 01/19/2018 | 100 | $4.91 |
| 01/19/2018 | 106,542 | $4.91 |
| 01/22/2018 | 84,614 | $4.88 |
| 01/22/2018 | 133,843 | $4.87 |
| 01/22/2018 | 249,900 | $4.87 |
| 02/01/2018 | 100,000 | $5.23 |
| 02/01/2018 | 110,000 | $5.25 |
| 02/01/2018 | 125,000 | $5.25 |
| 02/01/2018 | 150,000 | $5.22 |
| 02/05/2018 | 50,000 | $5.50 |
| 02/05/2018 | 50,000 | $5.52 |
| 02/05/2018 | 75,000 | $5.53 |
| 02/06/2018 | 65,000 | $5.39 |
| 02/06/2018 | 200,000 | $5.48 |
| 02/06/2018 | 200,000 | $5.48 |
| 02/07/2018 | 75,000 | $5.59 |
| 02/07/2018 | 100,000 | $5.59 |
| 02/09/2018 | 8,756 | $5.47 |
| 02/12/2018 | 216,244 | $5.51 |
| 02/12/2018 | 275,808 | $5.51 |
| 02/14/2018 | 200,000 | $5.55 |
| 02/14/2018 | 204,000 | $5.62 |
| 02/21/2018 | 158,352 | $5.80 |
| 02/21/2018 | 170,073 | $5.80 |
| 02/23/2018 | 225,000 | $5.76 |
| 02/23/2018 | 293,300 | $5.76 |
| 03/07/2018 | 164,286 | $5.90 |
| 03/07/2018 | 175,000 | $5.90 |
| 03/12/2018 | 150 | $5.94 |
| 03/12/2018 | 31,033 | $5.94 |

DocuSign Envelope ID: CF2C4053-62AF9-42E5-B935-B5182D3638F5

| 03/12/2018 | 73,969 | $5.94 |
| 03/13/2018 | 110 | $5.94 |
| 04/10/2018 | 25,000 | $5.52 |
| 04/10/2018 | 25,000 | $5.52 |
| 04/16/2018 | 20,000 | $5.63 |
| 04/16/2018 | 50,000 | $5.63 |
| 04/17/2018 | 8,600 | $5.85 |
| 04/17/2018 | 17,900 | $5.85 |
| 04/17/2018 | 33,100 | $5.86 |
| 04/17/2018 | 40,400 | $5.85 |
| 04/17/2018 | 50,000 | $5.85 |
| 04/26/2018 | 75,000 | $5.56 |
| 04/30/2018 | 100,000 | $6.01 |
| 04/30/2018 | 200,000 | $6.01 |
| 05/04/2018 | 125,000 | $6.00 |
| 05/04/2018 | 150,000 | $6.00 |
| 05/08/2018 | 50,000 | $6.22 |
| 05/08/2018 | 150,000 | $6.22 |
| 05/09/2018 | 25,000 | $6.35 |
| 05/09/2018 | 75,000 | $6.35 |
| 05/18/2018 | 15,000 | $6.26 |
| 05/18/2018 | 25,000 | $6.26 |
| 05/21/2018 | 15,000 | $6.24 |
| 05/21/2018 | 25,000 | $6.24 |
| 06/04/2018 | 25,000 | $5.95 |
| 06/04/2018 | 25,000 | $5.95 |
| 06/11/2018 | 300 | $5.92 |
| 06/12/2018 | 300 | $5.94 |
| 06/13/2018 | 14,400 | $6.02 |
| 06/14/2018 | 100,000 | $6.12 |
| 07/12/2018 | 150,000 | $5.85 |
| 07/16/2018 | 53,000 | $5.86 |
| 07/16/2018 | 100,000 | $5.88 |
| 07/24/2018 | 50,000 | $5.95 |
| 08/07/2018 | 300 | $5.41 |
| 08/07/2018 | 800 | $5.41 |
| 08/07/2018 | 48,900 | $5.40 |
| 08/07/2018 | 50,000 | $5.40 |
| 08/20/2018 | 50,000 | $5.28 |
| 08/27/2018 | 100,000 | $5.68 |
| 09/10/2018 | 300 | $5.44 |
| 09/10/2018 | 2,497 | $5.39 |
| 09/10/2018 | 22,503 | $5.40 |
| 09/11/2018 | 1,472 | $5.35 |
| 09/11/2018 | 2,000 | $5.35 |
| 09/11/2018 | 11,528 | $5.35 |
| 09/11/2018 | 15,000 | $5.35 |
| 09/11/2018 | 25,000 | $5.34 |
| 09/12/2018 | 2,274 | $5.28 |
| 09/12/2018 | 22,726 | $5.29 |
| 09/12/2018 | 50,000 | $5.28 |
| 09/13/2018 | 75,000 | $5.53 |
| 09/13/2018 | 100,000 | $5.55 |
| 09/17/2018 | 5,000 | $5.49 |
| 09/18/2018 | 25,000 | $5.62 |

