UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re NOKIA CORPORATION SECURITIES
LITIGATION

This Document Relates To:

     ALL ACTIONS.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:19-cv-03509-ALC

<u>CLASS ACTION</u>

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS NOKIA CORPORATION AND RAJEEV SURI'S MOTION TO DISMISS <u>THE SECOND CONSOLIDATED AMENDED COMPLAINT</u>

Jay B. Kasner
Susan L. Saltzstein
Jeffrey S. Geier
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
susan.saltzstein@skadden.com
jeffrey.geier@skadden.com

*Attorneys for Nokia Corporation
   and Rajeev Suri*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 6

      A.    The Parties .................................................................................................... 6

      B.    The Alcatel Acquisition ................................................................................ 7

      C.    Nokia Fully Discloses the Risks Associated With the Integration of Alcatel Over the Course of 2017 ................................................................... 8

      D.    Throughout 2017, Nokia Repeatedly Discusses Its Views of the Timing of 5G Implementation, as Well as the Associated Risks ............................... 10

      E.    Nokia's 2017 Form 20-F Discusses the Risks and Status of Both the Alcatel Integration and Ongoing Development of 5G Technology ...................... 13

      F.    Nokia Continues To Update Shareholders About Its Work Developing 5G Technology Throughout 2018 ................................................................... 13

      G.    Nokia's 2018 Form 20-F Again Identifies the Risks Associated With 5G Development ................................................................................................. 16

      H.    Nokia Continues to Update Shareholders About 5G Development During 2019 ............................................................................................................. 16

      I.    Nokia's Ethical Code of Conduct ............................................................... 17

      J.    The Alleged "Corrective" Disclosures ...................................................... 18

ARGUMENT .............................................................................................................................. 19

I.    PLAINTIFF'S SECTION 10(B) CLAIMS SHOULD BE DISMISSED .......................... 19

      A.    Plaintiff Fails to Plead Any Actionable Misstatement ............................... 20

            1.    Plaintiff Has Not Identified Any False or Misleading Statements ........... 20

                (a)    The Integration Statements Were Not False ................................. 21

                (b)    The 5G Statements Were Not False .............................................. 24

                (c)    The Compliance Statements Were Not False ............................... 26

                (d)    Plaintiff's Hodgepodge of Other Statements ............................... 27

             2.    The Bulk of the Challenged Statements are Nonactionable Puffery ........ 28

            3.    Many of the Cited Statements Are Not Actionable Because They Are Protected Forward-Looking Statements ........................................... 30

            4.    Certain Statements Are Nonactionable Because They Constitute Sincerely Held Statements of Opinion ................................................... 33

i

B.      The Complaint Does Not Identify Any Actionable Omissions ............................34

C.      Plaintiff's Claims Fail Because He Has Failed to Plead Scienter.........................35

    1.      Plaintiff Fails to Plead Motive and Opportunity.......................................35

    2.      Plaintiff Fails to Plead Conscious Misbehavior or Recklessness ..............37

    3.      Competing Nonculpable Inference is Stronger..........................................39

II.      PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED ...........................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Avon Securities Litigation,*
    No. 19 Civ. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ........................39

*Axar Master Fund, Ltd. v. Bedford,*
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd* 2020 WL 1456482 (2d Cir. Mar. 23,
    2020)  ...............................................................................................................................34

*In re Barrick Gold Corp. Securities Litigation,*
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)...............................................................................31

*In re Bayou Hedge Fund Litigation,*
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)...............................................................................37

*Bettis v. Aixtron,*
    No. 16 Civ. 00025 (CM) 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016)..........................32

*Boca Raton Firefighters & Police Pension Fund v. Bahash,*
    506 F. App'x 32 (2d Cir. 2012) ...................................................................................2, 21

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014)........................................................................................28, 35

*City of Providence, Rhode Island v. Bats Global Markets, Inc.,*
    878 F.3d 36 (2d Cir. 2017)................................................................................................23

*City of Warwick Municipal Employees Pension Fund v. Rackspace Hosting, Inc.,*
    No. 17 CIV. 3501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)..............................29

*Das v. Rio Tinto PLC,*
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)..................................................................... passim

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)..........................................................................20, 35, 36, 37

*Employees Retirement System Of City of Providence v. Embraer S.A.,*
    No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018)..........................6

*In re Express Scripts Holdings Co. Securities Litigation,*
    773 F. App'x 9 (2d Cir. 2019) ..........................................................................................22

*In re Fairway Group Holdings Corp. Securities Litigation,*
    No. 14 Civ. 0950 (AJP), 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)...........................30

*In re Ferrellgas Partners, L.P., Securities Litigation*,
No. 16 Civ. 7840 (RJS), 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ...............28, 31, 32

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom.* 779 F. App'x 69 (2d Cir.
Oct. 15, 2019) .................................................................................................34, 39

*Friedman v. Endo International PLC*,
No. 16-CV-3912 (JMF), 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018), *aff'd sub
nom. Steamfitters' Industry Pension Fund v. Endo International PLC*, 771 F.
App'x 494 (2d Cir. 2019)..................................................................................26

*Gagnon v. Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019)..................................................................38

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019)................................................................................35

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................38

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings,
Inc.*,
No. 18-cv-00299 (AJN), 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019) ..........................22

*Holbrook v. Trivago N.V.*,
No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26 2019) .............................39

*In re Iconix Brand Group, Inc.*,
No. 15 Civ. 4860 (PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017)...........................37

*Johnson v. Sequans Communications S.A.*,
No. 11 CIV. 6341 (PAC), 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ......................23, 29

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)..........................................................................36, 37

*Kemp v. Universal American Financial Corp.*,
No. 05 Civ. 9883 (JFK), 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ...............................30

*Kinsey v. Cendant Corp.*,
No. 04 Civ. 0582 RWS, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005)...........................38

*Lighthouse Financial Group v. Royal Bank of Scotland Group*,
902 F. Supp. 2d 329 (S.D.N.Y. 2012)..................................................................29

*In re Lions Gate Entertainment Corp. Securities Litigation*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) .....................................................................20

iv

*In re Lululemon Securities Litigation,*
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)....................20

*Martin v. Quartermain,*
    732 F. App'x 37 (2d Cir. 2018) .........................................................................................23

*In re Morgan Stanley Information Fund Securities Litigation,*
    592 F.3d 347 (2d Cir. 2010)...............................................................................................23

*Oklahoma Law Enforcement Retirement System v. Telefonaktiebolaget LM Ericsson,*
    No. 18-CV-3021 (JMF), 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020).............28, 29

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
    575 U.S. 175 (2015).............................................................................................................33

*In re Optionable Securities Litigation,*
    577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008).........................................................................34

*In re Philip Morris International Inc. Securities Litigation,*
    No. 18-cv-08049 (RA), 2020 WL 550769 (S.D.N.Y. Feb. 4, 2020) ...........................30, 31

*Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies Inc.,*
    548 F. App'x 16 (2d Cir. 2013) ..........................................................................................31

*In re Razorfish, Inc. Securities Litigation,*
    No. 00 CIV. 9474 (JSR), 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001)....................22, 28

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004).................................................................................................28

*In re Royal Bank of Scotland Group PLC Securities Litigation,*
    No. 09 Civ. 300(DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012)...............................28

*Schiro v. Cemex, S.A.B. de C.V.,*
    No. 18-CV-2352 (VEC), 2020 WL 635705 (S.D.N.Y. Feb. 10, 2020) ............................35

*Singh v. Cigna Corp.,*
    918 F.3d 57 (2d Cir. 2019)................................................................................................4, 27

*Slayton v. American Express Co.,*
    604 F.3d 758 (2d Cir. 2010).................................................................................................31

*South Carolina Retirement Systems Group Trust v. Eaton Corp. PLC,*
    791 F. App'x 230 (2d Cir. 2019) ........................................................................................25

*Stratte-McClure v. Morgan Stanley,*
    776 F.3d 94 (2d Cir. 2015)...................................................................................................34

*Tabor v. Bodisen Biotech, Inc.*,
　　579 F. Supp. 2d 438 (S.D.N.Y. 2008)..............................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
　　551 U.S. 308 (2007)........................................................................................35

*Tongue v. Sanofi*,
　　816 F.3d 199 (2d Cir. 2016)............................................................................33

*Tyler v. Liz Claiborne, Inc.*,
　　814 F. Supp. 2d 323 (S.D.N.Y. 2011)..............................................................39

*In re Veon Ltd. Securities Litigation*,
　　No. 15-CV-08672 (ALC), 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ..............6, 38, 40

*Waterford Township Police & Fire Retirement System v. Regional Management Corp.*,
　　723 F. App'x 20 (2d Cir. 2018) .......................................................................26

*Wilder v. News Corp.*,
　　No. 11 CIV. 4947 PGG, 2014 WL 1315960 (S.D.N.Y. Mar. 31, 2014) ...........................20

## STATUTES

15 U.S.C. § 78u-4(b)(1) ....................................................................................20

15 U.S.C. § 78u-4(b)(2)(A)................................................................................35

15 U.S.C. § 78u-5(c)(1) ....................................................................................30

15 U.S.C. § 78u-5(i)(1) .....................................................................................30

vi

Defendants Nokia Corporation ("Nokia" or the "Company") and Rajeev Suri ("Mr. Suri" and, with Nokia, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Second Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF # 47) (the "Complaint" or "SAC"), filed by lead plaintiff Clyde W. Waite ("Plaintiff"), pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

Despite spanning 164 paragraphs over 64 pages, the Complaint leaves its reader guessing at what Plaintiff alleges was false about the pages-upon-pages of block quotes contained therein and thus fails to plead the specifics required by Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)") and the PSLRA.  Lacking any coherent theme, Plaintiff cobbles together excerpts from earnings calls, press releases, earnings reports and conferences concerning Nokia's: (i) efforts to "integrate" Alcatel Lucent S.A. ("Alcatel"), which Nokia acquired in 2016 (SAC ¶¶ 40-42), (ii) efforts to develop cutting-edge 5G technologies and devices for the next generation of mobile networks (*id.* ¶¶ 43-83); (iii) Code of Conduct (*id.* ¶¶ 86-92); and (iv) other various statements.  Plaintiff then follows these pages of block quotations with a formulaic mantra, alleging that *all* of the above statements (grouped in yearly increments) were false for the same generic reasons.  (*See id.* ¶ 52 (alleging that 6 pages of 2017 statements created "the false and misleading impression that Nokia's integration with Alcatel was complete and successful and that the Company was fully prepared for the 5G transition" and failed to disclose "significant problems . . . that were necessary to make Nokia's statements concerning 5G readiness and the progress of integration not materially false and misleading"); *id.* ¶ 72 (repeating the same for 12 pages of  2018 statements); *id.* ¶ 85 (repeating the same for 6 pages of 2019 statements).)  Indeed, it apparently matters not that many of the statements swept into these

yearly amalgamations have nothing at all to do with "integration" or 5G.  Plaintiff's blunderbuss

allegations of falsity are wholly inconsistent with Nokia's actual disclosures and are insufficient

to state a claim.  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed. App'x

32, 37-38 (2d Cir. 2012) (affirming dismissal of a "280-page complaint consist[ing] in large part

of large block quotations with italicized text, followed by a passage that reads 'the statements

referenced . . . were each materially false and misleading when made for the reasons set forth in

¶ 256 and the factual detail contained throughout this Complaint.'")

