UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

In re NOKIA CORPORATION SECURITIES :   Civil Action No. 1:19-cv-03509-ALC
LITIGATION                                  :

                                      :   <u>CLASS ACTION</u>

——————————————————————— :

This Document Relates To:             :

                                      :

     ALL ACTIONS.                      :

——————————————————————— x

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE SECOND CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ....................................................................................1

II.   STATEMENT OF FACTS ..........................................................................................4

    A.    Nokia Acquires Alcatel in Order to Compete in 5G...............................................4

    B.    Nokia Touts Its Supposedly Successful and Speedy Integration of Alcatel ............5

    C.    Nokia's Claimed 5G Readiness Results from the Alcatel Integration.....................6

    D.    The Truth Emerges About Potential Criminal Compliance Issues
         Uncovered During the Alcatel Integration...............................................................10

    E.    The Company Finally Reveals that It Is Far Behind in the Race to 5G,
         Despite It's Many Prior Assurances to the Contrary ..............................................10

    F.    Developments Since the Filing of the Complaint Further Confirm that
         Nokia's 5G Delays Stemmed from Its Failed Integration .....................................12

III.  ARGUMENT..............................................................................................................14

    A.    Lead Plaintiff Pleads False and Misleading Statements ........................................14

    B.    Defendants' Misrepresentations Were Material ....................................................26

    C.    Defendants' Misrepresentations Are Not Protected Forward Looking
         Statements .............................................................................................................28

    D.    Lead Plaintiff's Allegations Raise a Strong Inference of Scienter .......................31

         1.    Defendant Suri's Assurances of Personal Involvement in the
               Integration Process Raise a Strong Inference of Scienter.........................33

         2.    Defendants' Access to Information Raises a Strong Inference of
               Scienter ...................................................................................................35

         3.    Defendant Suri's Motive and Opportunity Also Raise a Strong
               Inference of Scienter................................................................................36

         4.    The Core Operations Doctrine Supports a Strong Inference of
               Scienter ...................................................................................................38

    E.    The Complaint Alleges a Violation of Section 20(a).............................................39

IV.   CONCLUSION..........................................................................................................40

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020)...................................................................................................16

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................................16

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012)...................................................................................27

*Citiline Holdings, Inc. v. iStar Financial Inc.*
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)...................................................................................34

*City of Birmingham Retirement & Relief System v. Credit Suisse Group AG*
  2019 WL 719751
  (S.D.N.Y. Feb. 19, 2019) ...............................................................................................33, 34

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)...............................................................27, 32, 35, 38

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)...................................................................................35

*Cruz v. TD Bank, N.A.*,
  742 F.3d 520 (2d Cir. 2013)..................................................................................................40

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)...................................................................................35

*ECA, Local 134 1BEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..................................................................................................26

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)............................................................................................32, 35

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ................................................................................................37

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)...................................................................................38

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................................ *passim*

**Page**

*Gabelli v. SEC*,
568 U.S. 442 (2013) *rev'd* 653 F.3d 49 (2d Cir. 2011) ...........................................................18

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................................................. *passim*

*Gauquie v. Albany Molecular Research, Inc.*,
2016 WL 4007591
(E.D.N.Y. July 26, 2016) ........................................................................................................35

*Hawaii Structural Ironworkers Pension Trust Fund v.
AMC Entertainment Holdings, Inc.*
422 F. Supp. 3d 821 (S.D.N.Y. Sept. 23, 2019) ...........................................................23, 28, 30

*Ill. State Bd. of Inv. v. Authentidate Holding Corp.*,
369 F. App'x 260 (2d Cir. 2010) ............................................................................................29

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999) ..................................................................................24, 39

*In re Akorn, Inc. Securities Litigation*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ...........................................................................24, 25, 30

*In re Allergan PLS Sec. Litig.*,
2019 WL 4686445
(S.D.N.Y. Sept. 20, 2019)........................................................................................................25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................................39

*In re Avon Sec. Litig.*,
2019 WL 6115349
(S.D.N.Y. Nov. 18, 2019) ..................................................................................................26, 39

*In re BP p.l.c. Securities Litigation*
843 F. Supp. 2d 712 (S.D. Tex. 2012) ....................................................................................34

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010).....................................................................................27

*In re Credit Suisse-AOL Sec. Litig.*,
465 F. Supp. 2d 34 (D. Mass. 2006) ..................................................................................30, 31

**Page**

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006).......................................................................29

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561
(S.D.N.Y. Dec. 2, 2013)..........................................................................................39

*In re Insys Therapeutics, Inc. Sec. Litig.*,
2018 WL 2943746
(S.D.N.Y. June 12, 2018).................................................................................15, 16

*In re JPMorgan Chase & Co. Sec. Litig.*,
2007 U.S. Dist. LEXIS 93877
(N.D. Ill. Dec. 18, 2007) .........................................................................................37

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................38

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007).......................................................................37

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014).........................................................................38

*In re Razorfish, Inc. Securities Litigation*
2001 WL 1111502
(S.D.N.Y. Sept. 21, 2001).........................................................................................24

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................................37

*In re Salix Pharms., Ltd.,*
2016 WL 1629341
(S.D.N.Y. Apr. 22, 2016)...........................................................................19, 29, 33

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015).........................................................................35

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001).......................................................................................16

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889
(S.D.N.Y. Nov. 26, 2018) ..........................................................................19, 26, 27, 39

**Page**

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084
(S.D.N.Y. July 10, 2019) ..................................................................................3, 25

*In re STEC Inc. Securities Litigation*
2011 WL 2669217
(C.D. Cal. June 17, 2011) ......................................................................................18

*In re U.S. Bioscience Sec. Litig.*,
806 F. Supp. 1197 (E.D. Pa. 1992) .......................................................................19

*In re Vale S.A. Sec. Litig.*,
2017 WL 1102666
(S.D.N.Y. Mar. 23, 2017) .....................................................................................25

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979
(E.D.N.Y. May 20, 2020) ................................................................................29, 33

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) ......................................................................37

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)....................................................................37

*In re Wellcare Mgmt. Grp., Inc. Sec. Litig.*,
964 F. Supp. 632 (N.D.N.Y. 1997).........................................................................37

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016).....................................................................................36

*Johnson v. Sequans Communications S.A.*,
2013 WL 214297
(S.D.N.Y. Jan. 17, 2013)........................................................................................27

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236
(D.S.C. July 25, 2016) ...........................................................................................35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)...................................................................................40

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)...................................................................................25

**Page**

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................26, 32, 35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..................................................................................27, 28

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004)................................................................................30

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..............................................................................29

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229
   (D.N.J. July 27, 2018)......................................................................................24

*SEC v. Laura*,
   2020 U.S. Dist. LEXIS 50970
   (E.D.N.Y. Mar. 24, 2020)
   Fed. Sec. L. Rep. (CCH) P100,771....................................................................16

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)..............................................................................29

*Speakes v. Taro Pharm. Indus., Ltd.*,
   2018 WL 4572987
   (S.D.N.Y. Sept. 24, 2018)............................................................................15, 16

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)................................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................15, 32

## STATUTES, RULES AND REGULATIONS

Exchange Act ......................................................................................................39

Federal Rules of Civil Procedure
   Rule 15 ............................................................................................................40

**Page**

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995 ("PSLRA")
    Pub. L. No. 104-67, 109 Stat. 737 (1995)..............................................................16, 28, 29, 30

Lead Plaintiff, Judge Clyde W. Waite (Ret.), respectfully submits this memorandum of law in opposition to the motion to dismiss the Second Consolidated Amended Complaint (the "Complaint") filed by defendants Nokia Corporation ("Nokia" or the "Company") and Rajeev Suri (collectively, "Defendants").[1]

## I. PRELIMINARY STATEMENT

Lead Plaintiff alleges – as is now known – that Nokia's integration of Alcatel was beset by material undisclosed problems and that Defendants made false and misleading statements extolling the supposed success of the integration while misleading investors with respect to its significant problems. The Complaint alleges numerous express falsehoods about the Alcatel integration – including that it "went beautifully," that its objectives were "achieved in full," that "the heavy lifting [wa]s over," and that Nokia was "beyond the integration." The Complaint further alleges that a successful Alcatel integration was essential to the Company's transition to 5G wireless technology and particularizes numerous statements about the Company's supposed 5G-readiness that were likewise materially misleading because they omitted the truth concerning the Company's significant integration problems.

Lead Plaintiff alleges that investors learned the truth concerning Nokia's integration failures and resultant delays in 5G-readiness in two separate corrective disclosures. First, on March 21, 2019, despite announcing the material completion of the integration almost two years earlier, Nokia revealed compliance issues in legacy Alcatel that had been discovered – as the Company admitted – *during the integration* and rising to the level of potential criminal penalties. Given Nokia's history

---

[1] Paragraphs of the Complaint (ECF No. 47) are cited as "¶_." Defendants' memorandum of law (ECF No. 62) is cited as "Def. Br. at _." Exhibits to Defendants' accompanying declaration (ECF No. 63) are cited as "Def. Ex. _." Exhibits to the declaration of Chad Johnson are cited as "LP Ex. _." Unless otherwise noted, emphasis has been added and internal citations and internal quotation marks have been omitted. Capitalized terms not defined herein are as defined in the Complaint.

of troubled integrations, Alcatel's history of criminal compliance problems, and the Company's repeated assurances about its "culture of compliance," this information was material to investors and was the market's first indication that the Alcatel integration was not the great success Defendants had claimed. Defendants nevertheless reassured the market and continued to portray the Alcatel integration as successful and the transition to 5G as unhindered by integration problems.

Then, on October 23, 2019, Defendants announced massive problems and delays in Nokia's 5G rollout, including a significant increase in expenditures, a significant downward revision in financial guidance, elimination of the Company's dividend to shore up cash to address the problematic 5G transition, and that Nokia required up to two additional years to address these problems. Lead Plaintiff alleges that this disclosure revealed the true extent of Nokia's undisclosed integration problems. This news caused the largest decline in Nokia's share price on record.