| Date | Shares | Price |
|------|--------|-------|
| 09/18/2018 | 25,000 | $5.62 |
| 09/18/2018 | 40,000 | $5.64 |
| 09/18/2018 | 50,000 | $5.60 |
| 09/18/2018 | 50,000 | $5.58 |
| 09/18/2018 | 75,000 | $5.64 |
| 09/18/2018 | 100,000 | $5.57 |
| 09/20/2018 | 2,470 | $5.52 |
| 09/20/2018 | 13,400 | $5.52 |
| 09/20/2018 | 25,000 | $5.52 |
| 09/20/2018 | 234,130 | $5.52 |
| 09/25/2018 | 300 | $5.61 |
| 09/25/2018 | 50,000 | $5.58 |
| 09/25/2018 | 50,000 | $5.60 |
| 09/25/2018 | 50,000 | $5.60 |
| 09/26/2018 | 100,000 | $5.58 |
| 09/26/2018 | 100,000 | $5.58 |
| 10/01/2018 | 9,573 | $5.65 |
| 10/01/2018 | 100,000 | $5.65 |
| 10/09/2018 | 9,600 | $5.27 |
| 10/09/2018 | 40,400 | $5.27 |
| 10/19/2018 | 5,405 | $5.64 |
| 10/19/2018 | 25,000 | $5.63 |
| 10/19/2018 | 94,595 | $5.63 |
| 10/29/2018 | 3,994 | $5.64 |
| 10/29/2018 | 50,000 | $5.64 |
| 10/30/2018 | 50,000 | $5.63 |
| 10/30/2018 | 77,000 | $5.64 |
| 11/01/2018 | 50,000 | $5.75 |
| 11/01/2018 | 50,000 | $5.75 |
| 11/02/2018 | 13,488 | $5.82 |
| 11/02/2018 | 136,512 | $5.81 |
| 11/06/2018 | 2 | $5.84 |
| 12/04/2018 | 89,410 | $5.50 |
| 12/06/2018 | 354 | $5.64 |
| 12/06/2018 | 6,480 | $5.64 |
| 12/10/2018 | 50,000 | $5.62 |
| 12/17/2018 | 50,000 | $5.93 |
| 12/28/2018 | 50,000 | $5.69 |
| 01/02/2019 | 100,000 | $5.73 |
| 01/31/2019 | 25,000 | $6.38 |
| 02/08/2019 | 60,000 | $5.96 |
| 02/12/2019 | 100,000 | $6.25 |
| 02/12/2019 | 100,000 | $6.24 |
| 03/01/2019 | 2,500 | $6.13 |
| 03/01/2019 | 10,000 | $6.15 |
| 03/05/2019 | 10,000 | $6.18 |
| 03/15/2019 | 45,000 | $6.40 |
| 03/27/2019 | 18,000 | $5.82 |
| 03/27/2019 | 25,000 | $5.84 |
| 04/17/2019 | 3,700 | $5.80 |
| 04/30/2019 | 10,000 | $5.32 |
| 04/30/2019 | 100,000 | $5.32 |
| 05/01/2019 | 15,000 | $5.27 |
| 05/01/2019 | 40,000 | $5.33 |
| 05/02/2019 | 2,300 | $5.19 |