"Integration" Statements.  Plaintiff's "integration"-related claims of falsity hinge

primarily on his allegation that Nokia stated that it "had successfully completed and moved

'beyond the integration' of Alcatel."  (SAC ¶ 2.)  Plaintiff premises this allegation on isolated

statements made during an April 27, 2017 earnings call (*id.* ¶ 40), claiming that because Nokia

disclosed in 2019 "certain practices relating to compliance issues at the former Alcatel Lucent

business that have raised concerns" (*id.* ¶ 93), every earlier statement about "integration" must

have been false.  But Plaintiff's improper attempt to equate statements about "integration" with a

guaranty that every risk and compliance issue at the former Alcatel had been identified and

remedied fails as a matter of law and logic.  Indeed, a later disclosure that a compliance issue had

been unearthed in a company of tens-of-thousands of employees is in no way inconsistent with a

statement about the completion or success of an "integration," a process or concept broadly

referring to creating a single unified business following a merger or acquisition.

Moreover, not only did Nokia never guaranty against future risks or compliance issues, *it

stated the exact opposite*.  A risk disclosure incorporated into the April 27, 2017 earnings call

specifically warned that integration activities were ongoing, and that compliance issues may be

discovered in the future.  (Ex. 1 at 76.)[1]  A similar disclosure appeared in the following year's

Form 20-F.  (Ex. 2 at 77-78.)  Indeed, during the 18 months after the April 27, 2017 earnings

call, Nokia repeatedly advised investors that "integration" activities were continuing, and that

risks remained.  (*See, e.g.*, SAC ¶ 46 (discussing "bigger than expected workload" due in part to

"platform migration"); *id.* ¶ 50 (discussing risks associated with "network equipment swaps

related to the portfolio migration"); *see also id.* ¶¶ 51, 53, 64.)  Nokia also identified its ability to

integrate Alcatel as an express risk.  (Ex. 3 at 15, 73.)  Nokia's actual statements are directly at

odds with Plaintiff's generic claims of falsity and do not support a claim for securities fraud.

     5G Statements.  Plaintiff's allegations about Nokia's 5G-related statements are equally

meritless.  The core of these claims is the allegation that Nokia "repeatedly assured investors that

the Company was '5G ready'" (SAC ¶ 2) and then disclosed in 2019 that it needed to increase its

5G-related investments.  (*Id.* ¶ 99.)  Plaintiff repeats this allegation throughout the Complaint,

but never quotes an actual Nokia statement.  (*Id.* ¶¶ 4, 8, 38.)  This omission is for good reason.

Nokia actually disclosed that certain of its products – including AirScale – were "5G-ready" (Ex.

4 at 6), a fact that Plaintiff does not contest.  Indeed, 5G-ready hardware can be deployed well-

before 5G is implemented fully.  (*See, e.g.*, SAC ¶ 74 (explaining that "[s]ome of the hardware

that has been deployed is waiting for the availability and acceptances of key 5G software

releases.").)  Elsewhere, Plaintiff claims that Nokia stated that "its 5G products were 'ready for

full deployment.'" (*Id.* ¶ 38; *see also id.* ¶¶ 48-51.)  But, as with Plaintiff's supposed "5G ready"

statement, Plaintiff mischaracterizes what Nokia actually said about being "ready for full

deployment."  The Company was not discussing 5G at all, but instead updating its shareholders

---

[1]    References to "Ex. [ ]" are to the exhibits listed in the accompanying Declaration of Susan L. Saltzstein.

that it was in "deployment mode" with respect to its efforts to "swap" out Alcatel equipment for Nokia equipment (*see* Ex. 5 at 10, 13), another fact Plaintiff does not (and cannot) contest.

Nokia never assured investors that its efforts to develop cutting-edge 5G would instantly be successful and profitable. Contrary to the rosy outlook Plaintiff paints, Nokia's actual disclosures reflect a candid recognition of the risks associated with the acceleration of 5G, as well as the difficulties inherent in the process. (*See, e.g. id.* ¶ 44 ("[T]his situation does create some near term risk"); *id.* ¶ 55 ("We expect 2018 to be challenging from a market perspective and due to the acceleration of near-term 5G investments."); *see also id.* ¶ 61.) Rather than assurances of success, Nokia instead issued forthright (and at times negative) discussions of the risks facing the Company in this technologically complex undertaking.

Code of Conduct. Plaintiff also throws in allegations concerning Nokia's Code of Conduct, claiming that the Code "falsely conveyed that Alcatel had been fully integrated into the Company's Code of Conduct and compliance mechanisms" and that it "communicated to the market that Alcatel . . . had been brought within and was in compliance with Nokia's Code of Conduct" and failed to disclose that the "Company had discovered compliance issues during the integration." (SAC ¶ 92.) But Plaintiff's block quotations from Nokia's Code of Conduct say nothing about Alcatel (*see id.* ¶¶ 86-91), and there are no allegations that anything contained in the Code of Conduct was false. *See Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019) ("[The plaintiff] relies on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant violations; and *voila*, you have alleged a prima facie case of securities fraud! The problem with this equation, however, is that such generic statements do not invite reasonable reliance. They are not, therefore, *materially* misleading, and so cannot form the basis of a fraud case.") The Code of

4

Conduct sets out aspirational values and principles, but is not a guarantee of absolute compliance across a massive, complex and global enterprise.

Other Statements. In addition to the above categories of supposed misstatements and omissions, the Complaint quotes and bolds certain statements that fall outside even the generic allegations of falsity Plaintiff repeats. For example, the Complaint bolds statements such as: "I believe our second quarter results continue to show the underlying strength of Nokia and of our disciplined operating model in end-to-end portfolio in particular" (*id.* ¶ 43); "We have strong customer relationships, deep R&D capacity and thanks to our robust balance sheet, the ability to further invest as needed" (*id.* ¶ 44); "The performance of our AirScale product is extremely good" (*id.* ¶ 53). Plaintiff simply leaves the reader to guess how these and the numerous other randomly bolded statements were false when made.

*   *   *

It is apparent that Plaintiff has opportunistically seized on two supposed "corrective" disclosures issued in 2019 and, armed with the benefit of hindsight, worked backwards to claim that all related statements made before those disclosures were false. But the Complaint suffers from multiple independent deficiencies that warrant dismissal as a matter of law.

Absence of Actionable Misstatement or Omission. The Complaint fails to identify the reasons why any of Nokia's statements were false, let alone with the particularity required by Rule 9(b) and the PSLRA. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 799 (S.D.N.Y. 2018) (Carter, J.). (Section I(A)(1), *infra.*) Plaintiff repeatedly attempts to plead claims based on nonactionable puffery (Section I(A)(2), *infra*), statements protected by the PSLRA's safe harbor for forward-looking statements (Section I(A)(3), *infra*) and statements of opinion (Section I(A)(4), *infra*). The Complaint fails to establish a single actionable misstatement or omission.

5

Absence of Scienter.  The Complaint also fails to plead a strong inference of scienter. (Section I(C), *infra*.)  First, Plaintiff attempts to find a motive in certain relatively minor incentive mechanism tied to the "financial synergies and cultural integration" of Alcatel.  (SAC ¶ 58 (citation omitted); *see also id.* ¶¶ 128-31.)  But the Complaint fails to plead how Nokia's modest incentive compensation had any relationship to either the alleged compliance issue at Alcatel or 5G.  Nor are there any allegations that Mr. Suri ever sold a single unit of stock, a fact plainly at odds with any inference of scienter.  Alternatively, the Complaint attempts to plead that Mr. Suri "must have known" of the alleged falsity of certain statements because of the robust integration and reporting processes implemented at Nokia.  (*Id.* ¶¶ 111-127, 132-35.)  But Plaintiff's generic "must have known" allegations based on an individual's corporate position are insufficient to satisfy Rule 9(b) and the PSLRA.  *See, e.g.*, *In re Veon Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2018 WL 4168958, at *17 (S.D.N.Y. Aug. 30, 2018) (Carter, J.).  Plaintiff's failure to plead scienter with the specificity required by Rule 9(b) and the PSLRA is an independent ground for dismissal of the Complaint.

Despite extensive time, multiple complaints and the exchange of pre-motion letters, Plaintiff still cannot state a viable claim.  The Complaint ought to be dismissed with prejudice.

## STATEMENT OF FACTS[2]

### A.    The Parties

Nokia is incorporated in Finland, and its American Depositary Shares[3] trade on the New York Stock Exchange.  (SAC ¶ 15.)  It operates with tens-of-thousands of employees around the

---

[2]    The standards applicable to a motion to dismiss a claim for securities fraud are well-settled. *See, e.g. In re Veon*, 2018 WL 4168958, at *12.

[3]    "An American Depository Share [('ADS')] is a security that represents an ownership interest in a specified number of a company's ordinary shares." *Emps. Ret. Sys. Of City of*

(cont'd)

world, and "is a network and technology company that provides hardware, software, and services for telecommunications operators and enterprises and provides fixed networking solutions." (*Id.* ¶ 15.) Among Nokia's various projects over recent years is the development of cutting-edge 5G technologies, which Plaintiff describes as "the next generation of wireless cellular network technology, capable of significantly greater data speeds than earlier wireless networks." (*Id.* ¶ 18.) According to Plaintiff, "5G networks first began to become available within parts of this District during 2019, one of the first 5G rollouts in the United States." (*Id.* ¶ 18 n.4.) Rajeev Suri was the President and CEO of Nokia at all relevant times. (*Id.* ¶ 16.)