Defendants' motion to dismiss is without merit. Their principal argument – that Lead Plaintiff has not alleged false and misleading statements by Defendants – is spurious. To advance it, they misconstrue the allegations of the Complaint, feigning confusion about its "theme," ignoring the evidence it pleads, and demanding inferences that the record does not support. To be clear: Lead Plaintiff alleges that Defendants materially misrepresented the progress and effectiveness of the Alcatel integration, that their statements about the integration and related 5G transition were false and misleading for that reason, and that their subsequent disclosures revealed the true extent of undisclosed integration problems, causing significant harm to investors.

Lead Plaintiff supports these allegations of falsity with citation to, among other things, numerous contemporaneous analyst reports about Nokia confirming that the Company's corrective disclosures revealed its previously undisclosed integration failures. For example, one analyst cited in the Complaint explained that the Company's corrective disclosures showed that "it was bogged

down in an all-consuming post-merger integration process with Alcatel-Lucent." But Defendants ask this Court to look past this evidence and hold as a matter of law that their statements were not false or misleading because Defendants made no express confession of securities fraud. That is not the law. A disclosure need not "take the form of a 'flashing neon light,' with an explicit message stating that it is intended to cure an earlier fraudulent statement," and Lead Plaintiff's allegations are more than sufficient to plead Defendants' falsity. *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *14 (S.D.N.Y. July 10, 2019).

Also meritless are Defendants' efforts to recast their misrepresentations about the Alcatel integration as mere "puffery" or "opinion," as is their claim that their misrepresentations of historical or then-existing fact were protected forward-looking statements. In short, Defendants' mischaracterization of Lead Plaintiff's allegations bears little resemblance to the actual allegations and the Court should reject Defendants' groundless assertion that the Complaint pleads no actionable misstatements.

The Complaint also raises a strong inference of Defendants' scienter. The Complaint pleads direct evidence of Defendant Suri's scienter – based on his own repeated statements of personal involvement as a "permanent attendee" of the Integration and Transformation Board (the "Integration Board") – a committee of Nokia's executives responsible for the Alcatel integration, which Suri claimed gave him "granular visibility" into the process. The Complaint also pleads Suri's strong motive and opportunity to mislead investors about the true state of the Alcatel integration – including that Suri had staked his professional reputation on a successful Alcatel integration, boasted about it in public, and had personal financial incentives tied to its successful outcome. The Complaint also pleads additional strong evidence of scienter – including Suri placing extremely short deadlines on the integration and giving his team financial incentives to claim false

success; the robust reporting and monitoring structures that existed within the Company; and the fact that the Alcatel integration was the Company's single most important priority at all relevant times and was thus its foremost "core operation" – all of which further supports a strong inference scienter.

For these and other reasons discussed below, Lead Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss.

## II.    STATEMENT OF FACTS

Nokia is a network and technology company.  ¶15.  Nokia's ADSs or "shares" trade on the NYSE.  Defendant Suri served as Nokia's President and CEO from May 2014.  ¶16.  He was forced to announce his resignation from the Company in March 2020 (after the Complaint was filed).

### A.    Nokia Acquires Alcatel in Order to Compete in 5G

Since 2015, the coming transition to 5G has been the central focal point of the telecommunications industry.  ¶18.  5G requires a combination of wireless capabilities with physical networking and infrastructure (sometimes referred to as "end-to-end" capabilities) that Nokia did not have prior to its acquisition of Alcatel.  ¶19.  On April 15, 2015, Nokia announced plans to purchase Alcatel in order to enable Nokia to compete in 5G.  ¶¶17-19.  In light of the impending launch of 5G, Nokia's rapid integration of Alcatel was the single most important operational priority carried out by the Company during and in the lead-up to the Class Period.  ¶¶20, 132-135.

Both Nokia and Alcatel had histories of failing to successfully and timely integrate acquired companies.  ¶21.  In connection with Nokia's acquisition of Alcatel, Defendant Suri publicly acknowledged, given the Company's troubled history with other acquisitions, that it "is a very fair concern" for investors to worry about Nokia's integration of Alcatel.  ¶22.  However, Defendant Suri assured the market that "I do believe that this time can be different."  *Id*.

The difference, Defendant Suri explained, would result largely from his signature management methodology, which he called the Nokia Business System (the "NBS").  ¶23.  As part

- 4 -

of the NBS, Defendant Suri implemented a structure that involved him directly in the reporting chain and decision-making about the Alcatel integration. ¶¶24, 26. Suri initially put in place an "Integration Steering Board" to plan the integration, with that committee reporting to Suri himself in order to keep him directly informed. *Id*. Defendant Suri later formed the Integration Board to carry out the integration process and report to him about its progress. ¶¶25, 26. Defendant Suri described himself as a "***permanent attendee***" at the meetings of the Integration Board. ¶26.

Nokia also implemented compensation incentives for Defendant Suri and other members of the Company's executive leadership team to carry out the integration rapidly and seamlessly. ¶28. The Company granted Defendant Suri nearly €1 million of restricted stock units and other executives on his leadership team restricted stock units worth more than €4,800,000, all set to vest in equal tranches on October 1st of 2017, 2018, and 2019. ¶29. All of these grants were expressly tied to targets related to the smooth and speedy integration of Alcatel overseen by Suri and his team. *Id*. These grants incentivized Defendant Suri and his team to complete the integration rapidly and to overcome (or overlook) impediments to a seamless integration. ¶28.

### B. Nokia Touts Its Supposedly Successful and Speedy Integration of Alcatel

On January 14, 2016, Nokia announced that it had begun operations with Alcatel as a single company. ¶30.

On November 2, 2016, Nokia issued a press release announcing that "Nokia finalizes its acquisition of Alcatel-Lucent, ready to seize global connectivity opportunities." ¶32. Two weeks later, at a conference for investors and analysts hosted by Nokia, Defendant Suri touted the NBS as giving him "***granular visibility*** into the business" and "visibility to our progress and confidence that we can achieve our goals" including "the integration of Alcatel-Lucent." ¶34. Defendant Suri further emphasized that he is a "permanent attendee of these [NBS] sessions." *Id*.

Only a few months later, on February 2, 2017, Nokia conducted a call with analysts during

which Defendant Suri explained that the integration was nearly complete.  ¶35.  Defendant Suri stated: "*We have __completed__ the integration projects related to Alcatel-Lucent with the exception of a small handful of long-tail efforts*" and "I'm pleased we have *all of the main __integration work behind us__*, because now we can get on with it."  *Id*.

On April 27, 2017, Nokia again indicated that it had moved beyond the integration. ¶36.  On a call with analysts that day, Defendant Suri stated: "With *the integration of Alcatel-Lucent __behind us__*, we are committed to building on that platform and to making 2017 a year of execution and performance."  *Id*.  The market welcomed the clear message from Nokia that the integration was complete. ¶37.  For example, an analyst with Canaccord Financial published a report dated May 7, 2017, indicating that "*[w]ith Nokia's operations now integrated with Alcatel Lucent* . . . we believe the company is well positioned for improving industry trends longer term."  *Id*.  Similarly, a Societe General analyst lauded Nokia in a June 14, 2017 report for "a very successful integration of [Alcatel]."  *Id*.

On March 22, 2018, Nokia announced in its annual report for the fiscal year ending December 31, 2017, that it had completed "the last major organizational step in [the] Nokia and Alcatel integration." ¶57.  This same document announced that the incentive compensation awards related to the Alcatel integration had been paid to Defendant Suri because targets related to "financial synergies and cultural integration . . . were *__achieved in full__*."  ¶58.

### C.    Nokia's Claimed 5G Readiness Results from the Alcatel Integration

Given the vital importance of the Alcatel acquisition and integration to Nokia's readiness to compete in the 5G market, Nokia repeatedly gave the market guidance on its 5G readiness during the Class Period.  For instance, on a July 27, 2017 call with analysts, Defendant Suri announced that the planned 5G rollout had been moved up to meet market demands.  ¶44.  While noting that "this situation does create some near term risk," Suri downplayed the extent of the risk emphasizing that

"this is **_not broad based_** and we are talking just about certain projects and we expect to be confident to manage through this." ¶¶44, 46.

Similarly, on an October 26, 2017 call with analysts, Defendant Suri indicated that 5G was "com[ing] faster than originally expected," but that "Nokia is well positioned . . . [a]nd **_Nokia is one of the very few companies that is able to meet all those needs_**." ¶47. On that same call, Nokia announced that despite challenges related to the early rollout of 5G, the Company was "now fully in the deployment phase" of the project. ¶48. Defendant Suri further explained that those challenges had been related to planning and development for the early 5G rollout, all of which had been resolved and were immaterial now that Nokia's products were "**_5G ready_**" and "**_ready for full deployment_**." ¶¶49-50. In response to an analyst question about uncertainties created by the early 5G rollout, Defendant Suri emphasized that the uncertainties were not related to "a particular hardware issue or software per se." ¶51. Defendant Suri went on to underscore with regard to Nokia's 5G readiness that "**_the heavy lifting is over_**" and the remedial work was "down to a few projects, less than a handful." *Id*.

On February 1, 2018, Nokia hosted a call with investors and analysts. ¶53. Defendant Suri announced that the Company was "coming back very fast" from challenges related to the integration, and claimed, with respect to 5G readiness, that "software releases have been at our highest quality levels ever." *Id*. Defendant Suri went on to claim that a new piece of hardware within the Company's 5G infrastructure, the ReefShark chipset, would give Nokia a leg up on competitors in the 5G market. ¶54. On the same call, Defendant Suri emphasized that "[w]e are moving fast and successfully to put the portfolio integration challenges in Mobil Networks behind us" and "the speed at which we have addressed the portfolio integration challenges" demonstrates "the execution power of Nokia." ¶¶55-56.

On a call with analysts on April 26, 2018, Defendant Suri spoke glowingly about how "*we are in a very strong position for 5G*" and that "the roadmap issues which we saw last year are largely behind us[.]" ¶59. On that call, Defendant Suri also claimed that the ReefShark chipset was a "competitive, cost-based product" that would "improve the cost structure over the long term." ¶60.