DocuSign Envelope ID: CF8C4053-62AF9425F-B835-B5182D3638F5

| Date | Shares | Price |
|---|---|---|
| 05/02/2019 | 4,700 | $5.18 |
| 05/02/2019 | 25,250 | $5.18 |
| 05/03/2019 | 25,000 | $5.20 |
| 05/03/2019 | 50,000 | $5.20 |
| 05/06/2019 | 25,000 | $5.10 |
| 05/06/2019 | 25,000 | $5.15 |
| 05/06/2019 | 50,000 | $5.10 |
| 05/06/2019 | 50,000 | $5.15 |
| 05/16/2019 | 50,000 | $4.97 |
| 05/16/2019 | 100,000 | $4.97 |
| 05/20/2019 | 25,000 | $5.10 |
| 05/20/2019 | 50,000 | $5.10 |
| 05/24/2019 | 25,000 | $5.14 |
| 05/24/2019 | 50,000 | $5.04 |
| 05/24/2019 | 100,000 | $5.11 |
| 05/24/2019 | 200,000 | $5.11 |
| 05/29/2019 | 40,000 | $5.03 |
| 05/29/2019 | 75,000 | $5.01 |
| 05/30/2019 | 97 | $5.14 |
| 06/03/2019 | 100,000 | $5.02 |
| 06/05/2019 | 200,000 | $5.08 |
| 06/07/2019 | 12,000 | $5.05 |
| 06/07/2019 | 28,000 | $5.09 |
| 06/07/2019 | 50,000 | $5.09 |
| 06/07/2019 | 88,000 | $5.05 |
| 06/07/2019 | 100,000 | $5.08 |
| 06/07/2019 | 200,000 | $5.08 |
| 06/11/2019 | 21,787 | $5.17 |
| 06/11/2019 | 30,000 | $5.14 |
| 06/11/2019 | 45,000 | $5.14 |
| 06/11/2019 | 100,000 | $5.13 |
| 06/11/2019 | 100,000 | $5.14 |
| 06/18/2019 | 5,840 | $5.06 |
| 06/18/2019 | 40,449 | $5.06 |
| 06/18/2019 | 65,000 | $5.05 |
| 06/20/2019 | 100,000 | $5.18 |
| 06/20/2019 | 214,000 | $5.18 |
| 06/20/2019 | 300,000 | $5.16 |
| 07/02/2019 | 100,000 | $5.07 |
| 07/10/2019 | 10,888 | $5.08 |
| 07/11/2019 | 100,000 | $5.09 |
| 07/12/2019 | 15,362 | $5.10 |
| 07/15/2019 | 119,418 | $5.12 |
| 07/16/2019 | 71,364 | $5.15 |
| 07/17/2019 | 250,000 | $5.12 |
| 07/25/2019 | 2,050 | $5.72 |
| 07/25/2019 | 2,350 | $5.72 |
| 07/25/2019 | 45,600 | $5.71 |
| 07/25/2019 | 125,000 | $5.71 |
| 08/12/2019 | 20 | $5.37 |
| 08/12/2019 | 124 | $5.30 |
| 08/12/2019 | 9,876 | $5.30 |
| 08/12/2019 | 24,980 | $5.36 |
| 08/13/2019 | 1,000 | $5.37 |
| 08/14/2019 | 25,000 | $5.16 |

| | | |
|---|---|---|
| 08/15/2019 | 100,000 | $5.08 |
| 08/16/2019 | 8,248 | $5.17 |
| 08/16/2019 | 50,000 | $5.14 |
| 08/19/2019 | 34,151 | $5.25 |
| 08/20/2019 | 10,000 | $5.17 |
| 08/21/2019 | 3,700 | $5.21 |
| 08/21/2019 | 162,300 | $5.20 |
| 08/23/2019 | 100,000 | $5.08 |
| 08/29/2019 | 1,500 | $4.92 |
| 09/04/2019 | 2,236 | $4.94 |
| 09/04/2019 | 10,000 | $4.91 |
| 09/06/2019 | 15,000 | $5.03 |
| 09/06/2019 | 100,000 | $5.02 |
| 09/09/2019 | 300 | $5.03 |
| 09/09/2019 | 5,738 | $5.03 |
| 09/09/2019 | 23,938 | $5.02 |
| 09/09/2019 | 117,324 | $5.02 |
| 09/10/2019 | 152,000 | $5.03 |
| 09/19/2019 | 15,000 | $5.19 |
| 09/19/2019 | 25,000 | $5.20 |
| 09/20/2019 | 55,000 | $5.30 |
| 09/20/2019 | 60,000 | $5.28 |
| 09/20/2019 | 100,000 | $5.29 |
| 09/20/2019 | 300,000 | $5.27 |
| 10/23/2019 | 10,000 | $5.23 |

Prices listed are rounded to two decimal places.

*Opening position of 1,735,170 shares.
^Exercised Option.

### Options

### NOK US 01/15/21 C5 Equity

| Date Acquired | Amount of Options Acquired | Price |
|---|---|---|
| 08/12/2019 | 750 | $0.93 |
| 08/12/2019 | 600 | $0.91 |
| 08/13/2019 | 50 | $0.93 |
| 08/14/2019 | 1,500 | $0.83 |
| 08/15/2019 | 500 | $0.75 |
| 08/15/2019 | 30 | $0.78 |
| 08/15/2019 | 570 | $0.79 |
| 08/15/2019 | 150 | $0.79 |
| 08/20/2019 | 65 | $0.79 |
| 08/21/2019 | 150 | $0.80 |
| 08/22/2019 | 150 | $0.77 |
| 08/22/2019 | 100 | $0.76 |
| 08/27/2019 | 250 | $0.69 |
| 08/27/2019 | 150 | $0.67 |