## B.    The Alcatel Acquisition

On April 15, 2015, Nokia announced its intention to acquire Alcatel. (*Id.* ¶ 17.) Although Plaintiff alleges without citation that the transaction "was intended to enable the Company to compete in 5G" and that "Nokia was unable to compete in 5G on its own" (*id.* ¶¶ 18-19), the press release explains that the transaction, which valued Alcatel at 15.6 billion euro, would create a "combined company [that] will be uniquely positioned to create the foundation of seamless connectivity for people and things wherever they are." (Ex. 6 at 2.) (As of April 15, 2015, 15.6 billion euro equaled approximately $16.53 billion). The April 15, 2015 Release further explains that "[w]ith more than 40[,]000 R&D employees and spend of EUR 4.7 billion in R&D in 2014, the combined company will be in a position to accelerate development of future technologies including 5G, IP and software-defining networking, cloud, analytics as well as sensors and imaging." (*Id.*) (As of April 15, 2015, 4.7 billion euro equaled approximately $4.98 billion).

---

*Providence v. Embraer S.A.*, No. 16 Civ. 6277 (RMB), 2018 WL 1725574, n.3 (S.D.N.Y. Mar. 30, 2018) (citation omitted) (alterations in original).

The April 15, 2015 Release places the scope of the Alcatel acquisition in context, explaining that Alcatel "employs approximately 52,600 employees as of end of 2014" and that "[i]ts products and services are distributed all over the world." (*Id.* at 9.)  From the very first press release announcing the intended transaction, Nokia warned shareholders of the risks associated with its effort to integrate the massive company, identifying as an express risk factor "the ability of Nokia to integrate Alcatel-Lucent into Nokia operations." (*Id.* at 13.)

On November 2, 2016, Nokia announced that it had completed the *acquisition* of Alcatel. (SAC ¶ 32.)  But the formal "completion" of the acquisition did not mean that all the risks associated with the merger suddenly dissipated.  As Mr. Suri explained in 2018 (two years later), "usually it's a 3- to 5-year period you bring the cultures together, right?  Because it's just 50,000 people from each company coming together with different cultures, different backgrounds." (*Id.* ¶ 71.)  Indeed, the process of "integration" could only begin with full speed once the actual acquisition of ownership was complete.  Nokia regularly updated its shareholders about the status of its integration of Alcatel and the accompanying ongoing risks.

**C.    Nokia Fully Discloses the Risks Associated With the Integration of Alcatel Over the Course of 2017**

Plaintiff's putative class period begins on April 27, 2017, the date of a Nokia earnings call.  One of the core pillars of the Complaint is an isolated sentence excised from the very end of that call where Mr. Suri summarized that "*[w]ith the integration of Alcatel-Lucent behind us*, we are committed to building on that platform and to making 2017 a year of execution and performance." (Ex. 7 at 15 (emphasis added).)  Earlier in the call, however, Mr. Suri explained: "Nokia's first quarter results showed our improving business momentum and that *we are effectively moving beyond* the integration effort for 2016 to making 2017 a year of execution and performance." (*Id.* at 4 (emphasis added).)

8

Seizing on the italicized language, Plaintiff attempts to convert Nokia's statement about "integration" into an assurance that no remaining risks or compliance issues would be discovered within the former Alcatel business.  (SAC ¶ 42.)  Setting aside that Nokia provided no such assurance, the Complaint omits entirely that the earnings call began with a reference to specific risk disclosures issued about a month earlier, as well as risk disclosures contained in the accompanying earnings release.  (Ex. 7 at 4.) [4]  Included among the risk factors was:

> **We have identified material weaknesses in our internal control over financial reporting following the Acquisition of Alcatel Lucent which, if not remediated, could have a material adverse effect on us.**
>
> ***Our integration activities in connection with the Acquisition of Alcatel Lucent are ongoing***. In connection with the preparation of our consolidated financial statements for the year ended December 31, 2016, our management identified two material weaknesses in the effectiveness of our internal control over financial reporting related to (1) the accounting for income taxes at a former Alcatel Lucent entity in the United States and (2) the accounting and control functions at a former Alcatel Lucent subsidiary in China.
>
> As permitted by applicable regulations and accounting rules, ***Nokia's internal controls effectiveness assessment in 2016 did not include Alcatel Lucent's legacy operations.*** Our operating subsidiaries or our joint ventures' failure, or a failure to integrate the Alcatel Lucent legacy operations into our internal controls framework, could adversely affect the accuracy and timeliness of our financial reporting, which could result, for instance, in loss of confidence in us or in the accuracy and completeness of our financial reports, or otherwise in the imposition of fines or other regulatory measures, which could have a material adverse effect on us. ***Moreover, we may identify further control deficiencies that are material weaknesses in the future.***

(Ex. 1 at 76 (emphasis added).)  The Form 20-F also disclosed historic compliance issues at Alcatel, and that "[w]e may also be subject to claims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent prior to the acquisition."  (*Id.* at 79.)  The Form

---

[4]     The same incorporation of the 2016 Form 20-F risk disclosures is included in each earnings call regarding 2017 results.  (Ex. 5 at 4; Ex. 8 at 4; Ex. 9 at 4.)

20-F further warned that "there can be no assurance that the overall integration of Alcatel Lucent will be successful or yield expected benefits and results," and that one potential reason for a lack of success is the potential for discovery of compliance issues. (*Id.* at 67-68.)  Likewise, Nokia's Form 6-K issued the same day as the earnings call identified as a risk "our ability to integrate Alcatel Lucent into our operations and achieve the targeted business plans and benefits, including targeted synergies in relation to the acquisition of Alcatel Lucent." (Ex. 3 at 15, 73.)

### D.    Throughout 2017, Nokia Repeatedly Discusses Its Views of the Timing of 5G Implementation, as Well as the Associated Risks

Aside from integration, the Complaint also challenges statements purportedly regarding Nokia's development of 5G technology.  Over the course of 2017, Nokia repeatedly disclosed risks associated with its work developing 5G and, specifically that Nokia had observed an acceleration in the expected timeframe for 5G implementation, and that Nokia's R&D team was particularly stretched given the need to both "swap" out Alcatel products as a result of the acquisition, and prepare for the expected future implementation of 5G technology.

Second Quarter 2017.  During Nokia's 2017 Q2 earnings call, for example, it discussed that its original expectation was that 5G would "take off" in 2020 to 2021, but new indications were that it would instead accelerate sooner. (Ex. 8 at 5-6.)  Mr. Suri discussed that this acceleration required "expanding the workload on our R&D team in mobile networks" and that "this situation does create some near-term risk, as it makes the timing of certain project completions and acceptance is more uncertain than is typical for us." (*Id.* at 5.)  The accompanying earnings release also noted the level of investment needed for 5G could impact operating margin, and again identified the ability to integrate Alcatel as a risk. (Ex. 10 at 16.)

Third Quarter 2017.  Similar themes were echoed during Nokia's Q3 2017 earnings call, when Mr. Suri discussed the high workload confronting Nokia's R&D team arising from both (1) ongoing swapping out of Alcatel products, and (2) development of 5G.  (Ex. 5 at 6.)

The Complaint places great weight on this third quarter earnings call, alleging that the Company stated that it was "now fully in the deployment phase" of 5G, and that Nokia was "5G ready."  (SAC ¶¶ 48-49.)  What Nokia actually disclosed was that its efforts "will result in our *latest 5G-ready AirScale products* in wide use with considerable future upsell opportunities." (Ex. 5 at 6 (emphasis added).)[5]  The "5G ready" language quoted throughout the Complaint (SAC ¶¶ 2, 4, 8, 38) relates not to Nokia as a whole, but to particular products, such as the AirScale products.  Plaintiff makes no attempt to allege that AirScale was not 5G ready.

As to the ongoing "swaps," Nokia explained that "[i]t has taken extended time to converge a limited set of products and, as a result, we are having to swap out more products, as Rajeev [Suri] said.  *We are now fully in the deployment phase of our swaps program*, and this had provided us more insight, which is also factored into our revised estimates, for example, the number of site visits required."  (Ex. 5 at 10 (emphasis added).)  Elsewhere, Nokia explained:

> That is to do with – the extensive R&D workload [which] relate to migration, those 4 points I talked about.  And so that has a risk with those customers, where there is the element of network equipment swaps related to the portfolio migration.  And so it's contained to less than a handful of customers, but we see a risk that it could last until first half of 2018, simply because this is a multi-quarter activity.  *And the good part is that we are now in full deployment mode*, and that of course, is helpful.  And of course, some of that is – already hit us in Q3.

---

[5]    Plaintiff conflates a statement concerning one particular product, AirScale, with a claim concerning overall readiness for a complete generational transformation of telecommunications technology.  (*See* SAC ¶¶ 48, 54.)  As Nokia explained in its 2016 Form 20-F, "AirScale Radio Access: A 5G-ready complete radio access generation that helps operators address the increasing demands of today and tomorrow."  (Ex. 2 at 217.)

*(cont'd)*

11

(*Id.* at 13 (emphasis added).)  The "fully in the deployment phase" language quoted in the Complaint (SAC ¶ 48) thus related to the efforts to swap out Alcatel products, not 5G technology, which was still years away from full implementation.[6]  Plaintiff does not allege that any of the statements concerning the status of these swaps were false.  The accompanying earnings release again noted that investment in 5G could impact margins.  (Ex. 11 at 15.)

Fourth Quarter 2017.  Finally, with respect to Nokia's Q4 2017 earnings call, the Complaint offers a variety of excerpts concerning "product integration," and appears to suggest that those statements concern 5G.  But context shows that the statements refer to the continuing efforts to combine Nokia and Alcatel products.  (SAC ¶ 53.)  In addition to the product integration updates, Mr. Suri also explained that "2018 will be another challenging year, and *tapping the opportunity of 5G requires additional near-term investment.*  I am confident, however, that our investment will deliver the right future results."  (Ex. 9 at 18 (emphasis added).)  Nokia also explained its new ReefShark chipset.[7]  (SAC ¶ 54.)  The accompanying earnings release further provided that Nokia's operating margin would "come under some pressure in 2018" because of accelerating investment in 5G.  (Ex. 12 at 5.)  As the foregoing demonstrates, over the course of 2017, Nokia candidly discussed its view of the timing and status of the coming 5G transition, and the risks associated with its development.

---

[6]    The Complaint mischaracterizes this earnings call, alleging that Mr. Suri "explained, those execution challenges related to the planning and development of the technology needed for the early 5G rollout, all of which were resolved and immaterial now that Nokia's products were '5G ready' and 'ready for full deployment.'"  (SAC ¶ 49.)  Indeed, Mr. Suri explained that "I believe the 5G cycle will start in 2019, and that is because chipsets and devices will start to be available" and "I believe, when 5G comes, it will be trialed in '18 and then launches starting to happen somewhere in the second half of '19."  (Ex. 5 at 18.)