On a July 26, 2018 call with investors and analysts, while Defendant Suri gave a nod to "some risks" faced by everyone pushing to get 5G products to market, he repeatedly emphasized the supposed "*good news*" and "progress" that Nokia was making in its 5G readiness. ¶61. In particular, Defendant Suri indicated that "The good news here is that we see no change to the overall dynamics driving the acceleration of 5G . . . [and *the Nokia] Mobile Networks team is making solid progress on its roadmaps*." *Id*. Suri also assured investors that "I see *no reason for concern* about our market share position beyond normal execution challenges." ¶62.

On October 25, 2018, Nokia issued a press release touting its integration of Alcatel along with its resulting 5G readiness. The press release quotes Defendant Suri as saying: "*With the successful Alcatel-Lucent integration* and cost-saving program soon to be behind us, *we are taking steps to accelerate the execution of our strategy* and sharpen our customer focus." ¶64. Defendant Suri also stated that "*Our early progress in 5G is extremely strong*, we continue to increase our investment in this critical technology, and our win rate for new deals suggests that *we are in a very good competitive position*." *Id*.

At a UBS global technology conference on November 12, 2018, Defendant Suri gave a presentation titled "Creating Value in the 5G Era," which was followed by a question and answer session. ¶68. In response to a question about competition in the industry, Defendant Suri indicated that "competitive intensity [is] unchanged," and that Nokia was in a "good position to be in right at the beginning of the outset of 5G." ¶69. When asked about the Alcatel integration, Defendant Suri

indicated, "there are hiccups, but *it's been positive*."  ¶70.  And, with regard to the cultural integration of the companies, Suri asserted that "that actually *went beautifully*."  *Id*.

On January 31, 2019, Nokia hosted an earnings call with analysts.  On that call, Defendant Suri announced that certain risks "related to project timings and product deliveries" had materialized, but he assured investors that "I have absolutely *no doubt that a fast and meaningful shift to 5G* is underway."  ¶73.  Defendant Suri went on to state that Nokia had "a massive amount of 5G-ready hardware already deployed," some of which was "waiting for the availability and acceptances of key 5G software releases."  ¶74.

On March 21, 2019, Nokia filed its annual report for the fiscal year ended December 31, 2018.  ¶75.  The Nokia report again highlighted "*the successful Alcatel Lucent integration*."  *Id*. Nokia also touted its R&D capabilities without disclosing that problems with the Alcatel integration were impeding its ability to develop the technology it needed to compete.  ¶76.  The Company also emphasized its progress in 5G technology, including with the ReefShark processor, yet failed to disclose that Nokia was lagging behind its competitors in 5G development.  ¶77.

On an April 25, 2019 call with analysts, Defendant Suri addressed and rejected market rumors that Nokia was lagging behind its competitors in 5G development.  ¶79.  Defendant Suri acknowledged that "[w]e do have some short term issues," but claimed that these issues only delayed the anticipated 5G rollout by "weeks and, at most, a few months in some select cases."  *Id*.

On July 25, 2019, Nokia hosted a call with investors and analysts.  ¶81.  Defendant Suri again presented a positive view of Nokia's 5G competitive position.  ¶82.  In particular, Suri indicated that "we continue to win new deals and improve our product competitiveness," and assured the market that Nokia was in a "*solid position in the early stages of 5G*."  *Id*.  In response to a question about whether the Company was on track in developing the key hardware needed for 5G,

Suri stated that the hardware development was "a few weeks delayed" in the previous quarter, but that "the chipset development on 5G, again … [is] on track for both radio and broadband." ¶83.

**D.    The Truth Emerges About Potential Criminal Compliance Issues Uncovered During the Alcatel Integration**

Despite its numerous prior assurances that it had successfully completed the Alcatel integration without incident, on March 21, 2019, Nokia finally disclosed in its 2018 Annual Report that:

> ***During the*** course of the ongoing ***integration*** process, ***we have been made aware of*** certain practices relating to ***compliance issues at the former Alcatel*** Lucent business that have raised concerns . . .  The resolution of this matter ***could result in potential criminal or civil penalties***, including the possibility of monetary fines, which ***could have a material adverse effect on our*** business, brand, reputation or ***financial position***.

¶93.  Because this disclosure was contrary to the Company's many prior statements, this news stunned the market and caused a massive decline in the price of Nokia's ADSs.  ¶94.  As one securities analyst explained in response to this news, "[I]t is a bit strange to see such compliance issues emerging today, since Nokia completed the acquisition of [Alcatel] more [than] three years ago."  ¶3.  This news caused the price of Nokia's ADSs to decline by over 6% in a single day of unusually heavy trading volume.  ¶¶3, 94.  The reason for this price drop was clear to market observers.  ¶95.  "Nokia shares dive on potential Alcatel-Lucent compliance issues" proclaimed the headline of one *CNBC* article.  *Id*.  Similarly, *The Wall Street Journal* published an article about the losses suffered by investors resulting from this announcement titled, "Nokia Shares Plunge After Warning of Possible Compliance Issues."  *Id*.  Although Nokia tried to calm the market, Nokia's securities continued to decline in value over the next few trading days, falling approximately 3.23% further.  ¶¶96-97.

**E.    The Company Finally Reveals that It Is Far Behind in the Race to 5G, Despite It's Many Prior Assurances to the Contrary**

Over the next few months, Nokia continued to downplay the severity of the integration

challenges the Company faced, while simultaneously representing that its 5G development efforts were on track. ¶98. For instance, during the Company's Q1 2019 earnings call, Defendant Suri told analysts and investors that any interruptions to Nokia's 5G roadmap were nothing but "short term issues," that would only last "weeks and, at most, a few months in some select cases." *Id*. And, during the Q2 2019 earnings call on July 25, 2019, Defendant Suri again claimed that the Company was in a "solid position in the early stages of 5G," and that the hardware development for other key 5G infrastructure components was progressing smoothly. *Id*. These and other false and misleading statements by Defendants alleged in the Complaint continued to maintain Nokia's share price at artificially inflated levels. *Id*.

On October 24, 2019, in its quarterly report for the third quarter of 2019, Nokia finally acknowledged that it had experienced severe difficulties with the initial phase of its 5G rollout and was dramatically behind in the race to 5G. ¶99. The Company further disclosed that it would have to spend an additional $200 million in R&D and hire a team of 350 specialists to develop the necessary 5G technology, a project estimated to take up to two years. *Id*. Given these massive and previously undisclosed challenges, the Company announced a significant downward revision of its financial guidance for 2019 and 2020, and eliminated its dividend. *Id*.

Although the Company tried to couch these harsh realities in euphemistic terms, market analysts and observers immediately recognized that Nokia's inability to deliver on 5G stemmed from its failed integration. ¶¶101-105. For instance, an October 28, 2019 analyst report issued by Liberium explained that "the biggest reason for Nokia's problems over the past two years is that it fell behind Ericsson and Huawei in technology," and that "[t]he key factor was no doubt the company's merger with Alcatel-Lucent and the complexity of aligning both companies 4G and 5G roadmaps[.]" ¶103. Also, an October 24, 2019 Barclays analyst report explained that "***[d]ue to the***

- 11 -

*Alcatel integration* and an acceleration of 5G standards setting over the past few years, ***Nokia has been behind in 5G development***." ¶101. Similarly, a report by the DNB Markets Equity Research team tied the Company's 5G failures directly to the "post-Alcatel indigestion issues." ¶102.

On this news, the price of Nokia's ADRs fell 23.7% on unusually high trading volume of more than 250 million shares traded. ¶104.

Days later, a *Bloomberg* exposé provided further evidence of the integration failures causing the Company's 5G shortfall. ¶105. The article quoted a workers' representative from Nokia's headquarters describing the Company's significant integration problems, and explained that employees are frustrated because they believe that management "has been distracted by disagreements over priorities and staffing since" Nokia's takeover of Alcatel in 2016. *Id.* These revelations and others stand in stark contrast to Defendant Suri's false representations that the Company's "cultural integration . . . went beautifully[.]" *Id.*

**F.     Developments Since the Filing of the Complaint Further Confirm that Nokia's 5G Delays Stemmed from Its Failed Integration**

Developments since the Complaint reinforce Lead Plaintiff's allegations of securities fraud and show that Nokia's 5G shortfall was directly related to undisclosed integration problems. On January 18, 2020, just ten days after the Complaint was filed, *Bloomberg* reported that Finland's Financial Supervisory Authority (the "FSA") had begun an investigation into "whether Nokia [] misled investors" by failing to issue a profit warning before the October 24, 2019 corrective disclosure. LP Ex. 1. Then, on March 2, 2020, Nokia announced that Rajeev Suri would be departing the Company. Although the Company did not expressly admit that his departure was related to the Company's undisclosed integration problems and resultant lack of 5G-readiness, the context and coverage make clear that these failures were the cause.

Coverage in the days before the announcement of Suri's departure continued to show that

issues with the Alcatel integration had led to Nokia's 5G difficulties. On February 26, 2020, *Bloomberg* reported that "Nokia has endured a tumultuous 12 months – the shares fell 25% in October after cutting its outlook – in part because of ***the failure to effectively integrate its last major acquisition***," (LP Ex. 2), and on February 27, 2020, that "[a]s it struggles to catch up with competitors, ***Nokia's acquisition of [Alcatel] . . . slowed down development of new products*** as it contended with a complicated integration process." LP Ex. 3.