| 08/29/2019 | 150 | $0.65 |
| 08/30/2019 | 50 | $0.66 |
| 09/03/2019 | 246 | $0.66 |
| 09/03/2019 | 4 | $0.65 |
| 09/04/2019 | 140 | $0.64 |
| 09/04/2019 | 210 | $0.65 |
| 09/24/2019 | 200 | $0.75 |
| 10/02/2019 | 250 | $0.64 |
| 10/02/2019 | 250 | $0.64 |
| 10/03/2019 | 250 | $0.59 |
| 10/04/2019 | 300 | $0.62 |
| 10/21/2019 | 300 | $0.79 |

### NOK US 01/17/20 C4 Equity

| Date Acquired | Amount of Options Acquired | Price |
| --- | --- | --- |
| 11/06/2017 | 1,000 | $1.80 |
| 11/07/2017 | 1,000 | $1.55 |
| 11/07/2017 | 500 | $1.55 |

| Date Sold | Amount of Options Sold | Price |
| --- | --- | --- |
| 5/4/2018[A] | 500 | |
| 5/4/2018[A] | 500 | |

[A]Exercised Option.

### NOK US 01/17/20 C5 Equity

| Date Acquired | Amount of Options Acquired | Price |
| --- | --- | --- |
| 11/02/2017 | 100 | $1.00 |
| 11/02/2017 | 400 | $1.02 |
| 11/02/2017 | 3 | $1.00 |
| 11/03/2017 | 497 | $1.00 |
| 11/06/2017 | 500 | $1.00 |
| 11/07/2017 | 1,000 | $1.04 |
| 11/10/2017 | 500 | $0.90 |
| 11/10/2017 | 500 | $0.91 |
| 11/22/2017 | 500 | $0.96 |
| 12/13/2017 | 750 | $0.73 |
| 12/27/2017 | 500 | $0.79 |
| 12/29/2017 | 100 | $0.75 |
| 01/18/2018 | 140 | $0.81 |
| 08/15/2018 | 100 | $0.86 |
| 08/31/2018 | 250 | $1.14 |
| 08/31/2018 | 250 | $1.13 |
| 09/12/2018 | 500 | $0.94 |
| 09/12/2018 | 36 | $0.92 |

| Date | Amount | Price |
|------|--------|-------|
| 09/14/2018 | 3 | $1.05 |
| 10/15/2018 | 350 | $0.91 |
| 07/17/2019 | 200 | $0.48 |
| 07/18/2019 | 51 | $0.50 |
| 07/19/2019 | 100 | $0.52 |
| 07/19/2019 | 100 | $0.52 |
| 07/22/2019 | 100 | $0.49 |
| 07/23/2019 | 200 | $0.51 |
| 07/30/2019 | 10 | $0.69 |
| 07/31/2019 | 250 | $0.68 |
| 08/02/2019 | 100 | $0.68 |
| 09/25/2019 | 1 | $0.35 |
| 09/25/2019 | 299 | $0.36 |

| Date Sold | Amount of Options Sold | Price |
|-----------|------------------------|-------|
| 12/31/2018 | 250 | $1.14 |
| 01/08/2019 | 200 | $1.39 |
| 01/09/2019 | 200 | $1.44 |
| 01/09/2019 | 200 | $1.44 |
| 01/09/2019 | 200 | $1.47 |
| 01/09/2019 | 200 | $1.44 |
| 01/09/2019 | 200 | $1.44 |
| 01/09/2019 | 150 | $1.47 |
| 01/10/2019 | 500 | $1.42 |
| 01/10/2019 | 500 | $1.42 |
| 01/10/2019 | 100 | $1.41 |
| 01/10/2019 | 200 | $1.42 |
| 01/10/2019 | 600 | $1.41 |
| 01/11/2019 | 190 | $1.37 |
| 01/15/2019 | 200 | $1.36 |
| 01/17/2019 | 190 | $1.29 |
| 01/18/2019 | 100 | $1.37 |
| 01/23/2019 | 200 | $1.34 |
| 01/24/2019 | 200 | $1.40 |
| 01/24/2019 | 200 | $1.44 |
| 01/24/2019 | 100 | $1.41 |
| 01/25/2019 | 200 | $1.69 |
| 01/25/2019 | 500 | $1.70 |
| 01/25/2019 | 1,399 | $1.74 |

**CERTIFICATE OF SERVICE**

      I, Chad Johnson, hereby certify that on January 8, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



                                     */s/ Chad Johnson*

                                     CHAD JOHNSON