[7]    ReefShark is a chipset developed by Nokia that "leverage[s] in-house silicon expertise to dramatically reduce the size, cost and power consumption of operators' networks and meet the massive compute and radio requirements of 5G."  (Ex. 13 at 13.)

**E.      Nokia's 2017 Form 20-F Discusses the Risks and Status of Both
the Alcatel Integration and Ongoing Development of 5G Technology**

The Complaint references the disclosure in Nokia's 2017 Form 20-F (issued on March

22, 2018) that Nokia completed an agreement resulting in the formation of Nokia Shanghai Bell,

"the last major *organizational step* in Nokia and Alcatel Lucent integration."  (SAC ¶ 57

(emphasis added).)  There are no allegations that this was false.

The Complaint, however, omits the specific risk disclosures contained in the Form 20-F. [8]

Among other things, Nokia explained that:

> Potential challenges that we may encounter regarding the [Alcatel] integration
> process and operation as a combined company include the following: . . . claims,
> fines, investigations or assessments for conduct that we failed to or were unable to
> discover or identify in the course of performing our due diligence investigations of
> Alcatel Lucent prior to the acquisition, including unknown or unasserted liabilities.

(Ex. 2 at 77-78; *see also id.* at 74 (similar).)  Nokia again warned that the integration might not

be successful, potentially as a result of the discovery of compliance issues.  (*Id.*)

As to 5G development, the 20-F explained that "[a]s we move along the path towards

making 5G a commercial reality, we aim to extend our leadership in LTE with a smooth

evolution path compromising successive generations of 4.5G, 4.5G Pro and 4.9G offerings."  (*Id.*

at 25.)  Nokia identified as a risk: "our ability to correctly estimate technological developments,

including the impending turn to 5G, or adapt successfully to such developments."  (*Id.* at  73-74.)

**F.      Nokia Continues To Update Shareholders About
Its Work Developing 5G Technology Throughout 2018**

Throughout 2018, Nokia continued to keep shareholders informed of its progress with

respect to 5G development, as well as the attendant risks.

---

[8]      The risk disclosures are incorporated by reference into each of Nokia's 2018 earnings
calls.  (Ex. 14 at 4; Ex. 15 at 4; Ex. 16 at 4; Ex. 4 at 4.)

First Quarter 2018.  During the Q1 2018 earnings call, Mr. Suri expressed his opinion that the Company is "in a very strong position for 5G," while also noting that "roadmap issues which we saw last year are largely behind us, *even if there is plenty of heavy R&D lifting still to come in the sprint to 5G*."  (Ex. 14 at 6 (emphasis added) .)  The Company also discussed that its ReefShark product "will improve the cost structure *over the long term*."  (SAC ¶ 60 (emphasis added).)  Nokia identified among the various forward looking statements the ability to achieve the anticipated benefits from the Alcatel acquisition.  (Ex. 14 at 12.)

Second Quarter 2018.  During the Q2 2018 earnings call, Mr. Suri again noted the risks related to Nokia's ongoing efforts to develop 5G technology:

> The good news here is that we see no change to the overall dynamics driving the acceleration of 5G.  Nokia and its competitors are all hard at work, as there's been a radical shift in the time from the release of standards to the expectation of trial systems from around 12 months for 3G and 4G to just a few months for 5G.  *With that intensity, if any company tells you they have everything done and dusted for 5G, well, I would approach that claim with more than a little skepticism.  We all face some risks as we push to get 5G products to market.  Time is tight and development teams are stretched.*  But despite the high pressure, the Mobile Networks team is making solid progress on its roadmaps.  You can see this in the deals that we have won and announced, and we have others in the pipeline that are still to come.

(SAC ¶ 61 (emphasis added).)  Mr. Suri also explained generally about cost erosion for particular products.  (Ex. 15 at 12.)  The accompanying earnings release explained that results may be influenced by "the timing of completions and acceptances of certain projects, particularly related to 5G."  (Ex. 17 at 2.)

Third Quarter 2018.  During the 2018 Q3 earnings call, Nokia explained that work relating to cost-savings efforts flowing from the Alcatel acquisition remained ongoing.  (SAC ¶¶ 64, 67.)  The Complaint also points to certain statements regarding the status of swapping out Alcatel equipment, and that "getting out of the swap phase will enable us to fully focus our delivery capacity on the 5G project in North America, and that will help."  (SAC ¶ 66.)

14

Although not referenced in the Complaint, Nokia again discussed the risks relating to 5G development: "*we see some risks as we head to the end of this year with project timing and product deliveries. The orders are certainly there, but we are facing a heavy workload in the fourth quarter given the scale of the rollouts underway.*" (Ex. 16 at 4 (emphasis added).) Nokia reiterated that "[t]he 5G cycle is underway, and we remain well-positioned, even if there is still plenty of heavy lifting ahead." (*Id.* at 18-19.) The accompanying earnings release (referenced during the earnings call) identified as a risk "general economic and market conditions and other developments in the economies where we operate, including the timeline for the deployment of 5G and our ability to successfully capitalize on that deployment." (Ex. 18 at 12.)

Global Technology Conference. The Complaint devotes pages to quoting passages from the Global Technology Conference held in November 2018. (SAC ¶¶ 68-72; *see also* Ex. 19 at 11.) Among other things, Nokia disclosed that "we had some issues regarding our swaps" (SAC ¶ 68), "there are hiccups, but it's been positive" (*id.* ¶ 70), "[c]ultural integration is 80% over" (*id.* ¶ 71), and "cultural integration worked very well" and "went beautifully." (*Id.* ¶ 70.)

Fourth Quarter 2018. During the 2018 Q4 earnings call, Mr. Suri explained "that a fast and meaningful shift to 5G is underway" (*id.*) and that "while Nokia has a massive amount of 5G-ready hardware already deployed . . . conversion of orders and backlog to sales could be somewhat slower than normal. Some of the hardware that has been deployed is waiting for the availability and acceptances of key 5G software releases. Those releases will come available as the year progresses." (*Id.* ¶ 74.) In the accompanying earnings release, Nokia again identified timing of rollouts relating to 5G as a risk factor. (Ex. 20 at 15.)

**G.      Nokia's 2018 Form 20-F Again Identifies
the Risks Associated With 5G Development**

In its 2018 Form 20-F, Nokia updated shareholders that it "is rolling out technology today to prepare our customers for commercial launches when 5G devices and spectrum become available." (Ex. 13 at 12.)  Nokia further detailed that "roughly half of our R&D personnel are fully focused on 5G and this is expected to increase as we continue to move personnel on a periodic and strategic basis." (*Id.*)  Insofar as efforts to develop 5G were very much ongoing, Nokia identified statements about 5G as "forward-looking" (*Id.* at 4) and identified as a risk factor "our ability to correctly estimate technological developments, including the impending turn to 5G, or adapt successfully to such developments." (*Id.* at 61.)[9]

**H.      Nokia Continues to Update Shareholders
About 5G Development During 2019**

First Quarter 2019.  Nokia explained that the first quarter "was a weak quarter for Nokia as we expected." (Ex. 21 at 4.)  Mr. Suri told investors that the Company was facing higher product costs and disclosed certain "software defects and instability in the consumer device chipsets in the process of testing our 5G base station software." (*Id.* at 6)  Mr. Suri also noted that "[i]n Q1, however, we faced a significant hit to services profitability related to cost overruns and under performance in 2 large projects, driven by near-term 5G delays.  These projects will continue to provide a drag in Q2 but are expected to recover as the year progresses." (*Id.* at 7.)  The contemporaneous earnings release identified as a risk factor the "timing of the deliveries of our products and services, including our short term and longer term expectations around the

---

[9]      These risk disclosures are incorporated into each of the 2019 earnings calls identified by the Complaint.  (Ex. 21 at 4; Ex. 22 at 4.)

16

rollout of 5G and our ability to capitalize on such rollout; and the overall readiness of the 5G ecosystem." (Ex. 23 at 14.)

Cowen's Technology, Media and Telecommunications Conference. Among other things, Nokia's Corporate Chief Technology Officer indicated during the conference that "we have 500,000 of SKL platform base stations [that] have been deployed that are 5G-ready and 3.8 million 5G-ready radios. So we've sort of put the foundation in, but then the releases have to go in those, the actual features have to be built on those sort of 5G, and that's going to be years." (SAC ¶ 80; *see also* Ex. 24 at 5.) There are no allegations that any of these statements were false.

Second Quarter 2019. During this call, Nokia explained the continuing growth of the 5G market (including that Nokia had "9 live 5G networks" (Ex. 22 at 4)), and also disclosed risks. For example, Mr. Suri said that "in earlier calls, I commented on our 5G Radio roadmaps and while our progress is both fast and meaningful, *we still have work to do*." (*Id.* (emphasis added).) Mr. Suri also discussed the anticipated 5G investment cycle, which might last *between 10 and 20 years*. (*Id.* at 5.) Nokia explained that "as also was the case in the early cycle of 4G, it will be natural for 5G gross margin to be lower at the beginning, but to expand over time with scale due to improved product cost and, of course, as well as scale overall." (*Id.* at 11.) The accompanying earnings further noted that "[w]e also continued to enhance our position in 5G, and now have 45 commercial 5G deals and 9 live networks," (Ex. 25 at 1), and identified Nokia's ability to capitalize on the rollout of 5G as a risk factor. (*Id.* at 14.)

## I.    Nokia's Ethical Code of Conduct

At all relevant times, Nokia has had a Code of Conduct in place. (SAC ¶ 86, n.8.) That Code of Conduct reflects Nokia's desire to hold its employees and itself to the highest of ethical standards by setting forth a number of policy statements and compliance standards. Indeed, as

explained by Mr. Suri, Nokia's Code of Conduct represents "what we want to be and the traits we will use to get there – traits such as achievement, respect, hard work, renewal, and ethical behavior"  (Ex. 26 at 2.)  While the Code of Conduct is important, it is inherently aspirational and does not guarantee that no employee within Nokia will ever make a wrong decision.

**J.      The Alleged "Corrective" Disclosures**

The Complaint identifies two supposed "corrective" disclosures.  First, the Complaint points to a March 21, 2019 disclosure in Nokia's 2018 Form 20-F:

> During the course of the ongoing integration process, we have been made aware of certain practices relating to compliance issues at the former Alcatel Lucent business that have raised concerns.  We have initiated an internal investigation and voluntarily reported the matter to the relevant regulatory authorities, with whom we are cooperating with a view to resolving the matter.  The resolution of this matter could result in potential criminal or civil penalties, including the possibility of monetary fines, which could have a material adverse effect on our business, brand, reputation or financial position.