Reports following the announcement of Suri's departure likewise confirm that the undisclosed failures of the Alcatel integration were to blame. On March 2, 2020, *Bloomberg* reported that the acquisition of Alcatel caused Nokia issues "for which Suri now seems to be paying the price . . . ***[d]ifficulties integrating the French company proved a distraction as the telecommunications industry started developing [5G] technology***. Carriers complain that Nokia now lags Ericcson and Huawei technologically." LP Ex. 4. *Bloomberg* likewise reported that "[i]n October, Nokia angered investors when it suspended its dividend to conserve cash for 5G investments and cut its earnings guidance, wiping 23% off the share price in a day. It's also faced headwinds in integrating Alcatel-Lucent . . . and staff have complained internal politics are distracting managers." LP Ex. 5. Similarly, *Dow Jones Institutional News* explained that "Mr. Suri's big bet [on the Alcatel integration] was on the 'convergence' of mobile broadband with Wi-Fi technology . . . the ***complex integration process seems to have distracted Nokia*** from keeping up with Huawei. The need to accelerate the 'product road map' and bring down costs on its first-generation 5G technology was a big reason for the October profit warning" (LP Ex. 6), and that "Nokia's wider difficulties stem in part from digesting its $16.6 billion acquisition of Alcatel . . . [t]hough the deal was aimed at expanding Nokia's communications products and creating a one-stop shop for telecom companies, it also made it more challenging for the company to accelerate its own

efforts in 5G, according to one Nokia executive." LP Ex. 7.  Similarly, on June 1, 2020, *Barron's* explained that "Nokia has lost market share in recent years, as a costly ***acquisition of Alcatel-Lucent in 2016 caused distractions and delays in product development.  The company burned through billions of dollars on integrating the merger and lost the lead on 5G technology*." LP Ex. 8.

Nokia analysts likewise continued to attribute Nokia's 5G shortcomings to the Company's undisclosed integration problems.  For example, as recently as June 1, 2020, a JPMorgan analyst wrote that "Nokia's wireless equipment issue has been struggling since the Alcatel-Lucent deal due to issues with consolidating the two companies' roadmaps and thus being on time for the launch of 5G." LP Ex. 9.

## III.    ARGUMENT

### A.    Lead Plaintiff Pleads False and Misleading Statements

The Complaint alleges that during the Class Period, Nokia's integration of Alcatel was plagued by problems – including technological, cultural, organizational, and compliance problems fundamental to the integration process. *See, e.g.*, ¶¶2, 39, 42, 52, 72, 78, 85.  The Complaint alleges, contrary to this reality, that Defendants portrayed the integration as a complete success while concealing the truth about the troubled integration process. *See, e.g.*, ¶¶3-4, 35, 38-39, 40-41, 64, 52, 55, 57, 64-65, 67, 70, 75, 78.

The Complaint alleges that Defendants made numerous affirmative false or misleading statements describing and portraying the integration as complete and successful. *See, e.g.*, ¶¶35, 40, 55, 57-58, 64, 70-71, 75, 78.  In truth, it was neither.  The Complaint alleges that Defendants made numerous materially false or misleading statements about the Company's supposed 5G-readiness that omitted Defendants' material integration failures. *See, e.g.*, ¶¶4, 39, 52, 72, 82, 85.  In reality, the Company was not as 5G ready as Defendants claimed because the 5G transition depended on a successful integration of Nokia and Alcatel and the integration was nowhere near the success story

Defendants told.

The Complaint alleges with particularity that the market understood Defendants' Class Period statements to mean that the Alcatel integration and associated 5G transition were free of material integration problems, and that the market understood Defendants' much later profit warning to mean that, in truth, the Alcatel integration faced significant undisclosed challenges and Defendants' earlier statements had been false and misleading. *See, e.g.*, ¶¶3-4, 37, 95, 101-105. The Complaint also alleges particularized facts supporting inferences of specific but undisclosed problems in the process of combining Nokia and Alcatel, including technological, cultural, organizational, and compliance problems that stymied the integration process and delayed Nokia's 5G transition.

Defendants employ two primary tactics to evade these allegations. Defendants deny the allegations themselves, claiming that the Complaint does not prove that the integration suffered from problems or that Defendants' statements misled the market about the true state of the integration. And, Defendants misconstrue the allegations of the Complaint, pretending to misunderstand them while carving them into discrete unrecognizable pieces that Defendants deem unrelated to the undisclosed integration problems at the heart of the Complaint. The Court should reject both arguments.

Defendants' arguments attempt to turn the pleading standard on its head. At this stage, Lead Plaintiff's factual allegations must be taken as true and all reasonable inferences drawn in Lead Plaintiff's favor. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *3 (S.D.N.Y. Sept. 24, 2018) (Carter, J.) ("In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor."). The Court must

likewise "construe the complaint in the light most favorable to the plaintiff." *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *2 (S.D.N.Y. June 12, 2018).[2]

As the Second Circuit has explained, "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant. Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Thus, "the rule is not intended to be an insurmountable hurdle for claimants to overcome, but was designed to afford defendants fair notice of the fraud alleged against them." *SEC v. Laura*, 2020 U.S. Dist. LEXIS 50970, at *14-*15 (E.D.N.Y. Mar. 24, 2020), Fed. Sec. L. Rep. (CCH) P100,771; *see also Speakes*, 2018 WL 4572987, at *3 ("[T]he complaint must provide factual allegations sufficient to give the defendant fair notice of what the claim is and the grounds upon which it rests.").

The allegations of the Complaint more than satisfy these requirements and there is no credible argument that Defendants do not have notice of the basis for the Complaint's allegations that their statements were materially false and misleading. The Complaint sets forth extensive

---

[2]    Defendants improperly attempt to import the "strong inference" standard applicable only to scienter to the analysis of falsity, a distinct element of the claim for which there is no such heightened pleading requirement. *See, e.g., Speakes*, 2018 WL 4572987, at *3 (applying the *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) "facial plausibility" standard to allegations of falsity but not to scienter, which is separately governed by the PSLRA's requirement that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) ("The heightened pleading standard under the [PSLRA] applies only to the element of scienter; all other elements of a §10(b) claim are governed by traditional pleading standards[.]"). Along these lines, Defendants accuse Lead Plaintiff of pleading falsity "armed with the benefit of hindsight." Def. Br. at 5. Of course, the essence of the "corrective disclosures" concept in the federal securities laws is that later disclosures reveal the falsity of earlier ones. *See, e.g., Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 259 n.1 (2d Cir. 2020) ("[a] 'corrective disclosure' is an announcement or series of announcements that reveals to the market the falsity of a prior statement."). The Court should reject Defendants' effort to impose a fabricated pleading standard on Lead Plaintiff here.

allegations of Defendants' own statements with contemporaneous reports from Nokia securities analysts showing: (i) that the market understood Defendants' Class Period statements to mean that the Alcatel integration was complete and successful; and (ii) that Defendants' corrective disclosures – including those about the Company's 5G delays – revealed that, in reality and contrary to Defendants' earlier portrayal, the integration had been beset with undisclosed problems.

For example, Defendants ask the Court to hold, as a matter of law, that Defendants did not communicate to the market that the Alcatel integration was complete and successful. But the Complaint alleges numerous statements by Defendants that on their face show otherwise, including that the Company was "***beyond*** the integration;" that "the integration of Alcatel-Lucent [was] ***behind us***;" that the "financial synergies and cultural integration . . . were ***achieved in full***;" that the "cultural integration . . . ***went beautifully***;" and that the integration's "heavy lifting is ***over***." ¶¶40, 49, 58, 70-71. The Complaint likewise quotes numerous analyst reports showing that – at the time and contrary to the inference Defendants now seek – the market understood Defendants' statements to mean what the statements on their face conveyed: that the Company had moved beyond a successful integration. Thus, one analyst cited in the Complaint congratulated Defendants on "a very successful integration" while another accepted that "Nokia's operations [were] now integrated with Alcatel Lucent." ¶37. Defendants are not entitled to an inference that reasonable investors did not understand the plain meaning of Defendants' statements, particularly when analysts expressed the same understanding.

Along similar lines, Defendants ask for a ruling that, as a matter of law, the Court cannot plausibly infer that the integration suffered from significant problems. But securities analysts specializing in Nokia and cited in the Complaint drew that precise inference. Thus, when Nokia announced at the end of the Class Period that its 5G transition would be delayed by two years, one

analyst concluded that "post-Alcatel indigestion issues had more severe knock-on effects" than previously disclosed and that the Company was unable to be "ready in time for the 5G cycle take-off, as it was bogged down in an all-consuming post-merger integration process with Alcatel-Lucent." ¶102. Another analyst concluded that a "confluence of factors seemed to have caused this issue for Nokia. The key factor was no doubt the company's merger with Alcatel-Lucent and the complexity of aligning both companies[.]" ¶103. And Barclays's analyst – who had earlier applauded the "conclusion" of the integration – now indicated that "[d]ue to the Alcatel integration . . . Nokia has been behind in 5G development." *Compare* ¶37 with ¶101. The Court cannot fairly conclude that the inferences drawn by professional securities analysts are somehow implausible as a legal matter.

*In re STEC Inc. Securities Litigation* is instructive. 2011 WL 2669217 (C.D. Cal. June 17, 2011). In *STEC* the court held that plaintiffs had raised a plausible inference of falsity based solely on analyst reports. As the court explained, "[p]articular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed." *Id*. at *8.[3] In so holding, the court relied on a comparison of analyst reports from both before and after the corrective disclosures at issue, and concluded that "the third-party analyst statements comport with Plaintiffs' mosaic and the Court's conclusion that Defendants' statements could have been misleading to a reasonable investor." *Id*. So too here. Lead Plaintiff's allegations of falsity are consistent with multiple analysts' conclusions, which "underscore the plausibility and reasonableness" of Lead Plaintiff's allegation that Defendants' statements were "misleading to a

---

[3] Defendants take issue with Lead Plaintiff's allegations that – beyond their literal falsehoods about the integration – Defendants' statements created the "impression" that the integration was successful and that the 5G transition was unhindered by integration problems. Def. Br. at 21-22. Their objection is misplaced. "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg*, 712 F. Supp. 2d at 180; *see also Gabelli v. SEC*, 568 U.S. 442 (2013) *rev'd* 653 F.3d 49, 57 (2d Cir. 2011) ("literally true statements that create a materially misleading impression – will support claims for securities fraud.").

reasonable investor."[4]  *Compare* ¶37 with ¶¶100-105.