(the "Compliance Disclosure") (Ex. 13 at 74.)[10]  The Complaint does not contain any details concerning the alleged "compliance issues," or the nature of those issues.  The following day, Nokia further explained that "the specified investigation is not expected to have a material impact on Nokia.  We have seen no evidence that would suggest that criminal penalties would apply in this case, and we believe it is highly likely that any penalties that might apply would be limited and immaterial."  (SAC ¶ 96.)

The second alleged "corrective" disclosure was contained in Nokia's third quarter 2019 earnings report filed on Form 6-K. (*Id.* ¶ 99.)  Instead of quoting the actual disclosure, the Complaint characterizes it as having disclosed "that [Nokia] had experienced severe difficulties

---

[10]      Importantly, the Complaint ignores that a nearly identical disclosure was contained in a Euro Medium Term Note Programme prospectus issued by Nokia on March 1, 2019 – approximately 3 weeks prior to the Compliance Disclosure.

with the initial phase of its 5G rollout, and was dramatically behind its competition in the race to 5G." (*Id.*)  Elsewhere, the Complaint alleges that the disclosure reflects that "the Company was still at least *two years away* from marketing devices fully compatible with 5G."  (*Id.* ¶ 4.)  In reality, the actual disclosure recited in part:

> We are proud to have launched 15 live 5G networks with customers, including Spring, Verizon, AT&T and T-Mobile in the US; Vodafone Italy and Zain in Saudi Arabia; as well as SKT, KT and LGU+ in Korea.
>
> Many of our businesses are performing well and we expect Q4 to be strong, with a robust operating margin and an increase in net cash of approximately EUR 1.2 billion.  At the same time, some of the risks that we flagged previously related to the initial phase of 5G are now materializing.  In particular, our Q3 gross margin was impacted by product mix; a high cost level associated with our first generation 5G products; profitability challenges in China; pricing pressure in early 5G deals; and uncertainty related to the announced operator merger in North America.
>
> We expect that we will be able to progressively mitigate these issues over the course of next year. To do so, we will increase investment in 5G in order to accelerate product roadmaps and product cost reductions, and in the digitalization of internal processes to improve overall productivity. We will also continue to invest in our enterprise and software businesses, which are developing rapidly and performing well. Given these investments and the risks we see materializing, we are adjusting our targets for full-year 2019 and 2020; and we expect our recovery to drive improvement in our 2021 financial performance relative to 2020.

(the "5G Disclosure") (Ex. 11 at 1-2.)  The Form 6-K also announced a suspension of Nokia's dividend and a decrease in financial guidance.  (*Id.*)

## ARGUMENT

## I.    PLAINTIFF'S SECTION 10(b) CLAIMS SHOULD BE DISMISSED

To state a claim for securities fraud, a complaint must plead: "(i) a material misrepresentation or omission by the defendant; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation." *Das Rio Tinto PLC*, 332 F. Supp. 3d 786, 802 (S.D.N.Y. 2018) (citation omitted).  Securities fraud claims are subject

to both the heightened pleading standards of Rule 9(b) and the PSLRA.  These standards require that the complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *see also ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). In addition, a complaint must contain specific facts giving rise to a "strong inference" of scienter. *Id.* The Complaint does not come close to satisfying these exacting pleading requirements.

## A.    Plaintiff Fails to Plead Any Actionable Misstatement

Plaintiff's claims are loosely based on three broad categories of statements made by Nokia and its CEO between 2017 and 2019: (1) statements communicating the progress of its multi-year "integration" of Alcatel and its 50,000 employees (the "Integration Statements"); (2) the development and status of its cutting-edge 5G technologies (the "5G Statements"); and (3) Nokia's Code of Conduct (the "Compliance Statements").  (SAC ¶¶ 2-4, 38, 49, 86, 92.)[11]  In addition, the Complaint offers a variety of statements outside the scope of even Plaintiff's generic allegations of falsity. None of the identified statements are actionable.

### 1.    Plaintiff Has Not Identified Any False or Misleading Statements

A Plaintiff "must do more than simply assert that a statement is false – '[she] must demonstrate with specificity why that is so.'" *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  Instead of pleading such specifics, Plaintiff lists statements made over year-long periods, and concludes that those statements must have been false based on the subsequent Compliance Disclosure and

---

[11]    The Complaint cites certain statements made prior to the putative Class Period.  (*See* SAC ¶¶ 30-35).  But such statements are nonactionable as a matter of law.  *Wilder v. News Corp.*, No. 11 CIV. 4947 PGG, 2014 WL 1315960, at *7 (S.D.N.Y. Mar. 31, 2014) (holding that "statements that pre-date the Class Period are not actionable."); *see also In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016).

the 5G Disclosure.  (*See* SAC ¶ 52 (2017); *id.* ¶ 72 (2018); *id.* ¶ 85 (2019); *id.* ¶ 92 (Code of

Conduct).)  This pleading tactic fails as a matter of law.  *See, e.g., Boca Raton Firefighters &*

*Police Pension Fund v. Bahash*, 506 Fed. App'x, 32, 37-38 (2d Cir. 2012); *Tabor v. Bodisen*

*Biotech, Inc.*, 579 F. Supp. 2d 438, 458 (S.D.N.Y. 2008) (block quotes followed by "generalized

explanations" insufficient to meet pleading standards.)  But Plaintiff's claims also fail because he

has not identified any statements that were false when made.

### (a)        The Integration Statements Were Not False

The Complaint critiques certain statements made during an April 27, 2017 earnings call,

(*see* SAC ¶ 40), claiming that these statements "falsely conveyed that the risks associated with

the Company's integration efforts were behind it," because "the Company had learned of

material compliance issues at Alcatel."  (*Id.* ¶ 42; *see also id.* ¶ 93.)  Plaintiff also offers

conclusory assertions that pages of statements grouped in yearly increments gave the "false and

misleading *impression* that Nokia's integration with Alcatel was complete and successful."  (*Id.*

¶¶ 52, 72, 85 (emphasis added).)  These conclusory allegations, however, are at odds with

Nokia's actual disclosures.[12]

As a threshold matter, there is no inconsistency between a "successful"[13] or "complete"

integration and uncovering a subsequent compliance issue.  "Integration" risk is not the same as

compliance risk.  Nokia is a company of tens-of-thousands of employees operating around the

---

[12]        Plaintiff also points to an October 25, 2018 statement that "We have now gone through, one could say, one phase of cost optimization after the Alcatel Lucent integration, and we are now moving into the next phase" (SAC ¶ 41), but does not explain how this disclosure was false.

[13]        The Complaint take liberties with Nokia's disclosures, repeatedly complaining that Nokia had stated that it "had successfully completed and moved 'beyond the integration.'"  (SAC ¶ 2; *see also id.* ¶¶ 3, 38, 39, 41, 52, 72, 85, 86, 93.)  Contrary to Plaintiff's allegations, Nokia actually warned that the integration might not be successful for multiple reasons, including the possibility that compliance issues could be discovered.  (Ex. 1 at 67; Ex. 2 at 77-78.)

world.  In no sense is a statement regarding the progress of "integration" a guaranty against future risks or compliance issues.  Judge Rakoff's decision in *In re Razorfish Securities Litigation* is instructive on this point.  There, as here, the plaintiff alleged that a global technology company violated Sections 10(b) and 20(a) by making false and misleading statements about the progress of its ongoing post-merger integration, including that it was both "successful" and "complete."  *In re Razorfish, Inc. Sec. Litig.*, No. 00 CIV. 9474 (JSR), 2001 WL 1111502, at *1 (S.D.N.Y. Sept. 21, 2001).  Judge Rakoff rejected the claim and held the word "'*integration' is far too loose and uncertain a term on which to premise a claim of securities fraud.*"  *Id*. at 2 (emphasis added).[14]  The same conclusion is warranted here, where nothing about Nokia's actual statements contained the type of guarantees Plaintiff seeks to attribute to the word "integration."

Moreover, Plaintiff's allegations of falsity (based on Plaintiff's "impression") are not consistent with Nokia's actual disclosures.  In this regard, the Court ought to consider not only Plaintiff's conclusory allegations, but also the surrounding disclosures and context of the statements on which Plaintiff attempts to rely.  *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) ("Whether a statement is misleading is evaluated not only by the 'literal truth' of the statement but also 'by [the] context and manner of

[14]     In his pre-motion letter, Plaintiff cited *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*, No. 18-cv-00299 (AJN), 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019).  (ECF No. 55 at 2.)  But in that case, the Court considered whether statements such as "our efforts as best we can tell, surrounding integration planning and integration execution have been flawless,'" that "the integration process [was] 'done quickly;' 'very smooth;' 'running smoothly;' that 'great progress' had been made 'with the conversion of acquired theaters;' and that '[t]here have literally been no operational snafus of any note to report to you'" could have led an investor to infer "that there were no significant or systematic obstacles to Carmike's integration."  *Id.* at *12.  Here, Plaintiff takes a much more significant leap – from generic statements about integration far less specific than in *AMC Entertainment*, to guarantees regarding compliance issues across an enterprise of more than 50,000 employees.

presentation'") (citation omitted); *Martin v. Quartermain*, 732 F. App'x 37, 41-42 (2d Cir. 2018)

(a court "must consider the statements at issue 'in light of all [] surrounding text, including

hedges [and] disclaimers.'") (citation omitted); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592

F.3d 347, 366 (2d Cir. 2010) ("[T]he proper inquiry requires an examination of 'defendants'

representations, taken together and in context.'"); *Johnson v. Sequans Commc'ns S.A.*, No. 11

CIV. 6341 (PAC), 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013) ("The Court need not

accept allegations that . . . upon a full reading, point in the opposite direction.") [15]

Considered in this context, Plaintiff's assertion that the April 27, 2017 earnings call

"falsely conveyed that the risks associated with the Company's integration efforts were behind

it" (SAC ¶ 42) quickly falls away. As explained above, from the first press release announcing

the anticipated transaction, Nokia warned of the inherent risks associated with bringing together

the two large companies. (*See supra* at 7-8.) The very earnings call on which Plaintiff places

primary reliance referenced risk disclosures that warned that Nokia had not completed an

assessment of Alcatel's internal controls, and that certain compliance issues may be identified in

the future, and that the integration might not be successful. (*See supra* at 9-10.)[16] Nokia also

---

[15]    Plaintiff appears to argue in his pre-motion letter that the Court should not consider the full disclosures, and that the arguments that Plaintiff has taken statements out-of-context must await "later stages of the litigation." (ECF No. 55 at 2 (citing *City of Providence, Rhode Island v. Bats Global Markets, Inc.*, 878 F.3d 36, 50 (2d Cir. 2017).) But, as the authorities cited above reflect, it is perfectly appropriate – indeed, required – to consider the full statement at issue, not Plaintiff's partial and misleading excerpts. *City of Providence* is not to the contrary. That case – which concerned "a contested question of fact as to the extent and accuracy of the disclosure" – in no way stands for the proposition that a court must accept plaintiff's mischaracterizations. *Id.* at 50.