The Complaint also pleads – despite Defendants' efforts to ignore – detailed facts showing the existence of failures in specific aspects of the integration process – *i.e.*, the process for combining the technologies and operations of both Nokia and Alcatel for the purpose of competing in 5G.  The Complaint raises an inference that – contrary to Defendants' "5G ready" mantra – Nokia suffered from significant undisclosed problems integrating the formerly separate companies' technologies into a new line of first generation 5G products, particularly with respect to the ReefShark chipsets necessary for 5G.  *See, e.g.*, ¶¶54, 59, 60, 77, 84, 102.  The Complaint also raises an inference that Nokia suffered from significant difficulties combining the cultures and operations of the two companies, which Defendants repeatedly touted and which was necessary for the Company to field 5G-ready products in time.  *See, e.g.*, ¶¶38, 58, 70-72, 105.  The Complaint raises a further inference that the integration suffered from undisclosed problems bringing Alcatel (with its history of corrupt practices) into the Nokia compliance systems that Defendants' repeatedly acclaimed.  *See, e.g.*, ¶¶31, 38-39, 86-89, 90-92.

The Complaint explains in detail that the purpose of Nokia's acquisition of Alcatel was to combine the two companies' technologies to compete in 5G.  *See, e.g.*, ¶5.  The Complaint likewise

---

[4]    Numerous cases are in accord and rely on analyst reports, media reports, and the statements of other market observers as the basis for plausible inferences of falsity.  *See, e.g.*, *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at \*11 (S.D.N.Y. Apr. 22, 2016) ("the allegation that several different analysts understood Defendants as describing current inventory levels provides support for the Court's conclusion that Defendants' statements are reasonably interpreted as such."); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at \*13 (S.D.N.Y. Nov. 26, 2018) ("the belief among some third-party analysts that Signet substantially understated its reserves during the Class Period" cited as one factor supporting plausible inference of falsity); *In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1206 (E.D. Pa. 1992) (denying motion to strike securities analyst statements because "the securities analysts' reactions to Bioscience's allegedly false and misleading statements . . . are indicia . . . of the materially misleading nature of the statements"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding omissions actionable where analyst reports reflected the market's understanding of defendants' statements and the reports were influenced by company's public statements).

quotes detailed statements by Defendants concerning Airscale base stations and associated ReefShark chipsets – *i.e.,* Nokia's first generation 5G products claimed to marry Nokia's and Alcatel's legacy capabilities into "5G ready" products. *See, e.g.*, ¶¶51, 53-54, 59, 60, 63, 70, 77, 84.[5] The Complaint also cites Defendants' numerous assurances about the progress of these technological integration processes, such as that the "roadmaps" for integrating the formerly separate technological capabilities into new products were "on track," that any "roadmap issues [were] largely behind us," and that the Company was "in a very strong position for 5G" as a result. ¶¶59, 84; *see also* ¶¶61, 64, 70.

The Complaint shows that these and other statements like them concerning the supposed progress of Nokia's new "5G ready" products concealed significant problems in the underlying integration processes, which ultimately led to the Company's October 2019 profit warning. Thus, for example, one analyst cited in the Complaint expressly tied the Company's October 2019 negative disclosures about ReefShark to integration problems: "In our view, Nokia was not able to get its ASIC semiconducters, notably, the ReefShark family of custom silicon and external SoCs, ready in time for the 5G cycle take-off, as it was bogged down in an all-consuming post-merger integration process with Alcatel-Lucent." ¶102. And another analyst cited in the Complaint concluded that the "key factor" behind the Company's October 2019 outlook cut was "the company's merger with Alcatel-Lucent and the complexity of aligning both companies 4G and 5G roadmaps." ¶103.[6]

---

[5] *See also* LP Ex. 10 ("The ReefShark chipsets include one architecture focused on compute capacity and another for radio frequency (RF) applications. Both include artificial intelligence (AI) work from Nokia Bell Labs, which was **part of the Alcatel-Lucent deal**, and Nokia's history with mobile devices and base stations."); LP Ex. 11 ("ReefShark boosts baseband compute capacity through plug-in units fitted into the commercially available Nokia AirScale system module.").

[6] Similarly, an article published in *Dow Jones Institutional News* since the Complaint was filed expressly tied the Company's October corrective disclosure to "integration" and "product road map" problems: "[T]he complex integration process seems to have distracted Nokia from keeping up with Huawei. The need to accelerate the 'product road map' and bring down costs on its first-generation 5G technology was a big reason for the October profit warning." LP Ex. 6.

Defendants also try to misconstrue other allegations showing that their statements concerning the supposed progress integrating the two companies' cultures and organizations were materially false and misleading. The Complaint makes clear that the 5G transition depended on the successful combination of the Company's cultures and organizations into one cohesive operation capable of developing products that relied on both companies' legacy capabilities. *See, e.g.*, ¶¶70-71. The Complaint cites numerous examples of Defendants' reassurances concerning this cultural integration process. *See, e.g.*, ¶¶58, 70-71. And, the Complaint likewise cites news sources describing specific problems contrary to these repeated assurances about the supposed effectiveness of the cultural and organizational aspects of the integration. For example, the Complaint cites a *Bloomberg* article published several days after the end of the Class Period explicitly attributing the Company's profit warning and stock price collapse to "disagreements" and "internal politics" in the wake of the "Alcatel-Lucent purchase" and cites a workers' representative from Nokia's headquarters to explain that "management at the telecom equipment maker has been distracted by disagreements over priorities and staffing since Nokia's $18 billion takeover of Franco-American rival Alcatel-Lucent in 2016."[7] ¶105. Reports such as these by contemporaneous market observers support an inference that Defendants' statements – like their claim that the "cultural integration . . . went beautifully" – misled reasonable investors about the effectiveness of the integration process and Nokia's consequent preparedness for 5G.

Defendants also overlook the meaning of their March 21, 2019 corrective disclosure concerning compliance problems in legacy Alcatel. Defendants told the market two years earlier

---

[7]    LP Ex. 12. Similarly, a *Bloomberg* article published on March 2, 2020 – nearly two months after the Complaint was filed and on the same day as the announcement of Defendant Suri's departure – confirmed that these previously undisclosed internal problems led to the October corrective disclosure: "In October, Nokia angered investors when it suspended its dividend to conserve cash for 5G investments and cut its earnings guidance, wiping 23% off the share price in a day. It's also faced headwinds in integrating Alcatel-Lucent, which it acquired in 2016, and staff have complained internal politics are distracting managers." LP Ex. 5.

that the integration was complete and that the Company was moving beyond it.   ¶¶35, 40.

Defendants' announcement of the discovery of compliance problems rising to the level of potential

criminality "during" the integration was thus, on its face, tantamount to an admission that their

earlier declarations about the successfully completed integration were materially false and

misleading.   And, the disclosure likewise raised analyst questions about the veracity of the

Defendants' earlier disclosures, with one analyst cited in the Complaint noting that "it is a bit strange

to see such compliance issues emerging today, since Nokia completed the acquisition of [Alcatel]

more than three years ago."  ¶¶3, 95.

Moreover, numerous articles and analyst reports published since the Complaint further

demonstrate the market's view that Defendants' statements about the Alcatel integration and 5G

transition depending on it were materially misleading.  For example, on February 27, 2020 – just

days before the sudden announcement of Defendant Suri's departure – a *Bloomberg* article stated,

"Suri's dealmaking victory *hid [the] scale of task to merge companies*."  LP Ex. 13.  That article

quoted an analyst directly tying the scope of the Company's integration difficulties to its

technological shortfall: "The whole merger with Alcatel-Lucent made them take their eye off the ball

. . . because they were so focused on cost reduction and getting that done and that was a bigger task

than they thought it would be. . . .  So they are behind, technologically."  *Id.*[8]

Indeed, as late as June 2020, Nokia analysts were still opining that the Company's 5G deficit

stemmed from difficulties with the Alcatel integration.  For example, J.P. Morgan's Nokia analyst

wrote on June 1, 2020, that "Nokia's wireless equipment business has been struggling since the

Alcatel-Lucent deal due to issues with consolidating the two companies' roadmaps and thus being on

---

[8]    Along similar lines, a different *Bloomberg* article published on February 27, 2020, explained that "[a]s it struggles to catch up with competitors, Nokia's acquisition of French rival Alcatel-Lucent in 2016, which helped to broaden its offering, may have *slowed down development of new products as it contended with a complicated integration process.*"  LP Ex. 3.

time for the launch of 5G." LP Ex. 9.[9] On the same date, *Barron's* explained that the "acquisition of Alcatel-Lucent in 2016 caused distractions and delays in product development. The company burned through billions of dollars on integrating the merger and lost the lead on 5G technology." LP Ex. 8. Again, the conclusions drawn by analysts and other market observers cannot be implausible as a matter of law.

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.* ("*AMC*") is on point. *See* 422 F. Supp. 3d 821 (S.D.N.Y. Sept. 23, 2019). In *AMC*, the court sustained a complaint based on allegations of misstatements about the post-acquisition integration of Carmike by AMC. *Id.* at 848. The statements were held materially misleading due to the omission of information concerning underinvestment in the companies' facilities, which the court described as "significant or systemic obstacles to Carmike's integration[.]" *Id.* at 844. The court held that statements such as "integration planning and integration execution have been flawless," as well as statements "describ[ing] the integration process as having been 'done quickly;' 'very smooth;' 'running very smoothly;' [and] that 'great progress' had been made" in the integration were materially misleading because "[a] reasonable investor would expect that such statements would 'fairly align[ ] with the information in the issuer's possession at a time'" and that "an investor would reasonably infer that these statements indicated that [the defendant] had information showing that there were no significant or systemic obstacles to Carmike's integration." *Id.* The same logic applies here. Lead Plaintiff's allegations show that Nokia investors reasonably inferred from Defendants' numerous positive statements about the successful Alcatel integration and attendant 5G-readiness "that there were no substantial, systemic obstacles to" those processes. *Id.* at 844. But that

---

[9] The same analyst report goes on to discuss the specific problems with the ReefShark chipsets related to these integration problems. *Id.*

was not true.[10]

The Court should also reject Defendants' effort to twist and misconstrue the allegations of the Complaint. The Complaint alleges clearly that "the Alcatel integration was hampered by significant undisclosed problems and the Company was far from '5G ready' as a result." ¶2; *see also* ¶¶4, 38, 49, 98. Defendants pretend, however, that the allegations concerning integration problems and 5G readiness are unrelated and assert, on this misleading basis, that all their statements concerning 5G readiness (and otherwise) were consistent with their disclosure obligations. That argument is contrary to the detailed allegations of the Complaint, which pleads that the Company's 5G transition depended on a successful Alcatel integration and supports that pleading with extensive citation to analysts and other media reports that expressly linked the Company's ultimate 5G shortfall to its integration failures. Of course, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *In re Allergan PLS Sec. Litig*., 2019 WL 4686445, at *23 (S.D.N.Y.