[16]    Plaintiff alleges that "[t]he market was also particularly wary of any compliance issues at Alcatel because of that company's history of serious compliance and criminal law violations." (SAC ¶ 6.) Nokia also included a specific discussion of Alcatel's historic compliance issues in its Form 20-F. (*See supra* at 9.) Given Plaintiff's claim that the market was "wary" because of

*(cont'd)*

continued to disclose integration-specific risks in subsequent filings, including in its 2017 Form 20-F issued a year later, which again disclosed the very risk that ultimately came to fruition in the Compliance Disclosure (*see supra* at 13), and as late as November 2018, Nokia continued to discuss the ongoing status of the process, (*see supra* at 15). Plaintiff's attempt to reframe certain isolated statements into a guaranty that all Alcatel-related risks and issues had been identified and resolved is contrary to the actual content of Nokia's statements.

The Complaint also ignores entirely the size and global scope of the Alcatel acquisition in contending that the market understood that "the risks associated with the Company's integration efforts were behind it" so soon after the acquisition. (SAC ¶ 42.) That acquisition added more than 50,000 employees to Nokia's payroll and cost Nokia billions of dollars. The notion that Nokia could issue a *guarantee* that no compliance issues would arise and no risks remained so soon after an acquisition of this size defies logic.

In the end, Plaintiff has not identified any facts supporting a conclusion that any of Nokia's statements about "integration" were false.

### (b)    The 5G Statements Were Not False

Plaintiff's claims based on generic statements about Nokia's early 5G progress fail for the same reason – the Complaint contains no facts indicating that they were false when made. At the outset, the core of Plaintiff's claim – that Nokia allegedly stated it was "5G-ready" and "ready for full deployment" of 5G – mischaracterizes Nokia's actual disclosures. As discussed above, Nokia explained that certain *products* were "5G ready" and that it was "ready for full deployment" of certain swaps that would replace former Alcatel products with Nokia products.

---

Alcatel's historic issues, Nokia's specific risk disclosure that compliance issues could be uncovered in the future should have been particularly notable to the market.

24

(*See supra* at 11-12.)  Read in their proper context, there are no allegations that these statements regarding the 5G capabilities of specific products were false when made.  *See S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) ("Considering [the statement] in full—rather than considering the edited version that plaintiff provides in its brief—no misrepresentation or omission occurred.").

Moreover, Nokia's actual statements do not comport with Plaintiff's portrayal of Nokia as having continually touted a positive and risk-free picture of its development of 5G technologies.  Rather, Nokia's disclosures reflect candid disclosures of the risks and difficulties encountered by Nokia throughout its work.  Indeed, among other things, Nokia disclosed: "this situation does create some near term risk" (SAC ¶ 44); "[t]hese include uncertainties related to . . . the level of R&D investment needed to maintain product competitiveness and accelerate 5G" (*id.* ¶ 45); "[w]e expect 2018 to be challenging from a market perspective and due to the acceleration of near-term 5G investments" (*id.* ¶ 55); "there is plenty of heavy R&D lifting still to come in the sprint to 5G" (*id.* ¶ 59); "if any company tells you they have everything done and dusted for 5G, well, I would approach that claim with more than a little skepticism."  (*id.* ¶ 61); and "[w]e all face some risks as we push to get 5G products to market.  Time is tight and development teams are stretched" (*id.*).  Plaintiff's repeated allegation that the Company gave a "false and misleading impression that . . . the Company was fully prepared for the 5G transition" (*id.* ¶¶ 52, 72, 85) finds no support in Nokia's actual disclosures.

In addition, Plaintiff frequently conflates statements about product swaps with statements communicating the status of Nokia's work on 5G.  For instance, Plaintiff highlights statements that  "[i]t is just the feature requirements in particular customers with former Alcatel-Lucent footprint" (SAC ¶ 51); "[w]e are moving fast and successfully to put the portfolio integration

25

challenges in Mobile Networks behind us" (*id.* ¶ 55; *see also id.* ¶¶ 50, 53, 56, 66, 68). But these statements relate to swaps and changes necessitated by the coming together of the Alcatel and Nokia products, not Nokia's broader development of 5G, as Plaintiff mistakenly suggests. (*Id.* ¶¶ 50, 51, 66.) Plaintiff does not allege any basis to conclude that these statements were false. And, as explained below, these statements are nonactionable statements of opinion and/or puffery.

In the end, Plaintiff's subjective dissatisfaction that Nokia's 5G business decisions did not yield the anticipated results is nothing more than an impermissible attempt to plead fraud by hindsight. *See Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at \*7 (S.D.N.Y. Jan. 16, 2018) ("The securities laws . . . do not provide remedies for bad business decisions; they provide remedies only for fraud."), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019); *see also Waterford Township Police & Fire Ret. Sys. v. Regional Mgmt. Corp.*, 723 F. App'x 20, 22 (2d Cir. 2018) (fraud may not be pleaded by hindsight).[17]

### (c)     The Compliance Statements Were Not False

Plaintiff cites generalized statements from Nokia's 2017 and 2018 Codes of Conduct – including that Nokia maintains a "culture of compliance" and a "commitment to act compliantly and ethically" and that "we follow the laws of the countries where we do business" and "[w]e

---

[17]     Nor does Plaintiff's citation to one Bloomberg article alleging "internal politics" and "disagreements" at Nokia suffice for purposes of rendering the Integration and 5G Statements contemporaneously false. (SAC ¶ 105.) That article cites to a single Nokia "workers' representative" who reportedly opined that there were "disagreements over priorities and staffing" post-acquisition, and these problems were attributable to "pure politics." (*See id.*) On their face these statements do not contradict Nokia's earlier disclosures regarding the status of the Alcatel integration. Instead, this one employee merely notes her view that the Company was facing certain challenges. Lacking specificity and substance, these claims cannot support a fraud claim.

26

hold each other accountable to this Code" (SAC ¶¶ 86-92), and asserts that these generic statements "falsely conveyed that Alcatel had been fully integrated into [its] Code of Conduct." (*id.* ¶ 92.) But the proffered statements say nothing about Alcatel, and the Complaint contains no facts – much less particularized facts – to support Plaintiff's conclusion of falsity. Claims premised on the Compliance Statements fail because "general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *Singh*, 918 F.3d at 63 (citation omitted).

### (d)    Plaintiff's Hodgepodge of Other Statements

Plaintiff also highlights a sampling of seemingly random statements that have nothing to do with integration, 5G or the Code of Conduct. (*See, e.g.*, SAC ¶ 43 ("I believe our second quarter results continue to show the underlying strength of Nokia and of our disciplined operating model in end-to-end portfolio in particular.");[18] *id.* ¶ 44 ("We have strong customer relationships, deep R&D capacity and thanks to our robust balance sheet, the ability to further invest as needed."); *id.* ¶ 47 ("Nokia is one of the very few companies that is able to meet all those needs."); *id.* ¶ 53 ("Recent software releases have been at our highest quality levels ever. The performance of our AirScale product is extremely good.").)[19] Plaintiff makes no attempt to show that these statements were false and any claim based on these statements fails.

---

[18]    Nokia's "end-to-end portfolio" is much broader than just 5G technology. It includes other business areas, as well as other mobile technologies (e.g. 3G and 4G). (*See, generally,* Ex. 8 at 4-5 (discussing results in different business areas).)

[19]    (*See also, e.g.* SAC ¶ 54 (discussing ReefShark); *id.* ¶ 57 (discussing Nokia Shanghai Bell); *id.* ¶ 60 (discussing customer feedback and cost structure); *id.* ¶ 62 (discussing market share); *id.* ¶ 63 (discussing cost erosion for specific products); *id.* ¶ 65 (discussing capturing synergies); *id.* ¶ 73 (discussing that a shift to 5G is underway); *id.* ¶ 74 (discussing hardware that had been deployed); *id.* ¶ 77 (discussing 5G portfolio and number of customers); *id.* ¶ 80

*(cont'd)*

### 2.   The Bulk of the Challenged Statements are Nonactionable Puffery

Generic "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). Statements touting a "corporat[ion's] 'excellence' and *progress*," for example, are nonactionable puffery because such statements are "'too general to cause a reasonable investor to rely upon them.'" *Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 18-CV-3021 (JMF), 2020 WL 127546, at \*7 (S.D.N.Y. Jan. 10, 2020) (emphasis added) (citations omitted).

Plaintiff's attempt to frame claims based on Nokia's statements about the speed or success of "integration" (*see, e.g.*, SAC ¶¶ 64, 70, 71, 75), fail because they constitute nonactionable puffery. *See e.g.*, *Razorfish*, 2001 WL 1111502, at \*1 (dismissing claims based on statements that "integration efforts" were "complete" and "successful"); *In re Royal Bank of Scot. Group PLC Sec. Litig.*, No. 09 Civ. 300(DAB), 2012 WL 3826261, at \*10 (S.D.N.Y. Sept. 4, 2012) ("Vague and non-specific pronouncements on the success of integrating acquisitions are inactionable puffery." (citation omitted)), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013); *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at \*12 (S.D.N.Y. Mar. 30, 2018) (statement that integration "was smooth and seamless" is "far too vague to be actionable.").[20]

---

(discussing base stations being deployed); *id.* ¶ 84 (discussing timing of revenue recognition and chipset development timing).)

[20]   The Complaint also cites statements concerning Nokia's pace and progress integrating products into Nokia's portfolio. For instance, Mr. Suri stated during an earnings call with investors that he had "flagged some issues related to product integration challenges in Mobile Networks in previous calls" and the Company was "coming back very fast," (SAC ¶ 53), and was "moving fast and successfully to put the portfolio integration challenges in Mobile Networks behind us." (*Id.* ¶ 55; *see also id.* ¶ 56.) Not only does the Complaint fail to allege that these

*(cont'd)*

28

Plaintiff's challenges to paragraphs concerning 5G suffer a similar fate: the allegations fail to identify statements that rise beyond nonactionable puffery. Take, for example, Plaintiff's highlighting of certain optimistic statements by Nokia about its early 5G development— including that "[o]ur early progress in 5G is extremely strong," (SAC ¶ 64), and "we are in a very strong position for 5G," (*id.* ¶ 59; *see also, e.g., id.* ¶ 44 ("We have strong customer relationships . . ."); *id.* ¶ 47 ("Nokia is well positioned [for the coming of 5G] . . . . Nokia is one of the very few companies that is able to meet all those needs [associated with 5G]."); *id.* ¶ 54 ("ReefShark, which is something that will be hard for competitors to match."); *id.* ¶ 55 ("We have a highly competitive set of products and services ideally suited to the world of 5G."); *id.* ¶ 61 ("making solid progress on . . . roadmaps"); *id.* ¶ 64 ("[W]e are in a very good competitive position"); *id.* ¶ 69 ("[I]t's a good position to be in right at the beginning of the outset of 5G."); *id.* ¶ 82 ("Nokia has a solid position in the early stages of 5G.").)