---

[10]   *In re Akorn, Inc. Securities Litigation*, 240 F. Supp. 3d 802 (N.D. Ill. 2017) is in accord. There, the court sustained allegations involving representations that Akorn was "on track . . . to fully integrate" its acquisitions, that it had only "residual integration left on one of the acquisitions," and that its "other acquisitions are fully integrated." *Id*. at 816-17; *see also Galestan*, 348 F. Supp. 3d at 299-300 (sustaining allegations that defendants had failed to "disclose known, material, integration-related problems . . . existing from the beginning of the class period"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *14 (D.N.J. July 27, 2018) ("disclosure of the known impediments to successful integration would have significantly altered the mix of information available to a reasonable investor"); *In re Aetna Inc. Sec. Litig*., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (sustaining allegations based on defendants' claims that merger integration was "successful" and "on track"). In contrast, Defendants' reliance on *In re Razorfish, Inc. Securities Litigation* is misplaced. *See* 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001). *Razorfish* held, without analysis, that the term "integration" was "too loose and uncertain a term on which to premise a claim of securities fraud *in this context*." *Id*. at *2. But that context involved a small number of vague references to an integration. *Id*. In this case, Lead Plaintiff has cited multiple analyst reports, articles, and Defendants' own statements consistently discussing the integration and raising an inference of specific integration problems contrary to Defendants' public statements. ¶¶36-37, 40-41, 57-58, 64-65, 67, 70.

Sept. 20, 2019) (citing *Meyer v. Jinkosolar Holdings Co., Ltd*., 761 F.3d 245, 250 (2d Cir. 2014).[11]

Here, the Complaint pleads that Defendants falsely claimed a successful integration and then

perpetuated that false impression through multiple statements about 5G readiness that did not tell the

whole truth about the underlying integration. The Complaint must be viewed in that light and

Defendants are not entitled to impose their preferred construction of these allegations at this stage.[12]

Ultimately, Defendants ask the Court to disregard the Complaint's allegations because

Defendants' corrective disclosures did not confess to the Company's integration problems or admit

that their earlier statements were false and misleading. The law does not require such confessions.

A corrective disclosure need not "take the form of a flashing neon light, with an explicit message

stating that it is intended to cure an earlier fraudulent statement." *In re Signet*, 2019 WL 3001084,

at *14; *see also Freudenberg*, 712 F. Supp. 2d at 202 ("a corrective disclosure [need not] be a

'mirror image' tantamount to a confession of fraud . . . [b]ecause corporate wrongdoers rarely admit

that they committed fraud"); *In re Vale S.A. Sec. Litig*., 2017 WL 1102666, at *29 (S.D.N.Y.

Mar. 23, 2017) (same). Here, the Complaint cites analyst reports, news articles, and Defendants'

own statements, all of which support the conclusion that Defendants materially misrepresented to the

---

[11]    The Court should also reject Defendants' effort to change the subject to risk disclosures or to reframe the issue to focus on whether they "guaranteed" a successful 5G transition. Def. Br. at 25. "Even savvy investors may recover when a bald lie understates the gravity of a known risk." *Akorn*, 240 F. Supp. 3d at 814. Lead Plaintiff dispenses with this misleading argument in detail, *infra* at III.C, in connection with Defendants' contentions about forward-looking statements and the bespeaks caution doctrine.

[12]    Defendants likewise try to argue that numerous other statements by Defendants are unrelated to the Complaint's core allegations regarding the integration's failures. For example, Defendants claim that their statements concerning Nokia's "end-to-end portfolio" are "seemingly random statements that have nothing to do with integration." Def. Br. at 27. But the Company's "end-to-end portfolio" refers precisely to the product offerings resulting from the combination of Nokia and Alcatel. As explained in *Bloomberg*: "Under Suri . . . Nokia has bet on providing complete network systems, from physical equipment such as antennas and optical cables to software and other services, in a strategy dubbed 'end-to-end.' The approach was driven partly by the need to integrate the Alcatel purchase[.]" LP Ex. 13. Defendants cannot evade the allegations of the Complaint by pretending they do not understand their own business.

market the true state of the integration, including through their repeated assurance about 5G readiness.

### B.    Defendants' Misrepresentations Were Material

The Alcatel integration and associated 5G transition were highly material to investors and Defendants are not entitled to an inference that reasonable investors did not take representations about these subjects seriously.    The Court should reject Defendants' assertion that their misrepresentations about facts critical to investors were mere "puffery" or "opinions" that no reasonable investor could have considered.    Def. Br. at 28-35.

"The Second Circuit defines puffery as optimistic statements that are so vague, broad, and non-specific that no reasonable investor could possibly consider them significant in making investment decisions." *In re Signet*, 2018 WL 6167889, at *11 (citing *ECA, Local 134 1BEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197, 206 (2d Cir. 2009).    Whether a misrepresentation is puffery "depends, in part, on the context in which it was made." *Id*.    Thus, "[w]hile certain statements, viewed in isolation, may be mere puffery, when the statements are 'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.'" *Id*.[13]    Further, statements that constitute "misrepresentations of existing facts" are not puffery.  *See Galestan*, 348 F. Supp. 3d at 298 (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)).

The Complaint demonstrates that the Alcatel integration – and 5G transition depending on it – were the Company's most important focus during the Class Period.  ¶5.  The Complaint likewise shows that these matters were "particularly important to the company and investors," that securities

---

[13]    *See also In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("repeated representations on the same topic, even where those representations would otherwise be puffery . . . communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'").

analysts and financial journalists frequently asked[14] and reported about the integration and 5G transition, and that Defendant Suri's misstatements were "made repeatedly in an effort to reassure the investing public" about critical issues. *Id.; see also*, ¶¶50-51, 60-61, 63-64, 67, 69, 70-71, 84.[15]

Given these facts, Defendants cannot show that their statements were, as a matter of law, "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *See Galestan*, 348 F. Supp. 3d at 298 (statements regarding progress of integration not puffery).[16] In *Galestan*, for example, the court rejected a puffery defense where, as here, "Defendants offered more than 'rosy predictions' because they stated that [the] ***integration was going smoothly*** [despite] material productivity . . . concerns[.]" *See id*. at 303.[17]

Defendants' contention that their false and misleading statements are shielded as mere "opinions" is also meritless. The vast bulk of the misstatements identified in the Complaint are framed as statements of fact. *See, e.g.*, ¶¶40, 47, 49, 51, 57, 59, 64, 69, 70, 75, 78, 82. Regardless, a

---

[14] Indeed, many of the statements challenged in the Complaint regarding both the Alcatel integration and 5G were made in response to direct questions from analysts about these subjects, further confirming that investors were relying on the information. *See, e.g.*, ¶¶46, 50-51, 60-61, 63, 66-69, 70-71, 84; *see also In re Signet*, 2018 WL 6167889, at *11 (responses to questions about the credit portfolio not-puffery because they were reassuring investors of the company's health).

[15] The materiality of Defendants' misrepresentations concerning the integration is also clear from the market's reaction to Defendants corrective disclosures, including the largest stock price drop in the Company's history combined with extensive analyst and media coverage linking it to undisclosed integration problems. *See, e.g., City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (finding the reactions of securities analysts as supportive of an inference of materiality at the motion to dismiss stage); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) ("market's reaction in the wake of [the company's] disclosure suggests" that information was "highly material."). *C.f.* ¶¶100-105.

[16] *See also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (courts "must exercise great caution" when considering a puffery defense because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury").

[17] Defendants' reliance on *Johnson v. Sequans Communications S.A.*, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) (Def. Br. at 29) is misplaced. The "puffery" at issue there involved general optimistic statements about defendants' position in the market. *Id*. at *14. Here, the Complaint alleges that Defendants' statements about 5G readiness misled investors about the underlying integration necessary to a successful 5G transition.

statement of opinion is actionable if the opinion omits material information that renders it misleading to an ordinary investor. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015). Defendants here made repeated positive statements about the integration and 5G transition that omitted to disclose truthful information about material problems in these areas. ¶¶40-41, 47-49, 50-51, 53-54, 57-59, 61, 63-65, 69, 70-71, 75, 78, 84. The "core inquiry is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself" because "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects . . . that it fairly aligns with the information in the issuer's possession at a time.'" *AMC*, 422 F. Supp. 3d at 843.

*AMC* is again on point. There, as here, many of the challenged statements on their face concerned "concrete and measurable" facts on which investors could reasonably rely. 422 F. Supp. 3d at 845-46; *see, e.g.*, ¶¶40-41, 47-49, 50-51, 53-55, 57, 59, 61, 64-65, 67, 70-71, 75, 78, 84. But the court also held actionable statements such as "that ***integration efforts had been 'flawless'*** [] and that '[t]here have literally been no operational snafus of any note.'" *Id*. As the court explained, "drawing all available inferences in Plaintiffs' favor, it is plausible that a reasonable investor would have relied on [these statements] to mean the more 'concrete and measurable' fact that zero significant obstacles had occurred" in AMC's integration of Carmike. *Id*. The same is true here. Nokia investors reasonably relied on Defendants' repeated assurances about the integration and 5G transition and plausibly understood these statements to convey that no significant obstacles hindered those processes.