These statements are quintessential examples of puffery that are not actionable under the securities laws. *See Okla. Law Enf't*, 2020 WL 127546, at *7; *Johnson v. Sequans Commc'ns S.A.*, No. 11 CIV. 6341 (PAC), 2013 WL 214297, at *14 (S.D.N.Y. Jan. 17, 2013) ("The statements that [defendant] 'believe[s] we have a strong position in the . . . market,' and 'believe[s] we are better positioned to drive our roadmap to meet those needs" are non-actionable. Similarly, [defendant's] statement that 'we . . . are an early leader in the [4G] LTE [Long Term Evolution] market' is also a non-actionable statement of puffery." (citations omitted)); *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 CIV.

---

statements were false, but they also constitute nonactionable puffery. *See Lighthouse Fin. Group v. Royal Bank of Scot. Group*, 902 F. Supp. 2d 329, 341-342 (S.D.N.Y. 2012) (dismissing claims based on statements that integration was "progressing well" and "off to a promising start" as "vague pronouncements of corporate optimism"), *aff'd sub nom. IBEW Local 58 Pension Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 393 (2d Cir. 2015).

3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (rejecting as nonactionable puffery "[w]e've made good progress this year," "the distractions that we [had] to overcome earlier this year are now behind us," and "[w]e feel good about our progress so far."); *In re Fairway Group Holdings Corp. Secs. Litig.*, No. 14 Civ. 0950 (AJP), 2015 WL 4931357, *13 (S.D.N.Y. Aug. 19, 2015) (rejecting statement that defendant was "well positioned to support growth" as immaterial corporate puffery); *Kemp v. Universal Am. Fin. Corp.*, No. 05 Civ. 9883 (JFK), 2007 WL 86942, *14 (S.D.N.Y. Jan. 10, 2007) (statement "our company is well-positioned to offer the full range of needed products" is puffery). Likewise, the Compliance Statements are too generic to serve as the basis for securities fraud, and constitute nonactionable puffery. *See Rio Tinto PLC*, 332 F. Supp. 3d at 806-08.

### 3. Many of the Cited Statements Are Not Actionable Because They Are Protected Forward-Looking Statements

Under the PSLRA, a forward-looking statement is not actionable if a statement is (1) forward looking and accompanied by meaningful cautionary language; (2) immaterial, or (3) made without actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1); *see also In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18-cv-08049 (RA), 2020 WL 550769, at *16 (S.D.N.Y. Feb. 4, 2020) (quoting 15 U.S.C. § 78u-5(c)(1)). Satisfaction of any of these three tests renders the statement nonactionable as a matter of law. *Id.* The "bespeaks caution" doctrine offers similar protection. *See Philip Morris*, 2020 WL 550769, at *16 n.7 (citation omitted).

Forward-looking statements include the "plans and objectives of management for future operations" and statements relating to "future economic performance." 15 U.S.C. § 78u-5(i)(1). A statement need not be expressly labeled as forward-looking, and "a statement that 'projects results in the future' is 'plainly forward-looking.'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F.

30

Supp. 3d 358, 375 (S.D.N.Y. 2018) (internal citations omitted). To be insulated from liability under the "meaningful cautionary" language prong, the accompanying disclosure "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Philip Morris*, 2020 WL 550769, at *16 (citations omitted). Additionally, "[f]or a forward-looking statement to be actionable, the plaintiff must show that the statement was "made with actual knowledge of [its] falsity by the speaker." *Id.* (citation omitted). This scienter requirement is "stricter than for statements of current fact" because "liability . . . attaches only upon proof of knowing falsity." *Id.* (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010)).

Integration Statements. Plaintiff attempts to plead fraud based on Integration Statements that communicate the Company's ongoing and future plans – including that Nokia was "effectively moving beyond the integration effort for 2016," (SAC ¶¶ 36, 40); "we are now moving into the next phase," (*id.* ¶ 41; *see also id.* ¶ 78), "[w]e are moving fast and successfully to put the portfolio integration challenges. . . behind us," (*id.* ¶ 55; *see also id.* ¶ 46), "integration . . . [is] soon to be behind us," (*id.* ¶ 64); "integration is over at the end of this year," (*id.* ¶ 71), and "we now expect that the cost of executing those swaps will be somewhat lower than . . . originally anticipated." (*Id.* ¶ 66.) These statements, however, are "plainly forward looking" under the PSLRA's safe harbor because they are "framed as [] expectation[s] or projection[s]" and are accompanied by meaningful risk disclosures. *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs. Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013); *see also In re Ferrellgas Partners*, 2018 WL 2081859, at *12 (the statement "'we remain on track to deliver adjusted EBITDA in line with expectations' fall[s] within the PSLRA safe harbor for forward-

31

looking statements"); *Bettis v. Aixtron*, No. 16 Civ. 00025 (CM) 2016 WL 7468194, at *13 (S.D.N.Y. Dec. 20, 2016).

For example, the April 27, 2017 earnings call on which Plaintiff places primary reliance was accompanied by specific risk disclosures that were incorporated by reference from Nokia's Form 20-F *and* its contemporaneous earnings releases. (*See supra* at 9.)  In addition, during the call itself, Nokia warned "risks and uncertainties" could cause "actual results" to "differ materially from the results currently expected." (Ex. 7 at 4, 16.)  Similar cautionary language appears alongside the other Integration Statements identified by Plaintiff.[21]  Moreover, Plaintiff fails to plead that the forward looking statements were made with actual knowledge of falsity. As such, the forward-looking Integration Statements fall within the PSLRA's safe harbor and the bespeaks caution doctrine. *See In re Ferrellgas*, 2018 WL 2081859, at *12.

5G Statements.  The Complaint cites numerous statements by Nokia that communicated ongoing challenges and future plans regarding 5G, including that 5G is "com[ing] faster than originally expected," (SAC ¶ 47), "we expect those [5G] investments to pay off," (*id*.¶ 55), "[ReefShark] will improve the cost structure over the long term," (*id*. ¶ 60), "[w]e do have some short-term issues, weeks and, at most, a few months in some select cases" (*id*. ¶ 79) and "[o]n the chipset development on 5G, again, it's on track for both radio and baseband" (*id*. ¶ 83).  These statements are forward looking and are accompanied by meaningful risk disclosures.  For

---

[21]    (*See*, *e.g.*,  Ex. 18 at 11-13 ("These forward-looking statements reflect Nokia's current expectations and views of future developments and include statements regarding . . . our ability to *integrate* acquired businesses into our operations" and that certain factors, including "our ability to achieve the anticipated benefits, synergies, cost savings and efficiencies of acquisitions, including the acquisition of Alcatel-Lucent" could cause those expectations to differ.); Ex. 16 at 4 ("These statements are predictions that involve risk and uncertainties. Actual results may therefore differ materially from the results we currently expect").)

*(cont'd)*

instance, Nokia expressly warned that there were "risks and uncertainties" associated with the forward-looking statements made during the earnings calls, and incorporated the risk factors in Nokia's Form 20-F and accompanying earnings releases.[22]  And, as discussed in more detail above, throughout the relevant period Nokia repeatedly identified risks associated with its development of 5G technology.  (*See* SAC ¶¶ 59, 61, 71.)  Plaintiff also has failed to allege facts supporting the inference that the forward looking statements were made with actual knowledge of falsity.  The PSLRA safe harbor and the bespeaks caution doctrine therefore apply.

### 4.    Certain Statements Are Nonactionable Because They Constitute Sincerely Held Statements of Opinion

"[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Under *Omnicare*, a statement of opinion is not actionable unless: (1) the speaker does not hold the belief professed, (2) the facts supplied in support of the belief professed are untrue or (3) the speaker omits information that makes the statement misleading to a reasonable investor.  *See id*. at 186-87; *accord Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016).

Here, the Complaint does not even attempt to satisfy the *Omnicare* framework.  Instead, Plaintiff excerpts a scattershot of nonactionable opinion and belief statements by Nokia and Mr. Suri—including that "I believe our second quarter results continue to show . . . strength," (SAC ¶ 43), "we believe we are gaining share," (*id.* ¶ 44), "we expect to be confident to manage

---

[22]    Among the risk disclosures and specific warnings from its 2016 20-F is that Nokia's targeted investments in developing 5G may not "result in technologies, products or services that achieve or retain broad or timely market acceptance . . . or break-through innovations that we could otherwise utilize for value creation" and that "competition from various companies that may be able to develop technologies or products . . . [may] result in adverse effects on us through, for instance, developing technological innovations."  (Ex. 1 at 67, 69.)

through this," (*id.* ¶ 46), "we believe that 5G will come faster than originally expected," (*id.* ¶ 47), "we believe we will be positioned," (*id.* ¶ 55), "competitive intensity unchanged," (*id.* ¶ 69), "I think we're in a good place now," (*id.* ¶ 71), and "[i]t seems reasonable to believe . . . I do not find these gaps particularly surprising," (*id.* ¶ 79), to list just a few.  But Plaintiff makes no attempt to show that Defendants did not actually hold these beliefs at the time or that any of the other *Omnicare* tests are satisfied.  The Complaint therefore fails to state a claim premised on these statements of opinion.  *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753 (S.D.N.Y. 2018) ("For a statement of opinion or belief to be actionable as an untrue statement of a material fact, a complaint must plead facts sufficient to show that the defendant 'did not hold the belief . . . professed.'") (citation omitted), *aff'd* 2020 WL 1456482 (2d Cir. Mar. 23, 2020); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 230 (S.D.N.Y. 2018) (opinions relating to future earnings were non-actionable where plaintiff offered only "scant" detail about allegedly omitted facts), *aff'd sub nom.* 779 F. App'x 69 (2d Cir. Oct. 15, 2019).