## C.    Defendants' Misrepresentations Are Not Protected Forward Looking Statements

Defendants further attempt to escape liability by characterizing many of their misleading statements as forward-looking. Under the PSLRA, forward-looking statements are protected "only

to the extent that [defendants] can show that: (1) the statements were accompanied by meaningful cautionary language; (2) the statements were immaterial; or (3) the plaintiff failed to prove the statements were made with actual knowledge that they were false or misleading." *Galestan*, 348 F. Supp. 3d at 297 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). As the Second Circuit has explained, Defendants bear the burden of demonstrating that the "cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772. Courts have held that "[t]o be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). Further, "[t]he safe harbor . . . does not protect material omissions." *In re Salix*, 2016 WL 1629341, at \*9.[18]

Defendants cannot avail themselves of the PSLRA's safe harbor because the bulk of the statements at issue implicate matters of then-existing or historical fact. *See e.g.*, ¶¶40-41, 44, 47-49, 50-51, 53-55, 57-59, 61-65, 67, 69, 70-71, 75, 77-78, 82, 84. These statements are in the present-tense or clearly discuss past or present facts outside the protection of the safe-harbor or bespeaks caution doctrine. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*16 (E.D.N.Y. May 20, 2020) (statements of present of historical facts are, at best, severable from the forward looking portions.). For example, Defendants' represented that "***Nokia is well positioned*** [for the start of 5G]" (¶47), Nokia was "***now in full deployment mode***" (¶50), and "we are ***moving fast and successfully*** to put the portfolio integration challenges in mobile networks behind us" (¶55). These statements cannot reasonably be read to be forward-looking, and implicate present or historical facts outside the safe-harbor. *See Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 (2d Cir. 2010) ("[M]isrepresentation of present or historical facts cannot be cured by cautionary

---

[18] The bespeaks caution doctrine is similarly limited. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

language.").

Similarly, many of the statements cited by Defendants concern the then-current status of the integration or 5G transition. *See, e.g.*, Def. Br. at 31-32 ("***effectively moving beyond*** the integration effort for 2016" (indicating the integration had progressed beyond a certain point); "we are ***now moving into the next phase***" (indicating the previous phase had been completed); "the ***chipset development*** . . . ***it's on track*** . . ." (indicating 5G chip development had progressed beyond a certain point)). *See, e.g., Akorn*, 240 F. Supp. 3d at 817 (finding defendants' statement that the integration was "on track" expressed "a forward-looking belief about the future integration of the acquisitions, but . . . also . . . the current state of the integration efforts had progressed to a point that made it reasonably likely for Akorn to complete the integration process by a certain time."). Thus, these statements are not protected by either the safe-harbor or bespeaks caution doctrine.

Defendants' statements are also actionable because they omitted material information about the integration and 5G transition. In *Galestan*, for example, where the claims arose from undisclosed "problems and uncertainties" in the integration of an acquired company, the court concluded that because the allegations related to "omissions of material information, the PSLRA safe harbor provision cannot insulate the challenged statements." 348 F. Supp. 2d at 304.

In any event, risk disclosures do not absolve Defendants' for their multiple material misrepresentations concerning the supposed success of the integration and resultant 5G transition. *See, e.g., Akorn*, 240 F. Supp. 3d at 814 (risk disclosures cannot insulate a speaker when a "bald lie understates the gravity of a known risk"); *AMC*, 422 F. Supp. 3d at 847 (citing *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004)) ("it would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language"); *see also Freudenberg*, 712 F. Supp. 2d at 194 (citing *In re Credit*

*Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 n.17 (D. Mass. 2006) (continuing to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time[.]").[19]

### D. Lead Plaintiff's Allegations Raise a Strong Inference of Scienter

The Complaint raises a strong inference of scienter – *i.e.*, a cogent and compelling inference that Defendants knew or recklessly disregarded that the Alcatel integration suffered from material problems, that the Company had not moved beyond the Alcatel integration as Defendant Suri claimed, and that the Company was unprepared for the 5G transition as a result.

Defendant Suri repeatedly told investors that he played a direct personal role in managing the integration, including as a "permanent attendee" of the Integration Board, which he claimed gave him a "high degree of granular visibility" into the integration process. ¶¶26, 34. These admissions alone support a compelling inference that Defendant Suri had detailed knowledge of the realities of the Company's troubled integration process. ***Defendants do not even address these statements in their brief.*** Not only did Defendant Suri play a direct personal role managing and monitoring the integration, but the Complaint shows that he frequently reassured the market by boasting about his direct involvement and regularly updating the market about the integration process and the attendant 5G transition, further confirming his own belief that he was knowledgeable about its details.

The Complaint likewise includes extensive evidence showing Defendant Suri's consciousness of (or reckless disregard for) substantial difficulties confronting the integration, including through his access to and duty to monitor multiple sources of pertinent information. The allegations of the Complaint further reinforce the inference of scienter with evidence of Defendant

---

[19]    Moreover, even if any of Defendants' statement could be found within the safe harbor for forward-looking statements, Defendant Suri's repeated assurances of his personal knowledge of and involvement in the integration process raise a strong inference of his "statements were made with actual knowledge that they were false or misleading." *Galestan*, 348 F. Supp. 3d at 297.

Suri's financial motive to mislead about the integration – including almost €1 million tied directly to its outcome – as well as his motive to maintain his reputation as the merger integration expert he claimed to be. Suri's imposition of an aggressive integration timeline coupled with compensation arrangements incentivizing his direct reports to claim success further supports the inference of scienter. So too does his ouster from the Company following revelation of his integration failures.

The inference of scienter grows even stronger in light of the critical importance of the integration to the Company's business. The transition to 5G was the key to Nokia's business strategy and, as the Complaint details, a successful integration of the formerly separate companies was the necessary prerequisite to competing in 5G. The integration was therefore Nokia's single most important business priority during the Class Period, further supporting the strong inference that Defendants were knowledgeable about this foremost core operation.

A strong inference of scienter requires pleading of "facts to show that defendants had both motive and opportunity to commit fraud, or [] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. "The inquiry is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" *Tellabs*, 551 U.S. at 310 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324; *cf. Lockheed*, 875 F. Supp. 2d at 372 ("a tie . . . goes to the plaintiff").

Lead Plaintiff's allegations establish a cogent inference of Defendants' scienter. This inference is far more compelling than Defendants' implausible argument that Suri was somehow

ignorant about the realities of the integration he was responsible for carrying out.

### 1.  Defendant Suri's Assurances of Personal Involvement in the Integration Process Raise a Strong Inference of Scienter

Defendant Suri's personal involvement in the integration process alone raises a strong inference of scienter.  As the Complaint details, Suri created a small dedicated team – the Integration Board – with a singular purpose to carry out the Alcatel integration and report directly to him about its progress.  The Integration Board was a product of Suri's signature "Nokia Business System" designed to establish "focused M&A and integration practices" and a "clear governance structure for the execution of the integration," in which the head of the integration process "reports directly to Rajeev Suri, President and Chief Executive Officer of Nokia."  ¶¶23-26.  Defendant Suri told investors that he was a "permanent attendee" of the Integration Board's meetings and that the Integration Board provided him with a "high degree of granular visibility" into the integration process.  ¶¶26, 34.

Defendant Suri's admissions of direct involvement in and personal knowledge about the integration process raise a strong inference that he, in fact, did have personal knowledge about the integration process.  Numerous cases support that conclusion.  In *Salix*, the court found a strong inference of scienter where "Defendants claimed they had accurate knowledge" of the inventory levels at issue, including their statement that "we have visibility" into the misstated information. 2016 WL 1629341, at *14.  In *Vale*, involving misrepresentations about dam safety, the court found a strong inference of scienter where executives were "directly and intimately involved with dam safety," including "public representations suggesting familiarity with dam conditions" and involvement with the "unit that analyzed dam risks."  2020 WL 2610979, at *17.  In *City of Birmingham Retirement & Relief System v. Credit Suisse Group AG*, arising from misrepresentations about risk positions, the court found a strong inference of scienter where the complaint alleged "that

- 33 -

the Individual Defendants were part of . . . a sub-committee . . . that met monthly to actively monitor [] risk positions." 2019 WL 719751, at *8 (S.D.N.Y. Feb. 19, 2019).  And, in *Citiline Holdings, Inc. v. iStar Financial Inc.*, allegations that the defendants "told the investing public that they monitored the value of their portfolio on a nearly real-time basis" likewise upheld a strong inference of scienter. 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010).

Suri's presentation of himself as a hands-on leader of the Alcatel integration process further supports a strong inference of his scienter.  In *In re BP p.l.c. Securities Litigation*, for example, the court found a strong inference of scienter as to the defendant chief executive officer because his "own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that [he] paid special attention to [the] process . . . or, at the least, was reckless in not doing so while continuing to publicly tout improvements."  843 F. Supp. 2d 712, 783 (S.D. Tex. 2012).  As the court there explained, "the competing inference – that [he] professed to be focused on [the] process safety but remained unaware of [the] actual . . . concerns in BP's operations on the ground – is far less compelling."  *Id*.  So too here.  Defendant Suri presented himself as the spokesperson and champion of the integration process, which strongly supports an inference of his scienter and defeats any competing inference that he lacked knowledge about this critical subject in

which he specialized and frequently discussed in public.[20]

### 2.    Defendants' Access to Information Raises a Strong Inference of Scienter

In addition to Defendant Suri's admissions about his personal involvement in the process, the Complaint also raises a strong inference of scienter based on his access to facts and information contrary to his public assurances about the integration and its supposed progress.  A plaintiff may "support an inference of scienter in a variety of ways, including where defendants . . . had access to information suggesting that their public statements were not accurate."  *Blanford*, 794 F.3d at 306. A plaintiff may also provide facts establishing that defendants understood their public statements were inaccurate, or were "highly unreasonable" in failing to appreciate that possibility.  *See Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020) (citing *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015)).