**B.      The Complaint Does Not Identify Any Actionable Omissions**

Plaintiff's attempt to premise a claim on alleged omissions fares no better.  A corporation "is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (citation omitted).  "Such a duty may arise when there is . . . a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted).  Plaintiff has not alleged any particularized facts showing that the purported misstatements were ever

34

false.  Nor has Plaintiff alleged any other source of a duty by Nokia to disclose any additional

information.  Plaintiff's omissions-based claims therefore fail.

To the extent Plaintiff attempts to premise its claim on an alleged failure to disclose the

"compliance issue" discovered at Alcatel at an earlier time, the securities laws do not require

companies "to disclose uncharged, unadjudicated wrongdoing" because "disclosure is not a rite

of confession."  *City of Pontiac*, 752 F.3d at 184 (citations omitted); *see also Rio Tinto PLC*, 332

F. Supp. 3d at 808.  Moreover, even if such a duty existed, the Complaint still fails to plead with

particularity the existence of the alleged underlying illegal activity as is required.  *See Gamm v.*

*Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019); *Schiro v. Cemex, S.A.B. de C.V.*, No.

18-CV-2352 (VEC), 2020 WL 635705, *3 (S.D.N.Y. Feb. 10, 2020).

## C.    Plaintiff's Claims Fail Because He Has Failed to Plead Scienter

Plaintiff's claim independently fails because the Complaint does not allege particularized

facts giving rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  "[S]cienter can

be established by alleging facts to show either (1) that defendants had the motive and opportunity

to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or

recklessness."  *ECA,* 553 F.3d at 198.  In either case, however, the "inference of scienter must be

more than merely 'reasonable' or 'permissible'—it must be cogent and . . . at least as compelling

as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*

551 U.S. 308, 324 (2007).

### 1.    Plaintiff Fails to Plead Motive and Opportunity

Plaintiff conclusorily alleges that Mr. Suri had a motive to mislead investors about the

Alcatel integration because he "received incentive compensation tied specifically" to its success,

which supposedly incentivized him to "disregard or downplay any problems."  (SAC ¶ 128.)  But

"[m]otives that are common to most corporate officers, such as . . . increase[d] officer

35

compensation, do not constitute 'motive' for purposes of this inquiry" and "'[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'" *ECA*, 553 F.3d at 198, 201 (citations omitted). The Second Circuit has consistently rejected claims of fraudulent motive where, like here, "plaintiffs have not pointed to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders." *See, e.g., Kalnit v. Eichler*, 264 F.3d 131, 142-43 (2d Cir. 2001).

Seeking to elevate routine grants of incentive compensation into a "strong inference" of scienter, Plaintiff touts that Mr. Suri was awarded 208,700 restricted Nokia shares worth 986,942 euros in 2016 – which vested over a three-year period between 2016 and 2019 only if specific integration targets were met. (SAC ¶¶ 128-131.) But there is no indication that any of the vesting criteria had anything to do with the issue referenced in the Compliance Disclosure, or that an earlier release of the Compliance Disclosure would have jeopardized this compensation. To the contrary, the Complaint itself quotes Nokia's 20-F as explaining that the award was based on "financial synergies and cultural integration," not compliance. (*Id.* ¶ 58 (citation omitted).) And Plaintiff does not even attempt to tie this compensation to 5G.

Moreover, the integration-related incentive award represented a small fraction of Mr. Suri's total compensation (less than 5%) during this period.[23] Mr. Suri's long- and short-term incentive compensation was primarily tied not to the Alcatel transaction, but rather to specific net sales, revenue, operating profit, and cash flow metrics. (*See*, *e.g.*, Ex. 27 at 107-09; Ex. 1 at 109-10; Ex. 13 at 98-100.) Perhaps most telling is that Plaintiff does not allege that Mr. Suri sold a single unit of Nokia stock. It strains credulity to suggest that a relatively small

---

[23]     Between 2016 to 2018, for example, Mr. Suri's received approximately € 20,582,724 from Nokia as executive compensation. (*See* Ex. 2 at 117; Ex. 13 at 102.)

integration-related incentive award – which was held even after the Integration Disclosure – somehow served as a motive to commit fraud.  *See  In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at \*16 (S.D.N.Y. Oct. 25, 2017) (inference of fraud undermined by absence of stock sales.)  Indeed, the number of shares beneficially owned by Mr. Suri during the putative class period actually increased.  (*See* Ex. 2 at 119 (1.367 million shares); Ex. 13 at 103 (2.47 million shares); Ex. 28 at 117 (2.80 million shares).)  This further undermines an inference of scienter.  *See In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at \*16.  Plaintiff has failed to plead facts giving rise to any inference, much less the required strong inference, of scienter.

### 2.    Plaintiff Fails to Plead Conscious Misbehavior or Recklessness

Having failed to show motive, Plaintiff must "produce a[n] [even] stronger inference of recklessness" to support his allegations of scienter.  *Kalnit,* 264 F.3d at 143; *see also ECA*, 553 F.3d at 198–99.  This requires showing "an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142.  Plaintiff must "allege facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." *In re Bayou Hedge Fund Litig.,* 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (citation omitted), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98 (2d Cir. 2009).

Plaintiff cites Mr. Suri's "position" at Nokia and his "personal involvement" in the Alcatel integration[24] to conclude that he must have had knowledge of "multiple problems" associated with the integration efforts, including that Nokia "was not 5G ready" as result and

---

[24]    Plaintiff attempts to build its "must have known" argument by listing a variety of committees and initiatives.  (SAC ¶ 23 ("Nokia Business System"); *id.* ¶ 26 ("Integration and Transformation Board"); *id.* ¶ 28 ("Global Leadership Team"); *id.* ¶ 113 (board of directors).) But the Complaint does not identify any specific information that was conveyed to any of these committees or as a result of the business initiatives.

"Alcatel was not in compliance with Nokia's Code of Conduct." (SAC ¶¶ 107-08, 111.) But such corporate position-based allegations are insufficient. *See, e.g., In re Veon Ltd. Sec. Litig.,* 2018 WL 4168958, at *17-18 (rejecting scienter pleading where plaintiff failed to allege that CEO "was actually present during the relevant meetings, read the meeting minutes, or otherwise knew about the alleged misconduct."). Rather, to plead conscious misbehavior or recklessness, Plaintiff must allege particularized facts showing "that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *Id.* at *17 (citations and internal quotations omitted). This requires Plaintiff to "'specifically identify the reports or statements that are contradictory to the statements made,' or . . . 'provide specific instances in which Defendants received information that was contrary to their public declarations.'" *Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 587–88 (S.D.N.Y. 2011) (citation omitted); *see also Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 774 (S.D.N.Y. 2019); *Kinsey v. Cendant Corp.,* No. 04 Civ. 0582 RWS, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005). Plaintiff has identified no such contradictory statements.

Plaintiff further alleges that Mr. Suri "necessarily had first-hand knowledge" about the purported fraud because the "Alcatel integration was the single most important operational priority [for Nokia and Mr. Suri] during . . . the Class Period." (SAC ¶¶ 110, 135.) This appears to be an effort to invoke the so-called "core operations doctrine" to infer scienter because a statement relates to the "core operations" of a company. But courts in this District have questioned whether the doctrine even exists after the enactment of the PSLRA. *See, e.g., Rio Tinto PLC*, 332 F. Supp. 3d at 816. In any event, "[t]his theory 'at most constitutes "supplemental support" for alleging scienter but does not independently establish scienter.'" *Id.*

38

(citation omitted).[25]  Here, because none of Plaintiff's other allegations come even remotely close, individually or collectively, to supporting a strong inference of scienter, the doctrine has no application. *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). Additionally, the "core-operations" doctrine also does not apply for the separate reason that "courts have required that the operation in question constitute nearly all of a company's business," but Plaintiff has not pled any facts to make such a showing.  *Id.*

### 3.    Competing Nonculpable Inference is Stronger

As demonstrated above, Nokia highlighted the risks associated with the Alcatel integration and the development of 5G technology.  These repeated significant disclosures, voluntarily issued by Nokia, give rise to a far more compelling inference of nonculpable behavior than scienter.  *See, e.g.*, *Holbrook v. Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26 2019) (inference of scienter implausible in view of "numerous and fulsome disclosures."), *aff'd sub nom Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).  Further undermining an inference of scienter is the fact that in 2017 – just as the purported class period commenced – Nokia repurchased 785 million euros of its shares.  (Ex. 2 at 60.)  This negates an inference of scienter.  *See Frankfurt-Tr. Inv. Luxemburg AG*, 336 F. Supp. 3d at 225 ("[I]t would make no economic sense for a company to buy back its stock at a price it knows to be inflated.")  Because nonculpable inferences are at least as strong as any culpable inference, Plaintiff has failed to plead facts giving rise to a strong inference of scienter.

---

[25]     *In re Avon Securities Litigation,* No. 19 Civ. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019), cited by Plaintiff in his pre-motion letter (ECF No. 55 at 3), is not inconsistent. That case involved allegations that multiple confidential witnesses had identified multiple specific reports and meetings concerning the relevant delinquency rates in Brazil – the facts underlying the alleged misrepresentations. *Id.* at *19.  *Avon* does not support an inference of scienter here, were there are no specific facts pleaded that would support an inference of scienter.

## II.    PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED

To state a claim under Section 20(a) for control-person liability, Plaintiff must allege a primary violation of the securities laws, control and culpable participation. *See Rio Tinto PLC*, 332 F. Supp. 3d at 816. Here, for the reasons described above, Plaintiff has not sufficiently alleged a primary violation of Section 10(b), and its Section 20(a) claim therefore fails. *See id.* Nor has Plaintiff alleged that Mr. Suri was in any sense a culpable participant in a primary violation, also a fatal flaw. *See Veon*, 2018 WL 4168958, at *22 (plaintiffs failed to plead culpable participation where they had failed to plead scienter with particularity).

### CONCLUSION

The Complaint fails to state a claim against Nokia or Mr. Suri and ought to be dismissed. Because, having had the opportunity to review Defendants' Pre-Motion Letter, Plaintiff expressly declined to further amend the Complaint (*see* ECF No. 55 at 3), dismissal should be with prejudice.

Dated:  New York, New York
        May 1, 2020

> /s/Susan L. Saltzstein
> Jay B. Kasner
> Susan L. Saltzstein
> Jeffrey S. Geier
> SKADDEN, ARPS, SLATE,
>     MEAGHER & FLOM LLP
> One Manhattan West
> New York, NY 10001
> Phone: (212) 735-3000
> Fax: (212) 735-2000
> jay.kasner@skadden.com
> susan.saltzstein@skadden.com
> jeffrey.geier@skadden.com
>
> *Attorneys for Nokia Corporation*
> *and Rajeev Suri*