The Complaint alleges that Defendant Suri had extensive access to information concerning the integration through multiple channels.  Most importantly, Defendant Suri established the Integration Board for the express purpose of managing the integration and reporting to him directly about its progress.  ¶24.  Defendant Suri likewise had access to information concerning the integration from his position at the head of Nokia's "Group Leadership Team," a committee consisting of Defendant Suri and the Company's twelve senior-most executives – including those

---

[20]    *See also Gauquie v. Albany Molecular Research, Inc.*, 2016 WL 4007591, at *2-*3 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to it."); *Lockheed*, 875 F. Supp. 2d at 372 (defendants' statements "strong circumstantial evidence" executives "were receiving some form of specific information"); *see also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (strengthened inference of scienter when individual defendants frequently spoke on the relevant issues at conferences, on conference calls, and in press releases); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) ("[w]here a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter"); *Novak*, 216 F.3d at 311-12 ("despite knowledge of the true reasons for rising inventory levels, the defendants made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth," adding to the cogent inference of scienter).

personally responsible for the integration process.  ¶28.

Further, the Complaint alleges that Defendant Suri had extensive access to specific information concerning compliance matters, which were highly material given Alcatel's history of compliance problems and Nokia's claims about its "culture of compliance."  For example, the Complaint alleges that Suri became a member of the Alcatel Board of Directors immediately after the acquisition, providing him unique visibility into Alcatel's robust internal reporting systems created in response to earlier compliance issues (including the fifth largest FCPA settlement in history).  ¶¶113, 124.

The Complaint also alleges that Nokia had merged its compliance reporting and monitoring processes with Alcatel's by early 2016 under Nokia's Chief Legal Officer, Maria Varsellona, who reported directly to Suri, was a member of the Group Leadership Team, and sat on both the Nokia and Alcatel Board of Directors with Suri.  ¶¶119, 121-122.  This access to information further supports a strong inference of scienter.  *See, e.g., Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (finding that where plaintiffs' allegations strongly suggested that defendant knew about risks of civil and criminal liability, they "support[ed] the inference that [the defendant] acted with at least a reckless disregard of a known or obvious duty to disclose").

### 3.    Defendant Suri's Motive and Opportunity Also Raise a Strong Inference of Scienter

The inference of scienter is further strengthened by Defendant Suri's motive to mislead investors about the integration's failures.  *See, e.g., Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (scienter shown by "alleging facts . . . showing that the defendants had both motive and opportunity to commit the fraud").  Defendant Suri was motivated to mislead investors about the integration because he had incentive compensation arrangements tied specifically and exclusively to the Alcatel integration.  ¶109.  As the Complaint explains, according to Nokia's SEC

filings, Defendant Suri received 208,700 restricted shares in 2016, worth €986,942 on the grant date and tied expressly to integration targets. ¶129. The Complaint alleges further that these units were set to vest in three equal tranches on October 1st of 2017, 2018, and 2019 – all before the end of the Class Period. *Id*.[21]

Defendants' attempt to brush aside these grants – constituting over $1 million in additional compensation tied specifically to the integration – as "routine grants of incentive compensation" is unavailing. *See* Def. Br. at 36-37. Indeed, Defendants themselves describe these grants as "integration-related incentive award[s]" tied to "financial synergies and cultural integration[.]" *Id*. These incentive equity grants were thus not the typical incentives normally provided to corporate insiders because Nokia specifically linked them to the rapid integration of Alcatel. *See generally, In re Openwave Sys. Sec. Litig*., 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) (holding that defendants' stock options were "'concrete and personal' because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors").

These incentive equity grants, when considered within the totality of Plaintiff's allegations, further enforce a strong inference of scienter. *See In re Wellcare Mgmt. Grp., Inc. Sec. Litig*., 964 F. Supp. 632, 639 (N.D.N.Y. 1997) (holding that a "[c]ourt will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct"); *In re JPMorgan*

---

[21] The compensation incentives of the Group Leadership Team likewise support an inference of Suri's scienter. The Complaint alleges that the other twelve members of the Group Leadership Team were granted a total of 1,015,100 restricted shares, valued at €4,800,408 on the grant date. ¶29. Like Suri's own equity grants, these units vested in three equal tranches and were tied expressly to integration targets. *Id*. The Complaint shows that, with these incentives in place, Suri demanded that the integration take place in an extremely short timeline while publicly touting its speed and success. ¶27. In effect, Defendant Suri put significant pressure on Nokia's senior executives to claim rapid success in the integration and, at the same time, gave them a financial incentive to conceal any shortcomings in the process. *See, e.g., Fla. State Bd. of Admin. v. Green Tree Fin. Corp*., 270 F.3d 645, 662 (8th Cir. 2001) (compensation incentives created motive to "sweep [problems] under the rug"). To claim success on this basis is reckless at best. *See generally, In re Vivendi Universal, S.A. Sec. Litig*., 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003).

*Chase & Co. Sec. Litig.*, 2007 U.S. Dist. LEXIS 93877, at \*24-\*25 (N.D. Ill. Dec. 18, 2007) (holding that incentive compensation "show[s] motive for engaging in the alleged fraud").[22]

Defendants also ignore Suri's reputational incentive to shield integration problems from market scrutiny. Suri held himself out as uniquely skilled at managing post-merger integrations and boasted that, unlike the Company's previous difficulties with integrations, "this time can be different" (¶22) because of his skill in this area and his NBS integration methodology. ¶¶23-24. But when the market learned of the many failures in the Alcatel integration and his earlier statements proved untrue, Defendant Suri was forced to resign his position at Nokia's helm. These facts also support the strong inference of his scienter. *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014) (collecting cases). Numerous publications linked his departure to failures in the integration process and the Company's resultant lack of 5G readiness. *See* LP Exs. 4-7. Suri's resignation because of his integration failures adds to the strong inference of scienter here.

### 4. The Core Operations Doctrine Supports a Strong Inference of Scienter

The Alcatel integration was Nokia's single-most important undertaking during the Class Period. The Complaint pleads in detail that the purpose of the Alcatel acquisition was to enable

---

[22] Defendants' attempt to rebut the strong inference of scienter with Defendant Suri's alleged increasing beneficial stock ownership also fails. *See* Def. Br. at 36-37; *see also Freudenberg*, 712 F. Supp. at 201 (increasing stock ownership "does not demonstrate lack of scienter") (citing *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (stock purchases by defendant could not counteract other strong allegations of scienter). Defendants' similarly attempt to rebut the strong inference of scienter with irrelevant stock buybacks by Nokia. *See* Def. Br. at 39. These buybacks shed no light on Defendant Suri's scienter and cannot overcome the extensive allegations showing his knowledge. *See, e.g.*, *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014) (defendants' stock repurchase plan "weighs neither in favor of nor against an inference of scienter"). Further, Defendants' reliance on *Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018) is misplaced because the stock buybacks there were alleged to have been used to "'prop up' [the company's] earnings per share to conceal [its] inability to meet the guidance." *Id.* at 225. In contrast, there is no such allegation in this case and any Nokia stock buybacks cannot outweigh Defendant Suri's repeated assertions about his direct personal involvement in the integration process.

Nokia to be 5G ready in time, and that the integration of the two companies' operations was therefore Defendants' principal business focus at all relevant times. ¶¶132-135.

The Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter." *Lockheed*, 875 F. Supp. 2d at 371. The doctrine holds that "[k]nowledge . . . can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's . . . statements were false when issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004); *see also Avon*, 2019 WL 6115349, at *20 ("The 'core operations doctrine' permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, even without specific allegations that senior management had actual knowledge of such information."); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("[t]o fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business.").

The unique significance of the Alcatel integration into Nokia and its business adds even more force to the strong inference that Defendants were aware of material problems in the integration process. *See, e.g., Aetna*, 34 F. Supp. 2d at 953–54 (strong inference of scienter as to misrepresentations concerning post-acquisition integration due to defendants' high level executive positions and the significance and importance of the acquisition).

### E.    The Complaint Alleges a Violation of Section 20(a)

Defendants' only grounds for dismissal of the Section 20(a) claim is that the Complaint fails to establish a primary violation of the Exchange Act. Def. Br. at 40. Because the Complaint states a claim for a primary violation against the Individual Defendants, the Court should uphold Plaintiff's

Section 20(a) claim. *See In re Signet*, 2018 WL 6167889, at \*18-\*19.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully submits that the Court should deny

Defendants' motion to dismiss in its entirety.[23]

DATED:  June 30, 2020                              Respectfully submitted,

                                                   ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   CHAD JOHNSON
                                                   NOAM MANDEL
                                                   DESIREE CUMMINGS

                                                   */s/ Chad Johnson*
                                                   ─────────────────────
                                                   CHAD JOHNSON

                                                   125 Park Avenue, 25th Floor
                                                   New York, NY  10017
                                                   Telephone:  212/791-0567
                                                   619/231-7423 (fax)
                                                   chadj@rgrdlaw.com
                                                   noam@rgrdlaw.com
                                                   dcummings@rgrdlaw.com

                                                   ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   SAMUEL H. RUDMAN
                                                   DAVID A. ROSENFELD
                                                   PHILIP T. MERENDA
                                                   58 South Service Road, Suite 200
                                                   Melville, NY  11747
                                                   Telephone:  631/367-7100
                                                   631/367-1173 (fax)
                                                   srudman@rgrdlaw.com
                                                   drosenfeld@rgrdlaw.com
                                                   pmerenda@rgrdlaw.com

---

[23]    Should the Court determine that any part of the Complaint is deficient, Lead Plaintiff respectfully requests leave to amend. As the Second Circuit has held, "it is the usual practice upon granting a motion to dismiss to allow leave to replead." *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (reaffirming "liberal standard" of Rule 15 and recognizing that, "*[w]ithout the benefit of a ruling*, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

*Lead Counsel for Lead Plaintiff*

SCHALL LAW FIRM
BRIAN J. SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  310/301-3335
310/388-0192 (fax)

*Additional Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 30, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Chad Johnson*
CHAD JOHNSON

ROBBINS GELLER RUDMAN
  & DOWD LLP
125 Park Avenue, 25th Floor
New York, NY  10017
Telephone:  212/791-0567
619/231-7423 (fax)
chadj@rgrdlaw.com
